2023-1142

# United States Court of Appeals
# for the Federal Circuit

---

**MIDWEST-CBK, LLC,**

Plaintiff-Appellant,

*v.*

**UNITED STATES,**

Defendant-Appellee.

---

Appeal from the United States Court of International Trade,
Consol, Court No. 17-cv-00154, Judge Jennifer Choe-Groves

---

**PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT,
MIDWEST-CBK, LLC.**

---

John M. Peterson                    Richard F. O'Neill
  *Counsel of Record*                NEVILLE PETERSON LLP
Patrick B. Klein                   701 Fifth Ave Suite 4200-2159
NEVILLE PETERSON LLP               Seattle, WA 98104
55 Broadway, Suite 2602            (206) 905-3648
New York, NY 10006                 roneill@npwny.com
(212) 635-2730
jpeterson@npwny.com

March 1, 2024

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1142

**Short Case Caption** Midwest-CBK, LLC v US

**Filing Party/Entity** Midwest-CBK, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/22/2023

Signature: /s/ John M. Peterson

Name: John M. Peterson

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Midwest-CBK, LLC | | Ganz Holdings, Inc., a privately-held Canadian company. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable              ☐     Additional pages attached

| | | |
|---|---|---|
| Maria E. Celis<br>Neville Peterson LLP | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable              ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF CONTENTS ........................................................................ iii

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE ISSUES.............................................................. 2

STATEMENT OF THE CASE ................................................................. 2

SUMMARY OF THE ARGUMENT ....................................................... 14

ARGUMENT ...................................................................................... 17

I.     Standard of Review.................................................................. 17

II.    The Protested Entries Were Deemed Liquidated By Operation of Law
       Pursuant to 19 U.S.C. § 1504(b)............................................... 18

III.   There is no "Transaction Value" of the Imported Merchandise, under 19
       U.S.C. ¶ 1401a. ...................................................................... 25

       A.   There Has Been No "Sale For Export to the United States"............... 27

       B.   An "F.O.B. Buffalo, New York" Sale, Under the New York UCC,
            is a Domestic Sale. ........................................................... 30

       C.   The Trade Court's Holding that a "Sale for Exportation" Occurs
            Under the Instant Facts Directly Contradicts Decisions Both Trade
            and UCC Case Law. ......................................................... 36

IV.    Midwest's "FOB Buffalo, New York" Sales Cannot be Characterized as
       the Sales Which "Most Directly Caused the Exportation" of the Goods......41

V.     Deductive Value Appraisement is the Proper Methodology Under 19
       U.S.C. § 1401a.......................................................................... 42

CONCLUSION ................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Bell BCI Co. v. United States,* 570 F.3d 1337 (Fed. Cir. 2009) ..............................17

*Brosterhous v. United States*, 737 F. Supp. 1197 (Ct. Int'l Tr. 1990)............. 17, 41

*Butler v. Thomson, et. al.*, 92 U.S. 412 (1876) ........................................................28

*Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.*, 2010 WL 1541504 (N.D. Tex. 2010) ................................................................32

*Chase Manhattan Bank v. Nissho Pacific Corp.*, 22 A.D.2d 215 (1st Dep't 1964)....................................................................34

*Citizens Banking Co. v. Ravenna National Bank,* 234 U.S. 360 (1914)................28

*CMF Industries Inc. v. Ram Winch and Hoist Ltd.*, 2009 U.S. Dist. LEXIS 59713 (W.D. Wash. 2009). ..............................32

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010) ..............................................32

*E.C. McAfee Co. v. United States*, 842 F.23 314 (Fed. Cir. 1988) ........................39

*Five Per Cent Cases*, 110 U.S. 471 (1884).............................................................28

*Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir. 1998) ............. 15, 22, 24

*Greb Industries, Ltd. v. United States,* 64 Cust. Ct. 608 (1970)............................28

*Guess? Inc. v. United States*, 944 F.2d 855 (Fed. Cir. 1991) .................................17

*H.K. & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp. 133 (W.D.N.Y. 1992)...........................................33

*In re Carolina Wine Co.*, 2009 WL 2399944 (Bankr. E.D.N.C. 2009)..................33

*In re Nevins Ammunition, Inc.*, 79 B.R. 11 (Bankr. D. Idaho 1987) ......................32

*In re Sunbelt Grain WKS, ILC*, 406 B.R. 918 (D. Kan. 2009) ..............................33

*J.H. Cottman & Co., v. United States,* 20 C.C.P.A. 344 (1932)............................28

*J.L. Wood v. United States*, 62 C.C.P.A. 25 (1974)........................................ 25, 29

*Ladex Corp. v. Transporte Aereos Nacionales, S.A.*, 476 So. 2d 763 (Fla. Dist. Ct. App. 1985) ....................................32

*Lynteq Inc. v. United States*, 976 F.2d 693 (Fed. Cir. 1992) .................................17

*MEI Int'l, Inc. v. Schenkers Int'l Forwarders, Inc.*, 807 F. Supp. 979 (S.D.N.Y. 1992) .......................................33

*NealCooper Grain Co. v. Tex. Gulf Sulphur Co.*, 508 F.2d 283 (7th Cir. 1974)..................................................................32

*Nissho-Iwai American Corp. v United States*, 982 F.2d 505 (Fed Cir. 1992).. 39, 41

*Orbishphere Corp. v. United States,* 726 F. Supp. 1344 (Ct. Int'l Tr. 1989).. 16, 29, 35, 36

*Pittsburgh Industrial Furnace Co. v. Universal Consolidated Cos.*, 789 F. Supp. 184 (W.D. Pa. 1991) ................................34

*R.J. Saunders v. United States*, 42 C.C.P.A 55  (1955)..........................................39

*S&H Commcns, Inc. v. Seiscor Techs., Inc.*, 221 A.D.2d 156 (1995)....................34

*Sara Corp. v. Sanity Intl Am. Inc.*, 2008 U.S. Dist. 58049 (S.D.N.Y. 2008) ... 32, 33

*St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993).... 15, 21, 23

*Standard Casing Co. v. California Casing Co.*, 233 N.Y. 413 (1922)..................33

*Synergy Sport lnt'l, Ltd. v. United States*, 17 C.I.T. 18 (1993)........................ 29, 40

*United States v. Getz Bros & Co.*, 55 C.C.P.A. 11 ........................................39

*United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933) .................................. 16, 37

*United States v. S.S. Kresge Co. et al*, 26 C.C.P.A. 349 (1939)..............................39

*Universal Electronics Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997)..........18

*Universal Percussion Inc. v. United States*, 19 C.I.T. 546 (1995). ........................21

*VWP of Am., Inc. v. United States*, 117 Fed. Appx. 113  (Fed. Cir. 2004) ...... 42, 43

*VWP of Am., Inc. v. United States*, 175 F.3d 1327 (Fed. Cir. 1999) ............... 25, 29

*Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, 324 Fed. Appx. 117 (2d Cir. 2009)..................................................................................................33

## Statutes
19 U.S.C. § 1401a ............................................................................ passim

19 U.S.C. § 1484 ..........................................................................................7

19 U.S.C. § 1504 ............................................................................ passim

28 U.S.C. § 1295 ..........................................................................................2

28 U.S.C. § 1581 ....................................................................................2, 11

28 U.S.C. § 2107 ..........................................................................................1

28 U.S.C. § 2645 ..........................................................................................1

NY UCC § 2-106 ........................................................................................30

NY UCC § 2-319 ........................................................................................31

NY UCC § 2-401 ....................................................................... 30, 31, 33, 34

NY UCC § 2-509 ........................................................................................32

Trade Agreements Act of 1979, Pub. L. 96-39, 93 Stat. 144 (1979)......................39

## Other Authorities
*Customs Headquarters Ruling 548273 of April 17, 2003* ........................................30

*Customs Headquarters Ruling H165361 of November 1, 2011* ..............................43

Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation Code* (2d ed.) ........................................................................40

U.S. Customs and Border Protectiom, *Bona Fide Sales & Sales For Exportation to the United States; An Informed Compliance Publication* (2005) ...........................................................................................................35

Plaintiff-Appellant, Midwest-CBK LLC, in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure and the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, hereby submits its principal brief in this appeal.

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant Midwest makes the following statement:

1. Counsel for Plaintiff-Appellant are not aware of any action, currently pending in the U.S. Court of International Trade, which will directly affect or be affected by this Court's decision in the instant appeal.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Midwest-CBK LLC, ("Midwest," "Plaintiff-Appellant," or the "Company"), appeals from the final judgment of the U.S. Court of International Trade ("CIT" or "Trade Court") in *Midwest-CBK LLC v. United States*, Slip Op. 23-154, dated October 20, 2023. Appx15, Appx16-Appx19.

Midwest filed a timely notice of appeal on November 8, 2023, pursuant to 28 U.S.C. §§ 2107 and 2645(c) and Rule 4(a)(4) of the Federal Rules of Appellate procedure. The CIT possessed subject matter jurisdiction of this action pursuant to 28

U.S.C. § 1581(a), and this Court has appellate jurisdiction pursuant to 28 U.S.C.

§ 1295(a)(5). The appeal was docketed in this Court on November 14, 2023.

## STATEMENT OF THE ISSUES

1.  Whether the Trade Court properly determined that Plaintiff-Appellant's subject entries were not "deemed liquidated" by operation of law?

2.  Whether the Trade Court properly determined that Plaintiff Appellant's domestic sales to customers, made on the term "FOB, Buffalo, New York, in accordance with the New York Uniform Commercial Code," were  "sales for exportation to the United States," and could therefore serve as the basis for determining dutiable "transaction value" pursuant to 19 U.S.C. § 1401a(b)?

## STATEMENT OF THE CASE

### I.    Plaintiff Appellant's Import Operations

Plaintiff-Appellant was established in 1953 as "Midwest of Cannon Falls, Inc.," a retailer of Christmas ornaments, nutcrackers, wood carvings and similar decorative articles, headquartered in Cannon Falls, Minnesota, where it remained headquartered for all periods relevant to this case.

In 1964, the company established a wholesale division which sold Christmas ornaments and festive decorations to small retailers throughout the United States. Midwest purchased goods from producers in various Asian countries and imported them directly into the United States, warehousing them in Cannon Falls, Minnesota.

The company employed sales representatives, who were assigned particular geographic territories and who visited retailers in the United States to solicit orders, first using paper catalogues which displayed the wares and their prices, and later using electronic catalogues stored in tablet computers.

Terms of sale to customers were free on board ("FOB") Cannon Falls, Minnesota, which meant that the sale from Midwest of Cannon Falls, Inc. to its customer was consummated when the company delivered the goods to the customer's carrier of choice at Cannon Falls. The customer bore the cost of transporting the goods from Cannon Falls to its location.

In 2009, Midwest of Cannon Falls, Inc. was acquired by Blyth, Inc., which merged the company into its CBK Holdings Group, headquartered in Union Falls, Tennessee. The company was renamed "Midwest-CBK Inc." Its headquarters remained in Cannon Falls, Minnesota, but its inventory location was shifted to Union City, Tennessee. The company's business proceeded as before, except that sales to the company's customers were made on "FOB Union City, Tennessee" terms. The customers paid the cost of transporting the goods from Union City, Tennessee, to their respective locations.

In 2011, Midwest-CBK Inc. was acquired by South Carolina-based MVP Group International Inc. The company's corporate headquarters, operations and sales facilities remained in Cannon Falls, Minnesota, and its inventory operations

remained in Union City, Tennessee. Midwest-CBK, Inc. continued to import goods directly into the United States and sell them to customers on "FOB Union City, Tennessee" terms.

During these periods, Midwest-CBK, Inc.'s goods were imported directly into the United States, and appraised on the basis of "transaction value," 19 U.S.C. § 1401a(b), according to the prices at which foreign vendors sold the goods to Midwest "for export to the United States." There was never any suggestion that sales to its United States customers were anything other than domestic sales. The prices in those sales were never used for Customs appraisement.

## II.    <u>Developments Leading to this Case.</u>

In late 2012, the assets of Midwest-CBK, Inc. were acquired by Giftware Holdings LLC ("Giftware Holdings"), a Delaware LLC controlled by Canadian investors, the Ganz family. These assets were later transferred to Midwest-CBK, LLC ("Midwest")–the corporate entity who is the Plaintiff-Appellant in this action. Midwest continued to have its headquarters in Cannon Falls, Minnesota, and employed the same staff of sales representatives.

As the Ganz family controls substantial commercial warehouse properties in Canada, Midwest's inventory was moved to a warehouse just outside the Toronto city limits at 610 Hanlan Road, Woodbridge, Ontario, where Midwest entered a market-rate lease with Ganz Realty Ltd. for warehouse space. Midwest hired employees

to staff the warehouse. Midwest continued to be headquartered in Cannon Falls, and its sales force continued to be located in, and work from, the United States.

The only change evident to Midwest's customers was that the terms of sale in commercial documents were changed from "*FOB Union City, Tennessee*" to "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code.*" Midwest's sales to its customers remained purely domestic sales. Midwest continued to obtain state sales tax waivers from its customers. Customers indicated that they were resellers of the goods being purchased, which meant that Midwest did not need to collect state sales taxes from its customers in these domestic sales.

Midwest's purchase terms with its suppliers also changed. It now purchased goods "for export to the Canada," [1] at prices which could not be used as the basis for determining "transaction value" pursuant to 19 U.S.C. § 1401a(b) when the goods entered the United States. Goods Midwest bought from foreign vendors were shipped to the Port of Vancouver, British Columbia, Canada; and then shipped by rail and truck across Canada to the Woodbridge, Ontario, warehouse. At all times, Midwest remained solely a United States company and did not establish any Canadian affiliate or subsidiary.

---

[1] Midwest has a few "national account" customers—*i.e.,* large retailers such as Kohl's, to whom it continued to ship merchandise directly from foreign countries to the United States. The retailers generally acted as importers of record. These national account sales are not involved in this appeal.

5

Business operations continued as before: Midwest sales representatives solicited orders from retailers throughout the United States;[2] the orders were transmitted electronically to Midwest's headquarters in Minnesota, where they were reviewed and approved by Midwest's management. Once approved, the orders were transmitted electronically to the warehouse in Woodbridge, Ontario for fulfillment. A "pick list" would be generated, directing warehouse workers to select warehoused inventory for order fulfillment. Once picked from inventory, the order was placed in one or more boxes, labeled for delivery to the customer using a waybill form generated from the customer's appointed carrier (most typically, UPS or FedEx). The orders was then loaded into a truck—*i.e.,* third party contracted by Midwest—at the loading dock. Either when the truck reached its maximum loading capacity, or at the end of the workday, the truck departed from the Woodbridge warehouse to Buffalo, New York.

When the goods arrived in Buffalo, New York, they were entered with CBP for consumption, with Midwest designated as importer of record. Midwest's right to act as importer of record derived from the fact that it was the "owner" of the mer-

---

[2] In addition, customers were able to submit online orders, whereby, the sales representative for the territory where the customer was located received credit for the sale, and these sales were made on the same "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" terms as all other sales.

6

chandise under 19 U.S.C. § 1484(a)(2)(B). Midwest paid all Customs duties, brokerage, forwarding charges, and transportation charges, and handled all Partner Government Agency requirements (*e.g.,* filing reports with the United States Fish and Wildlife Service ("FWS")).

After clearing Customs, the goods were transported to the UPS facility in Buffalo (Cheektowaga), New York, for delivery to carriers, or for temporary storage. Under the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales term, title to the goods and risk of loss transferred from Midwest to its customer once the goods were turned over to the customer's designated carrier— in Buffalo, New York—after all United States Customs clearance formalities had been completed.

Thus, from the viewpoint of Midwest's customers, nothing had changed except the delivery point where they received title to their goods. The prices in Midwest-CBK LLC's catalogues were explicitly based on "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales terms. These were "fully loaded" prices, designed to allow Midwest to recoup all of its costs, including the considerable expenses of operating its United States headquarters and sales staff, the company's profits, and recoupment of expenses such as international transportation and Customs duty expenses—none of which costs are included in *any* of the bases

7

of Customs' appraisement set out in 19 U.S.C. § 1401a. The sales were by their terms domestic sales.

### III.    Midwest Enters Using "Deductive Value" 19 U.S.C. § 1401a(d).

Midwest's management understood that, under the new structure, there was no sale of the goods "for export to the United States." They also understood that, from a United States customs duty perspective, this supply chain structure was less efficient than when the goods had simply been purchased from vendors "for export to the United States."[3]

With no sale of the goods "for exportation to the United States" Midwest recognized that a different basis of Customs appraisement was needed under the hier-

---

[3] For instance, where goods were purchased from Asian vendors "for export to the United States," costs of ocean shipping from the country of origin to the United States would not be included in dutiable value. Where the goods were purchased "for export to Canada," however, no sale "for export to the United States" could be established. And regardless of the basis of United States appraisement selected, the dutiable value would include (1) the cost of transporting the goods from Asia to Canada, (2) the costs of shipping them across Canada to the warehouse location, (3) warehousing costs, and (4) costs of repacking the goods in Canada. These costs had not been subject to duty when the goods were exported directly to the United States. However, as noted above, there were business reasons for Midwest's decision to store its inventory in Canada, and United States duty concerns were not paramount.

8

archy set out in 19 U.S.C. § 1401a. There was no sale of "identical or similar merchandise" for exportation to the United States, so appraisement under 19 U.S.C. § 1401a(c) was not available.[4]

Turning to the next basis in the statutory hierarchy, Midwest determined to make entry using "deductive value" 19 U.S.C. § 1401a(d), and advised Customs at the Port of Buffalo of the fact.[5] Appx42.

### IV.    Customs Audits and Rate Advances Midwest's Entries

After advising CBP of its intention to make entry using "deductive value," Midwest did so through 2013, 2014, 2015, and into 2016. In 2014, Customs "extended" the liquidation of Midwest's entries pursuant to 19 U.S.C. § 1504(b), and requested that its Office of Regulatory Audit conduct an audit of Midwest's appraised values. Midwest fully cooperated in the audit.

CBP's audit field work lasted from February 24 through February 26, 2014, during which time, CBP collected information to appraise the subject entries. Midwest provided substantial documentation and never received any notices of deficiency. All initial and supplemental requests for information were issued by CBP to

---

[4] While Midwest continued to have some direct exports to the United States for "national accounts," these goods were neither identical nor similar to the goods at issue in this case.

[5] Midwest did not have production cost information from which a "computed value," 19 U.S.C. § 1401a(e), could be calculated.

Midwest, and all requested information was provided by Midwest to CBP, on or before June 14, 2014.

Confoundingly, CBP continued to extend liquidation of Midwest's entries for two more years, acting under claimed authority of 19 U.S.C. § 1504(b). As discussed below, these further extensions were unlawful.

Customs did nothing for more than a year after receiving the last of the information needed to appraise Midwest's goods. In a draft Audit Report dated July 2015, the Auditors concluded that Midwest's entries should be appraised according to "transaction value," at the "FOB Buffalo, New York" prices charged to Midwest's customers. Plaintiff submitted its legal comments on the draft audit report (which contained no new factual information), and on July 8, 2015, Midwest requested that the auditors seek Internal Advice from Customs Headquarters regarding the proper basis of appraisement of Midwest's merchandise.

On February 24, 2016, the Customs auditors issued their final audit report, repeating their conclusion that Midwest's imported merchandise should be appraised on "transaction value," according to the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" prices charged to Midwest's customers.[6] On

---

[6] Notably, the Customs Auditors did not await Customs Headquarters' response to their Internal Advice request before issuing the final report.

July 1, 2016, Customs Headquarters issued *Customs Headquarters Ruling H275056*, which reached the same conclusion.

However, Customs did not appraise any of Midwest's merchandise in liquidation using the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" prices. Rather, working from Midwest's 2013 financial statements, Import Specialists at the Port of Buffalo calculated an arbitrary "uplift" equal to 123.18% of Midwest's entered "deductive values"—effectively liquidating the goods at 223.18% of the entered values. This method did not correspond with *any* of the statutory bases of appraisement contained in 19 U.S.C. § 1401a.

Midwest protested these liquidations, noting that the "uplift" calculation was not a lawful method for appraising its merchandise, and that, in any event, the "uplift" calculation suffered from numerous computational errors. CBP accepted that it had made computational errors, and granted some of Midwest's protests, reliquidating its entries at entered deductive values, plus an "uplift" of 75.75%—effectively, 175.75% of entered value.

Midwest protested both the original liquidations and the reliquidations; and upon denial of its protests, commenced actions in the United States Court of International Trade ("CIT" or "Trade Court") under 28 U.S.C. § 1581(a), which were later consolidated. Appx23.

11

### V.    Proceedings at the Trade Court.

The Trade Court bifurcated the issue before it into two phases. Appx34.  Phase One concerned the following issues:

(1) whether Plaintiff's import transactions reflect a sale "for exportation to the United States" and

(2) whether the subject entries were deemed liquidated "as entered" by operation of law.

Appx34. The Phase One issues were submitted to the Court upon cross-motions for summary judgment. Appx34-Appx35. Phase Two would concern any remaining issues, including whether CBP's calculations of value during liquidation were correct, and whether deductive value was the appropriate basis of appraisement. Appx34-35.

On May 20, 2022, the Trade Court ruled on the issues in Phase One, finding that: (1) Midwest's "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales to its customers were sales for exportation to the United States under 19 U.S.C. § 1401a(b); and (2) that the subject entries had not been deemed liquidated by operation of law. Appx35.

After the Trade Court denied Midwest's request to certify the Phase One determinations for interlocutory appeal, the parties turned to Phase Two. Appx29. The first task in Phase Two was to determine whether the Trade Court's determination on the proper basis of appraisement represented a victory for Midwest or for the Government. Appx17. Since Customs had not appraised any of the protested entries

based on the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales prices the Trade Court had held appropriate, it was necessary to make a comparison of values determined using CBP's arbitrary "uplift" method with those derived from the these prices.

The task proved impossible. There were millions of "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales to Midwest's customers, embracing over 12,000 distinct products, and hundreds of different tariff classifications used. Each individual Customs entry typically featured several hundred such sales and thousands of different items. Many sales to customers were split across different entry lines (and consolidated with other customers' purchases on entry lines). And as Midwest had ceased active operations at the end of 2018,[7] the company had few resources to assist in such a task.

On October 10, 2023, Midwest, with the government's consent, requested the Trade Court enter judgment of dismissal against it based its Phase One decision, stipulating that (Appx18):

> … should the Court of Appeals for the Federal Circuit affirm this Court's final judgment, the case will be dismissed and that plaintiff will abandon all further claims for the return of the disputed duties that form the basis for this lawsuit. Plaintiff further stipulates that, should this

---

[7] At the end of 2018, Midwest wound up active operations and its sales operations were consolidated with those of the giftware wholesale Ganz, also owned by the Ganz family.

13

matter be remanded to the trial court for any purpose, plaintiff will not present any further evidence as to the calculation of transaction value.[8]

On October 20, 2023 the Trade Court entered such judgment and this appeal was followed. Appx15.

## SUMMARY OF THE ARGUMENT

Midwest's appeal rests on two grounds. *First,* Midwest submits that Customs' value advances in liquidation of its entries were unlawful. The entries had already "deemed liquidated" under 19 U.S.C. § 1504(a)(1) at the rates and amounts of duty asserted at the time of entry. 19 U.S.C. § 1504(a)(1) provides that entries not liquidated by CBP within one year of the entry date are "deemed liquidated" on the anniversary of the entry date "at the rate of duty, value, quantity, and amount of duties asserted by the importer of record." Section 504(b) of the Tariff Act authorizes the Secretary of the Treasury to issue up to three (3) one-year extensions of the liquidation period if certain conditions are met:

> (b) Extension
>
> The Secretary of the Treasury may extend the period in which to liquidate an entry if—
>
>> (1) the information needed for the proper appraisement or classification of the imported or withdrawn merchandise, or for determining the correct drawback amount, or for ensuring compliance with applicable law, is not available to the Customs Service; or

---

[8] Midwest would, if necessary submit evidence on remand related to the deductive values it had used to make entry.

14

(2) the importer of record or drawback claimant, as the case may be, requests such extension and shows good cause therefor.

Here, the statutory conditions are not met. Midwest, as importer, did not request that CBP extend the liquidation of its entries, but more importantly, Customs had received all "information needed for the proper appraisement" of Midwest's merchandise no later than **June 14, 2014**. CBP had no legal basis to further extend liquidation of Midwest's entries, and any such purported extensions are void, with the result that the entries were "deemed liquidated" under 19 U.S.C. § 1504(a) at the values and rates of duty contained in the entry documents.

While CBP has discretion to extend liquidation periods when it is awaiting the receipt of information necessary for appraisement, *see e.g., St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993), it has no discretion to extend the liquidation period after it has received all necessary information. *See e.g., Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir. 1998). This point is addressed first in this appeal because, if the Court rules in Midwest's favor, it may obviate the need to reach the second issue.

Second, Midwest challenges the Trade Court's holding that Midwest's sales to its customers, made on purely domestic terms "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" constitute sales "for exportation to the United States," which can serve as the basis of dutiable "transaction value" under 19

15

U.S.C. § 1401a(b). These are purely domestic sales which cannot serve as the basis of Customs appraisement.

As the Trade Court held previously in *Orbishphere Corp. v. United States,* 726 F. Supp. 1344 (Ct. Int'l Tr. 1989), the fact that goods are physically located outside the United States when a domestic sale is agreed to does not transform the domestic sale into a sale "for exportation to the United States" to be used for calculating a dutiable "transaction value." The Trade Court improperly rejected the holding in *Orbisphere* because it was based on a decision issued under a prior valuation statute, *United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933). However, as discussed herein, *Orbisphere* was decided under the current value statute, and the decision of this Court's predecessor in *Massce* remains relevant to the identification of sales in the current commercial context.

In the instant case, there is no sale "for exportation to the United States." Midwest structured its sales so that no sale "for exportation to the United States" could occur. Midwest's goods moved from Canada to the United States pursuant to an internal inventory transfer between two Midwest locations, all without any sale. Midwest retains title to the goods and risk of loss from the time they leave the Woodbridge, Ontario, facility, and through the period when the goods were entered for consumption into the United States and cleared through Customs. Title transferred

to Midwest's customers in the United States after the goods are delivered to the customers' designated carriers, per the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" terms of sale.

To the extent the Trade Court's decision treats Midwest's domestic sales to its customers as the sales which "cause" the goods to be shipped to the United States, the Court's decision would be reinstating the rule set out in *Brosterhous v. United States*, 737 F. Supp. 1197, 1199 (Ct. Int'l Tr. 1990), which this Court explicitly overruled in *Nissho-Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992).

The decision of the Trade Court below should be vacated, and this case remanded for further proceedings consistent with this Court's opinion.

## ARGUMENT

### I.  Standard of Review.

This Court reviews legal holdings *de novo* and examines factual findings for clear error. *Bell BCI Co. v. United States,* 570 F.3d 1337, 1340 (Fed. Cir. 2009). The Court also reviews the lower court's interpretation of statutory provisions *de novo* and without deference. *Lynteq Inc. v. United States*, 976 F.2d 693, 696 (Fed. Cir. 1992); *Guess? Inc. v. United States*, 944 F.2d 855, 857 (Fed. Cir. 1991). This Court reviews decisions of the CIT denying motions for summary judgment, and granting cross-motions for summary judgment, *de novo*.

Where, as here, matters are resolved upon summary judgment, and there are no disputed factual issues, this Court's inquiry resolves entirely into one of law, which this Court reviews *de novo* and without regard to any presumption of correctness which might otherwise attach to Customs' determination in liquidation. *See Universal Electronics Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997).

## II.    The Protested Entries Were Deemed Liquidated By Operation of Law Pursuant to 19 U.S.C. § 1504(b).

The entries at issue were liquidated by operation of law, as entered, pursuant to Section 504(b) of the Tariff Act, 19 U.S.C. § 1504(b).  Midwest submits that CBP had no basis to extend liquidation of entries after June 14, 2014, because at that time, CBP had in its possession "the information needed" for the appraisement of Midwest's entries. *Id.* The consequence of CBP's unjustified extensions is that the illegally extended entries were liquidated "as entered," by operation of law, on their anniversary dates.

By law, CBP is obligated to liquidate entries within one year of their date of entry. 19 U.S.C. § 1504(a)(1). If CBP fails to liquidate any entry within one year, the entry is deemed liquidated "by operation of law" at the rate and amount of duty asserted by the importer at the time of entry. Extensions of the one year liquidation period are permitted in certain circumstances where: (i) "the information needed for the proper appraisement ... is not available to [CBP]" or the importer requests an extension of liquidation (ii) notices of each extension are provided to the importer

18

and its surety; and (iii) the cumulative extensions of the liquidation period may not bring the liquidation date beyond four years from the date of entry (*i.e.*, only three one-year extensions of the liquidation period are possible). 19 U.S.C. § 1504(b).

Here, Midwest never requested an extension of liquidation of the protested entries. Rather, CBP officials, on their own initiative, extended the liquidation of the protested entries while engaged in a "quick response audit" of Midwest's entries. We have no doubt that extending liquidation is proper when CBP is gathering or receiving information; but once the information necessary for appraisement of the goods (in this case) was received – on June 14, 2014 – the statutory predicate for further extensions is no longer operative.

Midwest fully cooperated with Customs auditors.  CBP's audit field work began on February 24, 2014, and continued through February 26, 2014. During this time, CBP's audit team gathered information to appraise the subject entries. Midwest provided substantial documentation and never received a notice of deficiency. **Initial and supplemental requests for information were issued by CBP to Midwest, and all requested information was provided by Midwest to CBP, <u>on or before June 14, 2014.</u>**

Despite several requests from Midwest for status updates from CBP, there was **no further correspondence from CBP for more than a year, until, July 2015** when the auditors issued the Draft Audit Report, Appx43, and invited Midwest to

comment thereon. Because CBP's Draft Audit Report was so brief— panning only one-and-a-half pages in length, and bereft of citations to evidence or authority— Midwest submitted its comments very quickly. Appx43. This submission consisted solely of legal commentary, with no new factual information. Thus, CBP had received the last piece of information that it "needed" to appraise the protested entries more than a year before the date when the auditors issued the Draft Audit Report.

Customs then went silent for another seven months. Nothing further was heard from CBP until February 1, 2016, when Raymond Baker, Assistant Regulatory Audit Director for the Port of Buffalo, contacted Midwest's counsel to advise that a final audit report would be issued forthwith. The final audit report was issued on February 24, 2016. Appx43.

Almost two months later, on March 28, 2016, an Import Specialist at the Port of Buffalo issued a CF 29 Notice of Action which indicated that certain entries (included in the protests which are the subject of this action) would be liquidated with the 123.13% uplift. Appx44. The first of these liquidations occurred on April 8, 2016, which is nearly two years after CBP's auditors received the last of the information requested from Midwest, and almost exactly two years after the agency received the Midwest 2013 financial report on which the liquidated values were based. Subsequently, by letter dated April 25, 2016, Appx44, the Import Specialist ex-

plained the basis of CBP's 123.13% uplift calculation. According to CBP's assessment was based solely on information taken from financial statements which Midwest had provided to CBP in April 2014. It was not based on the "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" prices which Midwest charged its United States customers.

From the foregoing, it is clear that during the period June 14, 2014 through April 8, 2016, CBP was not lacking any of the information needed to calculate the appraised value of Midwest's entries. The consequence is that all further extensions of liquidation after June 14, 2014 are null and void and that the entries at bar were deemed liquidated, as entered, on their respective anniversary dates falling within that time. 19 U.S.C. § 1504(b).

It is well-established that CBP may not extend the liquidation of an entry without statutory cause, and the statute is clear that an extension is only valid if CBP lacks "the information needed for the proper appraisement" of an importer's entries. *Id.* Where CBP does not require additional information to liquidate an entry, and is not awaiting the submission of data necessary for liquidation, no basis in law exists for extending liquidation under 19 U.S.C. § 1504(b). *See e.g., St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993); *Universal Percussion Inc. v. United States*, 19 C.I.T. 546 (1995).

.

21

In *Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir. 1998), CBP officials sought information that they deemed necessary to appraise certain merchandise. There were deficiencies in the data which the importer provided, but CBP took no action to liquidate the entries for more than three years, and did not reach out to the importer with a notice of deficiency or request any new or additional information. This Court held "[i]n light of this record, a reasonable fact finder could determine that Customs did virtually nothing for nearly two years." *Id.* at 856. Notably in *Ford*, CBP defended its extensions of liquidation on the basis that it was conducting a fraud investigation, but the Court held this merely created an issue of fact to be decided at trial.[9]

A full airing of the facts in this case reveals that CBP's delay was unreasonable, resulting in the affected entries being deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504(a). Unlike *Ford,* Customs in this case was not conducting any investigation of the importer and the government did not so contend.[10] In this case, clearly CBP did not need any additional information to appraise Midwest's goods. The Import Specialist letter of April 25, 2016, Appx44, further demonstrates

---

[9] Stated another way, the information required by Customs which would justify extension of liquidation of an entry cannot be information Customs is awaiting to receive from itself.

[10] Had the government contended that it was awaiting information after June 14, 2014, this would have established a material question of fact, precluding the Trade Court's entry of summary judgment.

that CBP had all of the information required for the appraisements it *did* perform in early 2014.

CBP's own internal deliberations concerning the proper basis of appraisement of Midwest's goods do not constitute a "need" on the agency's part for additional information needed to appraise. Mere lassitude, or prolonged internal deliberations, do not provide a basis for extending the liquidation period.

CBP asserts that during the period from June 2014 until April 2016, the agency was engaged in various forms of internal "review." Appx60-Appx61. Finally, in February 2016 the final audit report was published. The Government asserts—without citation to authority—that liquidation, however, could not occur absent a final report.[11] This is untrue. This contention is particularly ironic in the instant case, where CBP liquidated Midwest's entries in a manner which disregarded the conclusions of the report entirely.

Citing this Court's decision in *St. Paul Fire & Marine Ins. Co v. United States*, 6 F.3d 763 (Fed Cir. 1993), the Trade Court asserted that CBP's decision to extend liquidation in this case should be reviewed according to an "abuse of discretion" standard. *St. Paul* is inapposite, however. In *St. Paul*, Customs had requested information from an importer, who failed to provide it, and then extended liquidation of

---

[11] It may be noted that the vast majority of CBP audits are audits of entries already liquidated.

entries in the (wan) hope the information would be received. Customs liquidated the importer's entries with a duty increase, and demanded payment from the importer's surety. The surety argued that the extensions were improper, and that the entries should be considered "deemed liquidated." This Court held that since the statutory basis for extending liquidation still existed—Customs lacked information necessary to properly liquidate the entries – the agency had discretion to extend liquidation.

That is not the case here. Customs had all the information it needed to appraise Midwest's entries by June 14, 2014. At that point the statutory condition for further extensions had disappeared, and the limit on liquidation set out in 19 U.S.C. § 1504(a) was operative. Nothing in §1504 provides Customs with any discretion in that situation.

This case more closely resembles *Ford Motor Co. v. United States*, 157 F.3d 849, 855 (Fed. Cir. 1998), where this Court held that "the Court of International Trade cannot uphold a decision to extend a liquidation if an importer 'eliminates all reasonable bases for making that decision.'"

Stated another way, Customs has discretion under 19 U.S.C. § 1504(b) until it does not. If it is still seeking information necessary to do its job, it has discretion to extend liquidation. Once it receives that information, its discretion disappears. Any other interpretation robs the statutory limitation on liquidation of all force and meaning.

24

Nor can the government argue that its internal deliberations regarding information received from the importer provides cause for further extending the liquidation of entries. Analysis and liquidation are precisely the tasks which 19 U.S.C. § 1504(a)(1) commands be done with alacrity. Nor can the government credibly claim that it needed to issue its Final Audit Report before liquidating, when the actual liquidations were performed without regard to that report, using information provided to Customs years earlier.

This Court should conclude that Midwest's entries liquidated by operation of 19 U.S.C. § 1504(a) "at the rate of duty, value, quantity, and amount of duties asserted by the importer of record." *Id.*

## III.   There is no "Transaction Value" of the Imported Merchandise, under 19 U.S.C. § 1401a.

The principal basis of appraisement for goods imported into the United States is "transaction value," defined at 19 U.S.C. § 1401a(b) as "the price actually paid or payable for the merchandise **when sold for exportation to the United States**," plus certain statutory additions not applicable here. There can be no "transaction value" of imported merchandise, unless two conditions are satisfied:

(1) There must be a "sale" of the merchandise, that is, "a transfer of title from one party to another for consideration," *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1339 (Fed. Cir. 1999); *see J.L. Wood v. United States*, 62 C.C.P.A. 25, 33 (1974); and

(2) The sale must be "for exportation to the United States," that is, an international sale in which the goods enter the customs territory of the United States.

If the merchandise undergoing appraisement was not the subject of a sale "for exportation to the United States, it must be appraised according to one of the other bases of appraisement set out in 19 U.S.C. § 1401a, which are applied in hierarchical order.[12]

---

[12] The statutory bases of appraisement are set out in 19 U.S.C. § 1401a(a)(1) as follows:

Sec. 1401a. Value

(a) Generally

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

(A) The transaction value provided for under subsection (b) of this section.

(B) The transaction value of identical merchandise provided for under subsection (c) of this section, if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2) of this section.

(C) The transaction value of similar merchandise provided for under subsection (c) of this section, if the value referred to in subparagraph (B) cannot be determined.

(D) The deductive value provided for under subsection (d) of this section, if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternative valuation under paragraph (2).

(E) The computed value provided for under subsection (e) of this section, if the value referred to in subparagraph (D) cannot be determined.

While in this case, there is a "sale," the second requirement is not met. The sales by Midwest to its customers are not sales "for export to the United States." Midwest owns the merchandise from the time it is shipped by the foreign manufacturer/seller. It continues to own the goods while they are stored in Canada, and when they are transferred from the Canadian warehouse to the distribution center in Buffalo, New York. The bill of lading and other documents accompanying the goods from Canada to the United States confirm that the shipment is a mere consignment, from one Midwest (storage) location to another (delivery) location, and that there is no sale of goods for exportation to the United States

The "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" sales from Midwest to its customer are sales by a domestic seller to domestic customers, procured by a United States-based sales staff, and effected by delivery to the customer at a designated delivery point in the United States. The terms of delivery are governed by State law, in particular the New York Uniform Commercial Code.

## A.     There Has Been No "Sale For Export to the United States"

As required by 19 U.S.C. § 1401a(b), analysis begins by determining whether transaction value can be used to appraise the merchandise entered into the United

---

(F) The value provided for under subsection (f) of this section, if the value referred to in subparagraph (E) cannot be determined.

States in the subject entries. The first question in this inquiry is whether, under the instant facts, there is a *bona fide* sale at arm's length between a buyer and seller.

The term "sale" has an established definition consistent with its common meaning and that intended by the Tariff Act and the UCC. According to *Greb Industries, Ltd. v. United States,* 64 Cust. Ct. 608, 617 (1970), the term "sale is defined as a contract by which the absolute ownership of property is transferred from one person to another for a price, sum of money, or other consideration." Likewise, in *J.H. Cottman & Co., v. United States,* 20 C.C.P.A. 344, 356 (1932), the Court defined sale as "a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or, loosely, for any consideration." This definition, according to the Court, "is the usual meaning given to [sale] by the courts, unless by accompanying language, some other meaning is evidently intended." *Id.* (citing *Citizens Banking Co. v. Ravenna National Bank,* 234 U.S. 360 (1914)); *Butler v. Thomson, et. al*., 92 U.S. 412, 414-15 (1876); *Five Per Cent Cases*, 110 U.S. 471, 478 (1884). The Supreme Court has held that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." *Id.* at 478. In the context of Section 402 of the Tariff Act, there is no reason to believe that "sale" should have any meaning besides its ordinary meaning. 19 U.S.C. § 1401a.

28

All of the foregoing definitions of "sale" consistently require a transfer of ownership for consideration. The Trade Courts have carefully scrutinized whether a transfer has occurred in a variety of contexts. *See e.g., J.L. Wood v. United States,* 62 C.C.P.A. 25, 33 (1974); *Orbisphere Corporation v. United States*, 726 F. Supp. 1344, 1357-58 (Ct. Int'l Trade 1989); *Synergy Sport lnt'l, Ltd. v. United States*, 17 C.I.T. 18, 19-21 (1993); *VWP of America Inc. v. United States*, 175 F.3d 1327, 1339 (Fed. Cir. 1999). In this case, the "FOB Buffalo" sales by Midwest to its customers are bona fide sales.

However because the sales occur entirely in the United States, they are not sales "for export to the United States. There is no "meeting of the minds" between buyer and seller to contract for an international sale of goods.

An apt comparison would be the purchase of a Mercedes-Benz automobile. A customer visits a Mercedes dealer in downtown Buffalo, and orders a vehicle which is to be delivered at the dealer's premises. The dealer and purchaser treat the sale as a "domestic one," with the dealer charging the buyer applicable sales taxes. This domestic sale is not transformed into a "sale for exportation" merely because (unbeknownst to the customer) the vehicle is outside the United States when the sales agreement is made.

Midwest sales were purely domestic sales. Customs has consistently ruled that sales occurring domestically are not sales "for exportation to the United States" and

cannot serve as the basis for a "transaction value" appraisement. *See, e.g., Customs Headquarters Ruling 548273 of April 17, 2003*.

**B.    An "F.O.B. Buffalo, New York" Sale, Under the New York UCC, is a Domestic Sale.**

If there remains any doubt that the prevailing elements of a sale require a transfer of title for consideration, the New York UCC, which governs Midwest's sales to its United States customers, is clear. It offers the following definition: "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." *See* NY UCC § 2-106. Addressing the transfer of title to a buyer, NY UCC § 2-401(1) provides that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." With an emphasis on the conditions of the sales contract, the law further states:

> (1) Unless otherwise explicitly agreed title passes to the buyer **at the time and place at which the seller completes his performance with reference to the physical delivery of the goods**, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
>
>> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>>
>> (b) if the contract requires delivery at destination, title passes on tender there.

30

NY UCC § 2-401(2) (emphasis added). Of course, here, the commercial sales documents specifically require delivery at a particular destination, and thus NY UCC § 2-401(2)(B) governs.

To this end, the *pro forma* invoice shows that the merchandise is exported from the Woodbridge warehouse on consignment to Midwest at an address in Buffalo, New York without any transfer of title or risk of loss occurring. Appx22. The packing slip further specifies that the terms of sale require that the goods be delivered to the customer "F.O.B. Buffalo, New York," while the invoice is even more explicit, specifying "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code.*"

The term "F.O.B." is governed by NY UCC § 2-319 (emphasis added), which provides in pertinent part:

(1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which

(a) [Inapplicable]

(b) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this Article (Section 2-503).

Midwest incurs all expenses associated with the movement of goods from Woodbridge to the "F.O.B. Buffalo, New York" delivery point. There is no question that

31

Midwest bears the risk of loss associated with this movement. Certainly, the NY UCC supports this position. *See* NY UCC § 2-509.

Terms of the agreement between the parties are evident in the transaction documents themselves. Midwest's Terms and Conditions, featured in its catalogue and website offering materials, expressly indicates that "Freight charge is in addition to our Buffalo NY F.O.B. cost." The invoice to the customer specifically states the terms of sale and delivery: "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code.*" Appx38-Appx39.

The UCC is explicit in requiring a seller of goods on "FOB" terms to make the goods available to the buyer at the named place, and bear the risks and costs of putting them into the buyer's possession.[13] Delivery to the carrier constitutes delivery to the buyer.[14] As described in *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1255 n.2 (11th Cir. 2010), "the use of the term F.O.B Savannah

---

[13] *Ladex Corp. v. Transporte Aereos Nacionales, S.A.*, 476 So. 2d 763,765 (Fla. Dist. Ct. App. 1985) (distinguishing between "shipment" and "destination" contracts); see also e.g., *In re Nevins Ammunition, Inc.*, 79 B.R. 11, 16-17 (Bankr. D. Idaho 1987) (same); *NealCooper Grain Co. v. Tex. Gulf Sulphur Co*., 508 F.2d 283, 291 (7th Cir. 1974) (same); *Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.*, 2010 WL 1541504 at *3 n.25 (N.D. Tex. 2010) (same).

[14] *Sara Corp. v. Sanity Intl Am. Inc.*, 2008 U.S. Dist. 58049 at *18-19 (S.D.N.Y 2008) and citations therein; *CMF Industries Inc. v. Ram Winch and Hoist Ltd.*, 2009 U.S. Dist. LEXIS 59713 (W.D. Wash. 2009).

in this case means that [seller] had the obligation to tender the product at its plant in Savannah and bore the risk of loss for the product until it was tendered."

Consequently, the term "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" means that merchandise is delivered when the seller hands it over to the buyer's conveyance at the seller's facility in New York. Delivery of the merchandise F.O.B. to the seller's facility means that the sale takes place there. *See* NY UCC § 2-401(2)(a). Under this provision, title passes upon delivery in the absence of a contrary agreement between the parties.[15] *See MEI Int'l, Inc. v. Schenkers Int'l Forwarders, Inc*., 807 F. Supp. 979, 986 n.2 (S.D.N.Y. 1992) ("[u]nder U.C.C. § 2-401(2), title to goods passes at the time and place that the seller completes performance with respect to the physical delivery of the goods"); *H.K. & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp. 133, 141-42 (W.D.N.Y. 1992). As set forth in *Sara Corp. v. Sainty Intl Am., Inc.,* 2008 U.S. Dist. 58049 (S.D.N.Y. 2008), "[t]he general rule is that upon a sale 'f.o.b. the point of shipment,' title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk." *Id.* at *18-19 (citing *Standard Casing Co. v. California Casing Co.*, 233 N.Y. 413, 416 (1922)). Thus, "[o]rdinari1y, delivery to the carrier

---

[15] *See e.g., Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, 324 Fed. Appx. 117, 119-120 (2d Cir. 2009); *In re Sunbelt Grain WKS, ILC*, 406 B.R. 918, 933 (D. Kan. 2009); *In re Carolina Wine Co.*, 2009 WL 2399944 at *2 (Bankr. E.D.N.C. 2009).

is delivery to the buyer." *Chase Manhattan Bank v. Nissho Pacific Corp.*, 22 A.D.2d 215, 221 (1st Dep't 1964). "[T]he seller must bear the risk and expense of putting the goods in the possession of an independent carrier at the seller's location." *Pittsburgh Industrial Furnace Co. v. Universal Consolidated Cos.*, 789 F. Supp. 184, 188-89 (W.D. Pa. 1991) (construing UCC 2-319(l)(a)).

NY UCC § 2-401(2)(a) permits the parties to specify in a contract the point at which title passes. *See e.g.*, *S&H Commcns, Inc. v. Seiscor Techs., Inc.*, 221 A.D.2d 156 (1995). In *S&H*, the contract specified that title passed at the place of delivery, and thus did not depart from the general rule set forth in UCC § 2-401(2). Consequently, title passed when the merchandise was handed over to the carrier, the same as if the contract were silent regarding title passage.

CBP's own Informed Compliance Publication regarding "sale for exportation" contains the following passage:

> 8. What factors indicate whether property or ownership in property was transferred?
>
> In determining whether property or ownership in property has been transferred from a potential seller to a potential buyer, CBP considers whether the potential buyer has assumed the risk of loss for the imported merchandise (i.e., the potential buyer was liable for the imported merchandise if lost or damaged during shipment) and acquired title to the imported merchandise (i.e., the potential buyer legally possesses or owns the imported merchandise). In addition, CBP may examine whether the potential buyer paid for the merchandise (i.e., consideration passed between the potential buyer and seller for the imported merchandise). Transactions involving goods that are shipped on consignment do not constitute bona fide sales because the goods are not the subject of a

34

sale. Therefore, the transaction value method of appraisement cannot be used to appraise goods shipped to the United States on consignment. Other examples where imported goods are not considered to be the subject of a sale include gifts, samples and promotional items furnished free of charge; goods imported under a leasing contract; and goods that were loaned. The transaction value method cannot be used to appraise such goods. Therefore, an alternative method of appraisement must be used in such situations.

U.S. Customs and Border Protectiom, *Bona Fide Sales & Sales For Exportation to the United States; An Informed Compliance Publication* (2005) at 3.[16] Here, under the governing contracts between Midwest and its customers, the sales occurred in Buffalo, New York because the merchandise was delivered and title and risk of loss transferred there.

The state of the law is clear, conclusive and overwhelming. Where goods are sold "FOB Buffalo, New York," pursuant to the New York UCC, the sale of the goods occurs domestically, in the State of New York. From a customs perspective, where a sale occurs at an "FOB" point in the U.S., and purchase orders are accepted in the U.S., the sale is purely a domestic one which cannot be used as the basis of dutiable "transaction value." *See Orbisphere, supra.*

Simply stated, the sales from Midwest to its United States customers are not "sales for exportation to the United States" since they do not occur until after expor-

---

[16]   Accessible at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/ICP-Bona-Fide-Sales-2005-Final.pdf (last accessed March 1, 2024).

tation to the United States has been completed. Midwest and its customers are subject to a purely domestic contract of sale, not an international one. A domestic sale is not a "sale for exportation to the United States" and cannot be used as the basis of transaction value appraisement.

**C.    The Trade Court's Holding that a "Sale for Exportation" Occurs Under the Instant Facts Directly Contradicts Decisions Both Trade and UCC Case Law.**

The Trade Court's holding that a "sale for export" exists under these facts directly contradicts court decisions interpreting the UCC and various decisions of the trade courts concerning whether there is a "sale for export to the U.S." for Customs appraisement purposes. Indeed, decisions interpreting the UCC as adopted by the State of New York, and as adopted in other states, corroborate Midwest's contentions herein, as well as the conclusions drawn in *Orbisphere* and related cases.

It is well-settled that where goods move to the United States on consignment, or in a transfer between two of the seller's facilities, there is no sale of goods "for exportation to the United States" and no transaction value can be determined for the goods. This principle was established over thirty years ago, in the case of *Orbisphere, Inc. v. United States*, 726 F. Supp. 1344, 1357-58 (Ct. Int'l Trade 1989). In *Orbisphere*, United States customers placed orders for the purchase of gas detection devices at one of the plaintiff's four domestic sales office location in New Jersey, Texas, Illinois and California. *Id*. at 1344. Once the orders were received, they were

forwarded to plaintiff's office in Geneva, Switzerland, where the devices were man-
ufactured. *Id*. at 1344-45. The goods were then shipped to Orbisphere's office in
New Jersey. Prices were set by the Geneva, Switzerland officer, and were not subject
to adjustment by the United States sales officer. *Id*. at 1345.

The gas detection devices, when imported, were unpacked and inspected at
Orbisphere's New Jersey office, before being shipped to United States customers.
*Id*. The Trade Court noted the terms of delivery to be the following:

> title and risk of loss passes [sic] from seller to the buyer on delivery of
> the merchandise to the carrier at the F.O.B. point indicated in the in-
> voice.' Under the heading 'Prices and payment terms', item 5 on this
> invoice, it is stated 'All prices are F.O.B. Haworth, N.J. Item 1 on this
> invoice, titled 'Orders', provides "Orders are subject to acceptance only
> at seller's office in Haworth, N.J.

*Id*. The costs of shipping the goods from the New Jersey office to the customers'
United States locations were billed to the customers separately from the price of the
goods. *Id*. Trial testimony also established that while the goods were being shipped
from Switzerland to the United States, Orbisphere maintained an open freight insur-
ance policy on the goods, and that any loss of the goods while in transit would be
for Orbisphere's account, not the customer's. *Id*. at 1348.

Referring to the decision in *United States v. Massce & Co., et. al*., 22 C.C.P.A.
54 (1933), the *Orbisphere* court noted that purchase orders had been placed in the
United States before the goods were exported from their foreign country of origin.
*Id*. at 1351. The key issue, the *Orbisphere* court noted, "depends substantially upon

where the sales of the product are deemed to have occurred." *Id*. at 1350. Holding

that the sales from Orbisphere to its customers were domestic sales, and that there

was no international sale which could have formed the basis for a transaction value,

the Court noted (*id*. at 1351):

> Because the present case involves statutes, legal issues, and facts similar to those in *Massce,* the doctrine of stare decisis would seem to require a similar outcome here. In fact such an outcome seems to be required even a fortiori here: while the incorporation status of the plaintiffs in *Massce* is not wholly clear from that decision, in the present case both Orbisphere and Orbisphere Labs were American corporations, incorporated in Delaware, at the time of the sales at issue; moreover, while it is also unclear what, if any, terms were included on sales or shipping documents used in the Massce transactions, the invoices used by Orbisphere to document the transactions at issue here, supported by testimony at trial, clearly states that the orders were acceptable at New Jersey, and that title and risk of loss of the goods passed to the purchasers at that location.

The Court also focused on the place where the orders were accepted, noting

that Orbisphere's United States offices accepted orders from United States custom-

ers, and that its Swiss office had no communication with the domestic purchasers of

the merchandise. In the instant case, all orders are accepted by Midwest's office in

Minnesota. Customers have no communication with the warehouse, and are likely

unaware that Midwest kept its inventory in Canada. Indeed, the warehouse had no

capacity to accept orders, as all order acceptance was done at plaintiff's Cannon

Falls, Minnesota headquarters office.

The decision in *Orbisphere* is directly applicable to the instant case, and this Court should adopt the lower court's reasoning in *Orbisphere* as its own. The Trade Court in this case held *Orbisphere* inapplicable because it was based on adoption of the rule from *Massce*, a case decided under an earlier version of the value statute. However, in deciding issues such as what constitutes a "sale for export to the United States" this Court has repeatedly looked to precedents under earlier version of the Customs valuation statute. *See e.g*, *Nissho-Iwai American Corp. v United States*, 982 F.2d 505 (Fed Cir. 1992); *E.C. McAfee Co. v. United States*, 842 F.23 314 (Fed. Cir. 1988); *United States v. Getz Bros & Co*., 55 C.C.P.A. 11 (1967); *R.J. Saunders v. United States*, 42 C.C.P.A 55, 59 (1955); *United States v. S.S. Kresge Co. et al*, 26 C.C.P.A. 349 (1939). While the Trade Agreements Act of 1979*, Pub. L. 96-39, 93 Stat. 144 (1979), adopted a positive system of Customs valuation instead of the former "notional" valuation scheme, certain basic commercial concepts – such as what constitutes a "sale," where a sale takes place, and whether a sale is a cross-border one – remain unchanged. This Court may certainly look to cases decided under pre-1979 law to define these concepts and apply them to the current statute.

It is overwhelmingly clear that a sale made on "*FOB Buffalo, New York, as defined in the New York Uniform Commercial Code*" terms is a sale occurring within New York State and is not an international sale or a "sale for exportation." That the goods may be sold on "FOB" terms within the U.S. before they are imported does

not transform a domestic sale into a sale for exportation. *See e.g., Synergy Sport International v. United States*, 17 C.I.T. 18, 20 (1993).[17] As the leading commentary on the GATT Customs Valuation Code (which is the basis for the U.S. value statute) indicates:

> The fact that the goods have been resold by the importer to a customer in the country of importation before they are imported does not alter the TV [transaction value analysis], at least if the original importer is still the importer or consignee and title passes through him to the later purchaser or if the customs value can be declared in his name.

*See* Sherman and Glashoff, *Customs Valuation: Commentary on the GATT Customs Valuation Code* (2d ed.) at ¶ 186.[18] The original owner (*i.e.,* Midwest), is still the consignee of the goods, title passes through it to subsequent purchasers, and, at the time of entry, the Customs entry is filed in Midwest's name, as Midwest holds title to the goods.

---

[17] Similarly, if, when Midwest had warehouses in Minnesota and Tennessee, a United States customer had placed a sale before goods were imported and available at the warehouse, this circumstance would not have transformed those customer sales into "sales for exportation to the United States."

[18] The same treatise also suggests that if a company acquires title to merchandise in a foreign country, and consigns it to himself in the country of importation, that could indicate that the price paid to the foreign supplier should be taken as the basis of a transaction value. *Id.*, ¶187. This notion would support appraising Midwest's goods on the basis of "transaction value," based on the prices Midwest pays to its various foreign vendors. The only impediment to applying this rule is that the goods are sent to Canada before being consigned into the United States.

We have found no authority for the proposition that CBP may change the terms of a clearly defined sales transaction, to convert it from a domestic one to a "sale for exportation to the United States."

## IV. Midwest's "FOB Buffalo, New York" Sales Cannot be Characterized as the Sales Which "Most Directly Caused the Exportation" of the Goods.

Lacking any sale of the imported merchandise other than Midwest's "FOB Buffalo New York" sales to its customers, one might take the position that, but for these sales, the goods would not have been imported into the United States. In *Brosterhous v. United States*, 737 F. Supp. 1197, 1199 (Ct. Int'l Tr. 1990), the Trade Court ruled that the "sale for exportation" for purposes of calculating a "transaction value" of imported merchandise, was the sale which most directly caused the goods to be exported to the United States. However, in *Nissho-Iwai American Corp. v. United States*, 982 F.2d 505, 511 (Fed. Cir 1992), this Court directly overruled *Brosterhous*, stating that:

> "[W]e can discern nothing in the legislative history of the 1979 amend-
> ment that suggests that Customs, in determining the transaction value
> of imported merchandise, should undertake an investigation focusing
> on which of two transactions most directly caused the exportation. The
> "Customs policy" followed by *Brosterhous* proceeds from an invalid
> premise. To the extent *Brosterhous* … require[s] a weighing of the rel-
> ative importance of two viable transactions, it is overruled."

While the instant case does not involve "two transactions," neither does it involve a "sale for exportation to the United States." The fact that Midwest's FOB Buffalo,

41

New York sales formed a reason for the exportation of the goods from Canada to the

United States does not transform a purely domestic sale into a "sale for exportation."

## V. Deductive Value Appraisement is the Proper Methodology Under 19 U.S.C. § 1401a.

Where, as here, goods are entered into the U.S. on consignment, transaction

value appraisement does not apply. In *VWP of Am., Inc. v. United States*, 117 Fed.

Appx. 113, 115-116 (Fed. Cir. 2004), this Court explained the sequential application

of the appraisement methods of Section 402:

> In the event that the transaction value of the imported merchandise cannot be calculated, the merchandise should next be appraised based on the transaction value of identical or similar merchandise. *See id*. §§ 1401a(a)(l)(B) & (C). This transaction value must be calculated from imported merchandise that is "(A) with respect to the merchandise being appraised, either identical merchandise or similar merchandise, as the case may be; and (B) exported to the United States at or about the time that the merchandise being appraised is exported to the United States." *Id*. § 140la(c)(l).

> The next preferred appraisal value, if identical or similar merchandise is not available, is "deductive value." *id*. § 140la(a)(1)(D). Deductive value is equal to the resale price in the United States, less certain commissions, costs, and duties. *Id*. § 140la(d)(3)(A). If deductive value, too, is unavailable, Customs may turn to "computed value," *id*. § 140la(a)(1)(E), which reflects the sum of production and material costs of the imported merchandise, plus profits and general expenses from sales of merchandise of the "same class or kind as the imported merchandise," *id*. § 140la(e)(l). In the event that none of the valuation methods described in section 1401a(a)(l)(A)-(E)can be used, Customs may resort to section 140la(f), *id*. § methods set forth in ... subsections [(b) through (e)], with such methods being reasonably adjusted to the extent necessary to arrive at a value," *id*. § 140la(f)(l).

42

*See also e.g., Customs Headquarters Ruling H165361 of November 1, 2011* ("However, in order to use transaction value as the basis for appraisement, there must be a bona fide sale. If there is no sale, as in the case of merchandise imported under consignment, then appraisement must be based on another method set forth in 19 U.S.C. § 140la, the valuation statute, taken in sequential order.").

Here, Midwest moves the goods from its Woodbridge warehouse into the U.S. on consignment without any transfer of title or risk of loss. It is well-settled that an international consignment of goods is not a "sale," and certainly not a "sale for exportation to the U.S." Accordingly, transaction value cannot serve as the basis of appraising the goods. Where transaction value appraisement under 19 U.S.C. § 1401a(b) is unavailable, "the merchandise should next be appraised based on the transaction value of identical or similar merchandise." *VWP of Am.*, at 115 (citing 19 U.S.C. §§ 1401a(a)(l)(B) & (C)). This method of appraisement is unavailable in this case, as Midwest does not sell identical or similar goods for export to the United States to any customers. In such situations, Section 402 indicates that deductive value appraisement is appropriate. *Id*. at § 1401a(a)(I)(D) Alternatively, the goods may be appraised according to the residual appraisement provided in § 1401a(f).

.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff-Appellant, Midwest-CBK LLC, respectfully requests that this Court vacate the opinion and judgment of the CIT, hold that the subject goods in the protested entries be liquidated according to the "deductive value" appraisement methodology, and remand this action to the Court of International Trade for further proceedings consistent with its holding.

Respectfully submitted.

    /s/ John M. Peterson
John M. Peterson
*Counsel of Record*
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

*Attorneys for Plaintiff-Appellant*

March 1, 2024

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify that the foregoing Principal Brief of Plaintiff-Appellant Midwest-CBK LLC., complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules. It was prepared using a proportionally-spaced typeface and includes 10,647 words.


   /s/ John M. Peterson
      John M. Peterson

March 1, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of March, 2024, I electronically filed the forego-ing Principal Brief of Midwest-CBK LLC., with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

       /s/ John M. Peterson
       John M. Peterson

March 1, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

MIDWEST-CBK, LLC,

     Plaintiff,

v.

UNITED STATES,

     Defendant.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 17-00154

### JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision, now therefore, in conformity with said decision, it is hereby

**ORDERED** that Plaintiff's Motion for Final Judgment of Dismissal to be Entered, ECF No. 87, is granted; and it is further

**ORDERED** that Judgment is entered for the United States.

        /s/ Jennifer Choe-Groves
        Jennifer Choe-Groves, Judge

Dated:   October 20, 2023
     New York, New York

Slip Op. 23-154

## UNITED STATES COURT OF INTERNATIONAL TRADE

MIDWEST-CBK, LLC,

      Plaintiff,

v.

UNITED STATES,

      Defendant.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 17-00154

## OPINION

[Granting Plaintiff's motion for final judgment of dismissal.]

Dated: October 20, 2023

John M. Peterson and Patrick B. Klein, Neville Peterson, LLP, of New York, N.Y., for Plaintiff Midwest-CBK, LLC.

Monica P. Triana and Brandon A. Kennedy, Trial Attorneys, International Trade Field Office, U.S. Department of Justice, of New York, N.Y., for Defendant.

Choe-Groves, Judge:  Before the Court is Plaintiff Midwest-CBK, LLC's

Motion for Final Judgment of Dismissal to be Entered.  Pl.'s Mot. Final J.

Dismissal Entered ("Pl.'s Mot."), ECF No. 87.  At the request of the Parties, the

Court bifurcated this case into two phases.  Order (May 10, 2021), ECF No. 52.  In

Phase I, the Court held that Plaintiff's import transactions constituted a sale "for

exportation to the United States" and that the subject entries were not deemed

liquidated by operation of law.  <u>Midwest-CBK, LLC v. United States</u>, 46 CIT __,

578 F. Supp. 3d 1296 (2022).  Remaining for Phase II are questions of valuation of

the subject merchandise.

Plaintiff filed a status report on September 8, 2023, informing the Court that

"it will not be able to provide further evidence relating to the issues to be addressed

in Phase II of this litigation."  Pl.'s Status Rep., ECF No. 86.  Plaintiff explained

that Defendant has requested the production of all evidence necessary to determine

a dutiable value for the subject merchandise.  <u>Id.</u> at 1; <u>see also</u> Pl.'s Mot. at 1.

Though Plaintiff concedes that the production request is not per se unreasonable,

Plaintiff argues that its business model and the considerable number of individual

sales of goods that entered the United States would require "years of work and

hundreds of thousands of dollars in expense" to comply.  Pl.'s Status Rep. at 1–2;

<u>see also</u> Pl.'s Mot. at 1–2.  Plaintiff further advises the Court that it maintains its

corporate existence, but ceased doing business in 2018.  Pl.'s Status Rep. at 1; <u>see</u>

<u>also</u> Pl.'s Mot. at 1.

Plaintiff moves the Court to enter a final judgment of dismissal against

Plaintiff based on the findings of the Court's prior opinion.[1]  Pl.'s Mot. at 2–3.

Entry of a final judgment would permit Plaintiff to appeal the Phase I holdings to

---

[1]  Plaintiff stresses that it consents only to a form of judgment of dismissal, not a
stipulated judgment.  Pl.'s Mot. at 3–4.

the U.S. Court of Appeals for the Federal Circuit ("CAFC").  Plaintiff stipulates

that should the CAFC affirm the Court's final judgment, Plaintiff will abandon all

further claims in this case.  Id. at 3.  Plaintiff also stipulates that should the CAFC

reverse the Court's holding, Plaintiff will present no further evidence as to the

calculation of transaction value.  Id.  Defendant United States consents to the

motion.  Id. at 4.

Rule 41(a)(2) provides that "an action may be dismissed at the plaintiff's

request only by court order, on terms that the court considers proper."  USCIT R.

41(a)(2).  The Court is obligated to resolve cases in a "just, speedy, and

inexpensive" manner.  USCIT R. 1.  The Court concludes that dismissal is proper

in this case because doing so would effectuate resolution of the dispute and avoid

potentially time-consuming and costly litigation.  Plaintiff has expressed its

intention to appeal the Court's Phase I holding.  Because an appeal is likely to

reduce or eliminate the need for prolonged litigation, the Court is persuaded by

Plaintiff's argument that it would be impractical and costly to require the Parties to

engage in expensive Phase II discovery at this time.

Upon consideration of Plaintiff's Motion for Final Judgment of Dismissal to

be Entered, and all other papers and proceedings in this action, it is hereby

**ORDERED** that Plaintiff's Motion for Final Judgment of Dismissal to be Entered, ECF No. 87, is granted.

Judgment shall issue accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    October 20, 2023
         New York, New York

Slip Op. 22-51

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MIDWEST-CBK, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Before: Jennifer Choe-Groves, Judge** |
| **UNITED STATES,** | **Consol. Court No. 17-00154** |
| **Defendant.** | |

## OPINION AND ORDER

[Denying Plaintiff's motion for partial summary judgment and granting Defendant's cross-motion for partial summary judgment regarding whether sales of giftware, houseware, and decorative items imported by Plaintiff were "for exportation to the United States" and whether certain subject entries should have been deemed liquidated by operation of law.]

Dated: May 20, 2022

John M. Peterson and Patrick B. Klein, Neville Peterson, LLP, of New York, N.Y., argued for Plaintiff Midwest-CBK, LLC. With them on the reply brief was Richard F. O'Neill.

Monica P. Triana and Brandon A. Kennedy, Trial Attorneys, International Trade Field Office, U.S. Department of Justice, of New York, N.Y., argued for Defendant. With them on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Justin R. Miller, Attorney-in-Charge, International Trade Field Office. Of counsel on the brief was Mathias Rabinovitch, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection. With them on the reply brief was Patricia M. McCarthy, Director.

Choe-Groves, Judge: Plaintiff Midwest-CBK, LLC ("Plaintiff") is a

Minnesota-based retailer and wholesaler of Christmas ornaments, nutcrackers,

wood carvings, and similar decorative articles that are manufactured in China.

Plaintiff commenced this action to contest the denial by U.S. Customs and Border

Protection ("Customs") of Plaintiff's protest against liquidation and reliquidation

of subject merchandise imported into the United States.  Compl. at 1, ECF No. 8.

Plaintiff contends that Customs appraised its merchandise improperly on the basis

of transaction value because Plaintiff's sales to customers were not "for

exportation to the United States" under 19 U.S.C. § 1401a(b)(1), erred in its

calculation during liquidation, and failed to liquidate certain entries that should

have been deemed liquidated by operation of law.  Id. at 7–12.

At the request of the Parties, this case was bifurcated into two phases.  Order

(May 10, 2021) ("Bifurcation Order"), ECF No. 52.  Phase One is limited to the

questions: (1) whether Plaintiff's import transactions reflect a sale "for exportation

to the United States" and (2) whether the subject entries became deemed liquidated

by operation of law.  Id. at 1.  Whether a sale is "for exportation to the United

States" is a threshold question for determining the appropriate method of valuation.

See 19 U.S.C. § 1401a.  Phase Two will encompass all remaining issues, including

the determination of the proper method of valuing the subject merchandise and

whether Customs' calculation of the transaction value during liquidation was

correct.  Bifurcation Order at 1.

Plaintiff filed a Motion for Partial Summary Judgment arguing that its

subject merchandise cannot be appraised on the basis of transaction value because

Plaintiff's sales to customers within the United States were not "sales for

exportation to the United States."  See Pl.'s Mot. Partial Summ. J. ("Plaintiff's

Motion" or "Pl.'s Mot."), ECF No. 56; Pl.'s Mem. P. & A. Supp. Mot. Partial

Summ. J. ("Plaintiff's Brief" or "Pl.'s Br."), ECF No. 56-1.  Defendant United

States ("Defendant") filed a Cross-Motion for Partial Summary Judgment arguing

that Plaintiff's sales were "for exportation to the United States" under 19 U.S.C.

§ 1401a(b)(1), that transaction value is the proper basis of appraisal for the subject

merchandise, and that the subject entries should not have been deemed liquidated

by operation of law.  See Def.'s Cross-Mot. Partial Summ. J. ("Defendant's Cross-

Motion" or "Def.'s Cross-Mot."), ECF No. 61; Def.'s Mem. Opp'n Pl.'s Mot.

Partial Summ. J. and Supp. Def.'s Cross-Mot. Partial Summ. J. ("Defendant's

Brief" or "Def.'s Br."), ECF No. 61.

The Court concludes that under Phase One of the bifurcated action,

Plaintiff's sales of the subject merchandise were sales "for exportation to the

United States" and the subject entries should not have been deemed liquidated by

operation of law.  The proper method of valuing the subject merchandise is not a

question within the scope of Phase One of this action.  Accordingly, the Court

denies Plaintiff's Motion for Partial Summary Judgment and grants Defendant's

Cross-Motion for Partial Summary Judgment.

## BACKGROUND

The Parties have submitted separate statements of undisputed material facts.

See Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMF"), ECF No. 56-2;

Def.'s Statement of Undisputed Material Facts ("Def.'s SMF"), ECF No. 61-1;

Def.'s Resp. Pl.'s Statement of Material Facts ("Def.'s Resp."), ECF No. 61-2;

Pl.'s Resp. Def.'s Statement of Material Facts ("Pl.'s Resp."), ECF No. 64-1.

The following facts are not in dispute:

Plaintiff is a Delaware limited liability company.  Pl.'s SMF ¶ 1 at 1; Def.'s

Resp. at 1.  Plaintiff was founded as Midwest of Cannon Falls, Inc. in 1953 as a

wholesaler of seasonal items.  Pl.'s SMF ¶ 2 at 1; Def.'s SMF ¶ 1 at 1; Def.'s Resp.

at 1–2; Pl.'s Resp. at 1.  Midwest of Cannon Falls, Inc. maintained its headquarters

and warehouse facility in Cannon Falls, Minnesota.  Def.'s SMF ¶ 2 at 1; Pl.'s

Resp. at 1.  Merchandise was imported from foreign suppliers and sold to

customers in the United States through a catalogue and staff of sales

representatives.  Pl.'s SMF ¶ 3 at 1–2; Def.'s SMF ¶¶ 3–4 at 1–2; Def.'s Resp. at 2;

Pl.'s Resp. at 1.

In 2009, Midwest of Cannon Falls, Inc. was acquired by Blyth, Inc. and merged with CBK Holdings Group, forming Midwest-CBK, Inc. Pl.'s SMF ¶ 4 at 2; Def.'s Resp. at 2. Midwest-CBK, Inc. maintained its headquarters, operations, and sales offices in Cannon Falls, Minnesota and relocated its warehouse and inventory to Union City, Tennessee. Pl.'s SMF ¶ 4 at 2; Def.'s Resp. at 2. In December 2012, the assets of Midwest-CBK, Inc. were acquired by the Ganz family, a group of Canadian investors. Pl.'s SMF ¶ 6 at 2; Def.'s SMF ¶ 7 at 2; Def.'s Resp. at 2–3; Pl.'s Resp. at 2. The assets of Midwest-CBK, Inc. were transferred to Plaintiff Midwest-CBK, LLC. Pl.'s SMF ¶ 6 at 2; Def.'s SMF ¶ 8 at 2; Def.'s Resp. at 2–3; Pl.'s Resp. at 2.

Following its acquisition by the Ganz family, Plaintiff maintained its corporate office in Cannon Falls, Minnesota, which housed the product development, supply chain, procurement, purchasing, compliance, financial analysis, planning, accounting, and sales management departments. Def.'s SMF ¶ 13 at 3; Pl.'s Resp. at 3. Plaintiff relocated its inventory, distribution, warehousing, invoicing, and order control departments to Ontario, Canada, where it leased a warehouse, storage space, and a two-story office building from other entities controlled by the Ganz family. Def.'s SMF ¶¶ 14–18 at 3–4; Pl.'s Resp. at 3–4. Plaintiff also operated a data center and showroom in Ganz-owned properties in Ontario, Canada. Def.'s SMF ¶¶ 23–25 at 5; Pl.'s Resp. at 5. Approximately

twenty-two employees worked in the Ontario, Canada facility in the order processing, inventory control, customer service, key accounts, information technology, and customer accounts departments.  Def.'s SMF ¶ 19 at 4; Pl.'s Resp. at 4.  Plaintiff opened Canadian bank accounts for payroll, rent, and other expenses associated with its Canadian operations.  Pl.'s SMF ¶ 8 at 3; Def.'s Resp. at 3.

Plaintiff's business model involved purchasing merchandise from foreign suppliers for exportation to Canada.  Pl.'s SMF ¶ 11 at 3; Def.'s SMF ¶ 27 at 5; Def.'s Resp. at 4; Pl.'s Resp. at 6.  Merchandise was imported into Canada at the Port of Vancouver, British Columbia and transported to Plaintiff's Ontario, Canada warehouse.  Pl.'s SMF ¶ 11 at 3; Def.'s SMF ¶ 27 at 5; Def.'s Resp. at 4; Pl.'s Resp. at 6.  Plaintiff employed a United States sales staff to solicit orders from customers within assigned geographic territories.  Pl.'s SMF ¶ 14 at 4; Def.'s SMF ¶ 30 at 6; Def.'s Resp. at 5; Pl.'s Resp. at 6.  Sales representatives accepted orders using electronic devices loaded with two point-of-sale software systems, Enum and WhereOWare.  Def.'s SMF ¶¶ 31–32 at 6; Pl.'s Resp. at 7.  When a completed order was accepted into either system, it was made available to Plaintiff's personnel in Cannon Falls, Minnesota and Ontario, Canada.  Def.'s SMF ¶ 33 at 6; Pl.'s Resp. at 7.  Purchase orders provided to customers included the language: "All prices [Free on Board ("FOB")] Buffalo, New York as defined by the New

York State Uniform Commercial Code."  Def.'s SMF ¶¶ 36–38 at 7; Def.'s Resp.

at 7–8.

Purchase orders were usually first accessed and reviewed by Plaintiff's

Order Processing Department in Canada.  Def.'s SMF ¶ 35 at 7; Pl.'s Resp. at 7;

see also Pl.'s Mot. Partial Summ. J., Ex. B ("Pl.'s Basis of Appraisement Letter")

at 4, ECF No. 56-3.  Employees at the Canadian facility confirmed the availability

of merchandise located in Canada in an inventory control system, collected

merchandise from the Canadian warehouse, packaged merchandise for shipment,

attached waybills for customers' designated domestic carriers, and loaded

shipments onto trucks for transport to the United States.  Pl.'s SMF ¶¶ 18, 20–22,

24 at 5, 6; Def.'s SMF ¶¶ 41, 43–51 at 7–8; Def.'s Resp. at 6–7; Pl.'s Resp. at 8–

10.

Plaintiff engaged a third-party overland truck carrier to transport

merchandise from its facility in Ontario, Canada to Buffalo, New York.  Pl.'s SMF

¶¶ 23, 25 at 5, 6; Def.'s Resp. at 7.  Plaintiff acted as the importer of record for the

merchandise and was responsible for all duties.  Pl.'s SMF ¶ 26 at 6; Def.'s SMF

¶ 59 at 10; Def.'s Resp. at 7; Pl.'s Resp. at 11.  Upon arrival in Buffalo, New York,

merchandise was delivered to domestic carriers designated by Plaintiff's customers

or to a facility rented by Plaintiff from United Parcels Service ("UPS").  Pl.'s SMF

¶ 27 at 6; Def.'s Resp. at 7–8.  UPS employees deconsolidated shipping boxes,

scanned shipping labels, and shipped merchandise to Plaintiff's United States customers. Def.'s SMF ¶¶ 60–61 at 10–11; Pl.'s Resp. at 12.

Invoices were prepared in Ontario, Canada and couriered to Buffalo, New York for mailing. Def.'s SMF ¶¶ 63–65, 67 at 11; Pl.'s Resp. at 12, 13. Customers were directed to remit physical payments to a post office box in Buffalo, New York. Def.'s SMF ¶ 68 at 11; Pl.'s Resp. at 13. Plaintiff engaged a bank's lockbox service to collect and deposit the payments. Def.'s SMF ¶ 69 at 12; Pl.'s Resp. at 13.

The Parties do not dispute whether Plaintiff imported the subject merchandise into the United States. Plaintiff advised Customs in 2013 that Plaintiff imported merchandise from foreign manufacturers into Canada, where merchandise was stored until sold. Pl.'s Basis of Appraisement Letter at 2–4; Pl.'s SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14. After receiving a sales order, merchandise was transported from Plaintiff's Canadian warehouse to the United States for delivery to customers with shipments designated as FOB Buffalo, New York. Pl.'s Basis of Appraisement Letter at 2–4; Pl.'s SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14. Plaintiff described the same process in 2015 when it requested that Customs seek internal advice on the proper method of valuation. Def.'s Cross-Mot. Partial Summ. J., Ex. 20 ("Def.'s Request for Internal Advice"). At oral argument,

Defendant offered a similar description of Plaintiff's importation process of subject merchandise:

> [Plaintiff] purchased [the] merchandise at issue from a manufacturer in China and it was imported directly from China to [Plaintiff's] facilities in Canada.  The merchandise remained at [Plaintiff's] Canadian facilities until a sale was made.  And when a sale was made to a specific U.S. customer, [Plaintiff] caused the goods to be picked, packed, and labeled for that specific U.S. customer in Canada and [Plaintiff] would export the merchandise out of Canada and into the United States for the first time based on that specific sale.  [Plaintiff] arranged for this exact process to apply to each of the sales that are at issue here.

Oral Arg. at 28:22–29:00, Mar. 22, 2022, ECF No. 70.  This description of Plaintiff's importation process is also consistent with the Parties' written submissions to the Court.  Compl. at 2–5; Pl.'s Br. at 8–12; Def.'s Br. at 6–13.  Neither Party has disputed Plaintiff's sale and importation of the subject merchandise at issue in this case.  It is also undisputed that the sales transactions for the relevant entries involved FOB Buffalo, New York shipping terms.  Pl.'s SMF ¶ 33 at 7; Def.'s Resp. at 9.  The Court finds that the following facts are undisputed: (1) the subject merchandise was imported from foreign countries to Canada; (2) the subject merchandise was based in Canada at the time of sale; (3) the subject merchandise was packaged and sent from Canada to the United States after sales orders were received; (4) the subject merchandise was clearly destined for the United States at the time of sale; and (5) the subject merchandise was sold and exported from Canada to customers based in the United States.

In 2013, Plaintiff advised Customs that Plaintiff had changed its operations model and would enter merchandise on the basis of its deductive value, in accordance with 19 U.S.C. § 1401a(d).[1] Pl.'s Basis of Appraisement Letter; Pl.'s SMF ¶ 34 at 7; Def.'s SMF ¶ 73 at 12; Def.'s Resp. at 9; Pl.'s Resp. at 14. Customs subsequently extended the deadline for liquidation of Plaintiff's entries and initiated a Regulatory Audit to determine the proper basis of valuation. Pl.'s SMF ¶¶ 35–36 at 7–8; Def.'s SMF ¶¶ 75–77 at 12–13; Def.'s Resp. at 9–10; Pl.'s Resp. at 14. The audit involved multiple steps, including a risk assessment of the relevant issues, the issuance of a questionnaire, a walkthrough of import practices or entries, interviews with Plaintiff's personnel, and the issuance of a final report. Def.'s SMF ¶ 80 at 13; Pl.'s Resp. at 15; see also Def.'s Cross-Mot. Partial Summ. J., Ex. 19 ("Conrad Decl."), ECF No. 61-4 (describing audit process). Customs requested information from Plaintiff and conducted an on-site visit at the Ontario, Canada facility. Def.'s SMF ¶¶ 81–82 at 13; Pl.'s Resp. at 15. The auditor's fieldwork also involved matching customer invoices with specific line items on Plaintiff's entry paperwork. Def.'s SMF ¶ 85 at 14; Pl.'s Resp. at 16. More than 560 entries were subject to the audit. Def.'s SMF ¶ 86 at 14; Pl.'s Resp. at 16.

---

[1] The deductive value method bases valuation on the price of sale adjusted for certain considerations, including transportation and insurance costs, duties and taxes, and other general expenses. 19 U.S.C. § 1401a(d); 19 C.F.R. § 152.105.

Customs completed its fieldwork on October 14, 2014.  Def.'s SMF ¶ 89 at 14;

Pl.'s Resp. at 16–17.

    Customs' auditors issued a Draft Audit Report on July 1, 2015, concluding

that transaction value was the proper basis of appraisal for the subject merchandise.

Pl.'s Mot. Partial Summ. J., Ex. Q ("Draft Audit Report"), ECF No. 56-3; Pl.'s

SMF ¶ 36 at 8; Def.'s SMF ¶ 99 at 16; Def.'s Resp. at 10; Pl.'s Resp. at 18.

Plaintiff submitted responsive comments on July 8, 2015.  Pl.'s Mot. Partial

Summ. J., Ex. R ("Pl.'s Resp. Draft Audit Report"), ECF No. 56-3; Pl.'s SMF ¶ 37

at 8; Def.'s SMF ¶ 100 at 15; Def.'s Resp. at 10; Pl.'s Resp. at 18.  No additional

information was requested from Plaintiff.  Pl.'s SMF ¶ 38 at 8; Def.'s Resp. at 10.

On August 20, 2015, Plaintiff requested advice from Customs' Office of

Regulations and Rulings pursuant to 19 C.F.R. § 177.11 regarding the proper basis

for valuation of the subject merchandise.  Def.'s SMF ¶¶ 103–04 at 16; Pl.'s Resp.

at 19.  Customs issued a Final Audit Report to Plaintiff on February 24, 2016,

stating that the subject merchandise should be valued on the basis of transaction

value.  Pl.'s Mot. Partial Summ. J., Ex. S ("Final Audit Report"), ECF No. 56-4;

Pl.'s SMF ¶ 39 at 8; Def.'s SMF ¶ 101 at 16; Def.'s Resp. at 10–11; Pl.'s Resp. at

19.  On July 1, 2016, Customs issued Headquarters Ruling H275056, which also

determined that valuation on the basis of transaction value was proper.  HQ

H275056 (July 1, 2016); Pl.'s SMF ¶ 40 at 9; Def.'s SMF ¶ 114 at 18; Def.'s Resp.
at 11; Pl.'s Resp. at 21.

On March 28, 2016, Customs officials at the Port of Buffalo, New York
issued a Form 29 Notice of Action indicating that Customs would liquidate certain
entries and that transaction value would be calculated using the original entered
values plus a 123.18% adjustment.  Pl.'s Mot. Partial Summ. J., Ex. U, ECF No.
56-4; Pl.'s SMF ¶ 42 at 9; Def.'s SMF ¶ 110 at 17; Def.'s Resp. at 11; Pl.'s Resp.
at 20.  Plaintiff requested information from Customs about the basis of the
appraisal and requested an extension of the liquidation deadline.  Pl.'s Mot. Partial
Summ. J., Ex. V, ECF No. 56-4; Pl.'s SMF ¶ 43 at 10; Def.'s SMF ¶ 111 at 17;
Def.'s Resp. at 11–12; Pl.'s Resp. at 21.  Customs responded that the calculation
was based on financial information provided by Plaintiff for the year 2013.  Pl.'s
Mot. Partial Summ. J., Ex. W, ECF No. 56-4; Pl.'s SMF ¶ 44 at 10; Def.'s Resp. at
12.  Plaintiff submitted a response and argued that the proposed method of
calculation was based on multiple errors.  Pl.'s Mot. Partial Summ. J., Ex. X, ECF
No. 56-4; Pl.'s SMF ¶ 45 at 10–11; Def.'s SMF ¶¶ 112–13 at 17; Def.'s Resp. at
12; Pl.'s Resp. at 21.  Three hundred thirty-six entries were liquidated using the
method described in Customs' March 28, 2016 notice, including the application of
a 123.18% upward adjustment.  Def.'s SMF ¶ 117 at 18; Pl.'s Resp. at 22.  Plaintiff
protested the liquidation of these entries.  Pl.'s Mot. Partial Summ. J., Ex. Y, ECF

No. 56-4; Pl.'s SMF ¶ 46 at 11; Def.'s SMF ¶ 120 at 18–19; Def.'s Resp. at 12;

Pl.'s Resp. at 22.  Customs approved the protests in part and reduced the

adjustment to 75.75%.  Pl.'s Mot. Partial Summ. J., Ex. Z, ECF No. 56-4; Pl.'s

SMF ¶¶ 47–48 at 11; Def.'s SMF ¶ 118 at 18; Def.'s Resp. at 12–13; Pl.'s Resp. at

22.  Plaintiff protested the reliquidation.  Pl.'s Mot. Partial Summ. J., Ex. AA, ECF

No. 56-4; Pl.'s SMF ¶ 49 at 11; Def.'s SMF ¶ 122 at 19; Def.'s Resp. at 13; Pl.'s

Resp. at 23.  Customs denied Plaintiff's protest.  Pl.'s SMF ¶ 50 at 11; Def.'s SMF

¶¶ 122–23 at 19; Def.'s Resp. at 13; Pl.'s Resp. at 23.

Plaintiff filed three cases in June and November 2017 contesting Customs'

denial of Plaintiff's protests.  Summons, ECF No. 1; Summons, Midwest-CBK,

LLC v. United States, Court No. 17-00155, ECF No. 1; Summons, Midwest-CBK,

LLC v. United States, Court No. 17-00272, ECF No. 1.  Plaintiff filed Complaints

in March 2019 in two of the cases.  Compl.; Compl., Court No. 17-00155, ECF

No. 9.  The third case remained on the Court's Customs Case Management

Calendar.  Order (Oct. 16, 2019), Court No. 17-00272, ECF No. 9.  The Court

consolidated the three cases in May 2020 at the request of the Parties.  Pl.'s Mot.

Consol., ECF No. 25; Pl.'s Consol. Compl., ECF No. 26; Order (May 21, 2020),

ECF No. 27.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a). The Court will grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. USCIT R. 56(a). To raise a genuine issue of material fact, a party cannot rest upon mere allegations or denials and must point to sufficient supporting evidence for the claimed factual dispute to require resolution of the differing versions of the truth at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 835–36 (Fed. Cir. 1984).

## DISCUSSION

Plaintiff argues that Customs appraised the subject merchandise improperly based on transaction value because the sales were domestic and not for exportation to the United States. Pl.'s Br. at 14–32. Plaintiff also contends that certain subject entries should have been deemed liquidated by operation of law because Customs had no authority to extend the deadline for liquidation after June 14, 2015. Id. at 34–38. Defendant counters that the subject merchandise was destined for export to the United States at the time of sale, there is no requirement for an international sale, and transaction value is the appropriate method of appraising the subject

merchandise.  Def.'s Br. at 21–38.  Defendant also argues that Customs'

extensions of the liquidation deadline were proper.  Id. at 39–44.

## I.    "For Exportation to the United States"

In order to determine appropriate duties, Customs appraises merchandise at

the time of entry to ascertain its value.  19 U.S.C. § 1500.  Transaction value is the

default method of appraising the value of imported merchandise.  Id.

§ 1401a(a)(1); see also Trimil S.A. v. United States, 43 CIT __, __, 419 F. Supp.

3d 1307, 1311 (2019) ("Whenever possible, Customs appraises imported

merchandise on the basis of its 'transaction value.'").  Transaction value is defined

by statute as the "price actually paid or payable for the merchandise when sold for

exportation to the United States," plus other considerations enumerated by statute.

19 U.S.C. § 1401a(b).

Appraisal on the basis of transaction value has two requirements: (1) that the

merchandise is sold and (2) that the sale is for exportation to the United States.  Id.;

VWP of Am., Inc. v. United States, 175 F.3d 1327, 1338–39 (Fed. Cir. 1999).

Only if transaction value cannot be determined or used should merchandise be

appraised by "looking to the secondary valuation methods in the order listed in

[section] 1401a(a)(1) until an appraisal is obtained."  VWP of Am., Inc., 175 F.3d

at 1330 (citing 19 U.S.C. § 1401a(a)(1)).  Neither party contests that a bona fide

sale of merchandise occurred in this case.  See Pl.'s Br. at 15; Def.'s Br. at 22.

The Court determines whether merchandise is sold "for exportation to the United States" based on a fact-specific inquiry that requires case-by-case analysis. E.C. McAfee Co. v. United States, 842 F.2d 314, 319 (Fed. Cir. 1988). The relevant factual inquiry for the Court is to examine "the reality of the transaction" between the parties to the sale. Id. When goods are clearly destined for the United States at the time of sale, the sale is for exportation to the United States. Id.

After conducting a fact-specific inquiry of whether the sales were for exportation to the United States under 19 U.S.C. § 1401a(b)(1), the Court concludes that the undisputed evidence demonstrates that Plaintiff's sales were for exportation to the United States at the time of sale. It is undisputed that when Plaintiff's sales representatives accepted sales orders from customers within the United States, the subject merchandise was stored in a warehouse facility in Ontario, Canada at the time of sale. Pl.'s SMF ¶¶ 7, 14, 17 at 3, 4, 5; Def.'s SMF ¶¶ 14–16, 30 at 3–4, 6; Def.'s Resp. at 3, 5–6; Pl.'s Resp. at 3–4, 6. The sales orders were transmitted electronically and were usually first accessed and reviewed by Plaintiff's Order Processing Department in Canada. Def.'s SMF ¶¶ 31–35 at 6–7; Pl.'s Resp. at 7. Plaintiff's employees in Canada confirmed the availability of the subject merchandise located in the Canadian warehouse, then collected, packaged, and prepared the goods for shipment from the Canadian warehouse to United States customers. Pl.'s SMF ¶¶ 18–22 at 5; Def.'s SMF ¶¶ 43–49 at 8–9;

Def.'s Resp. at 6–7; Pl.'s Resp. at 9–10.  It is undisputed that upon receiving orders

from customers based in the United States, the subject merchandise was

transported from Plaintiff's Ontario, Canada warehouse to Buffalo, New York,

where the merchandise was delivered to domestic carriers for distribution to United

States customers.  Pl.'s SMF ¶¶ 23–25, 27 at 5–6; Def.'s Resp. at 7–8.  Based on

the undisputed evidence and a fact-specific analysis of the record, the Court

concludes that the reality of the transaction establishes that the subject merchandise

was based in Canada at the time of sale, was clearly destined for the United States

at the time of sale, and Plaintiff's sales of the subject merchandise were for

exportation to the United States under 19 U.S.C. § 1401a(b)(1).

Plaintiff argues that a sale "for exportation to the United States" imposes an

additional requirement that the sale must have occurred abroad or have an

international character.[2]  Pl.'s Br. at 16–18.  Plaintiff contends that the individual

sales were negotiated and agreed to within the United States, that Plaintiff retained

title to the subject merchandise when the goods were shipped from Canada and

imported into the United States, and under the FOB shipping terms included by

Plaintiff on the purchase orders, that title transferred to the United States customers

only after the goods were imported into the United States and delivered to

---

[2] Plaintiff uses the terms "international" and "abroad" interchangeably to describe
a sale that occurred outside of the United States.

domestic carriers in Buffalo, New York for delivery, thus reflecting domestic sales within the United States. Id. at 16–23.

In support of its argument that there was no transfer of property until after importation and thus no possible export or international sale to the United States from which to calculate transaction value, Plaintiff relies mainly on Orbisphere Corp. v. United States ("Orbisphere"), 13 CIT 866, 726 F. Supp. 1344 (1989). The Court notes at the outset that Orbisphere is a thirty-three-year-old case from the U.S. Court of International Trade that applies an outdated statute that was amended in 1979. In Orbisphere, the court considered the method of valuation for oxygen analyzing devices manufactured in Geneva, Switzerland by Orbisphere Laboratories, a subsidiary of Orbisphere Corporation. Orbisphere, 13 CIT at 867, 726 F. Supp. at 1344. Orders accepted from customers in the United States were forwarded to Orbisphere Laboratories in Geneva for manufacture. Id., 726 F. Supp. at 1344–45. Completed orders were shipped to New Jersey, where they were unpacked, inspected, repackaged, and shipped to customers. Id., 726 F. Supp. at 1345.

The court in Orbisphere reasoned that a determination of whether transaction value may be used "depends substantially upon where the sales of the merchandise are deemed to have occurred." Id. at 872, 726 F. Supp. at 1348. The Orbisphere court relied on the Court of Customs and Patent Appeals' analysis in United States

v. Massce & Company ("Massce"), 21 CCPA 54 (1933), a case decided under a

predecessor to the current valuation statute. Orbisphere, 13 CIT at 875, 726 F.

Supp. at 1350. Relying on the 1933 Massce case, the Orbisphere court analogized

"transaction value" and "deductive value" under 19 U.S.C. § 1401a to "export

value" and "United States value" as they were used under the predecessor statute.

Id. at 875–76, 726 F. Supp. at 1350–51.[3] The Massce court concluded that "where

offers of sale, agreements to sell, and sales are all made in the United States, and

none in a foreign country, there can not [sic] be an export value of the exported

---

[3]     "Export value" under the predecessor statute was defined as:

> the market value or the price, at the time of exportation of such
> merchandise to the United States, at which such or similar merchandise
> is freely offered for sale to all purchasers in the principal markets of the
> country from which exported, in the usual wholesale quantities and in
> the ordinary course of trade, for exportation to the United States . . . .

Id. at 873–74, 726 F. Supp. at 1349 (quoting 19 U.S.C. § 1401a(b) (1964)).

"United States value" was defined as:

> the price at which such or similar imported merchandise is freely
> offered for sale, packed ready for delivery in the principal market of the
> United States to all purchasers, at the time of exportation of the
> imported merchandise, in the usual wholesale quantities and in the
> ordinary course of trade, with allowance made for duty, cost of
> transportation and insurance, and other necessary expenses from the
> place of shipment to the place of delivery . . . .

Id. at 874, 726 F. Supp. at 1349–50 (quoting 19 U.S.C. § 1401a(b) (1964)).

merchandise involved in such transactions." Massce, 21 CCPA at 60.  The court in

Orbisphere reasoned that the determinative factor between the use of "export

value" and "United States value" was whether the sale occurred within or outside

of the United States.  Orbisphere, 13 CIT at 876, 726 F. Supp. at 1351.  Though

acknowledging that the definitions of "export value" and "transaction value" are

not identical, the court concluded that they were sufficiently similar to both require

a "sale abroad for export to the United States."  Id. at 875, 726 F. Supp. at 1350–

51.

        This Court does not find Orbisphere persuasive due to its reliance on the

1933 Massce case pre-dating the relevant statutory amendments in the Trade

Agreements Act of 1979 that abandoned export value in favor of transaction value.

See Trade Agreements Act of 1979, Pub. L. No. 96-39, § 201(a), 93 Stat. 144,

194–201 (1979).  Significantly, this Court notes that the language of the current

statute does not expressly require that a sale be international or occur abroad.  The

1979 revision removed all references to foreign markets in which merchandise

might be traded.  As the Senate Committee on Finance noted in its report on the

Trade Agreements Act of 1979:

> The use of transaction value as the primary basis for customs valuation
> will allow use of the price which the buyer and seller agreed to in their
> transaction as the basis for valuation, rather than having to resort to the
> more difficult concepts of "freely offered," "ordinary course of trade,"

> "principal markets of the country of exportation," and "usual wholesale
> quantities" contained in existing U.S. law.

S. Rep. No. 96-249, at 119 (1979).  The U.S. Court of Appeals for the Federal

Circuit has also recognized that transaction value is a departure from the

complexities of export value.  See Generra Sportswear Co. v. United States, 905

F.2d 377, 381 (Fed. Cir. 1990); see also VWP of Am., Inc., 175 F.3d at 1334–35

(recognizing the difference between "export value" and "transaction value" and

that the Trade Agreement Act of 1979 effectively repealed the prior valuation

statute).

Moreover, Plaintiff's contention that a sale "for exportation to the United

States" requires an international sale or a sale abroad is contrary to existing case

law.  In VWP of America, Inc. v. United States, 175 F.3d 1327, 1338–39 (Fed. Cir.

1999), the U.S. Court of Appeals for the Federal Circuit considered a three-tier

system involving a Canadian manufacturer that sold fabric to its wholly-owned

United States subsidiary for resale to buyers within the United States.  VWP of

Am., Inc., 175 F.3d at 1331.  The VWP court held that the sales between the

Canadian manufacturer and United States distributor were sales for exportation to

the United States that served as the basis for transaction value, but noted that the

sales between the United States distributor and its domestic buyers could provide

an alternative basis for transaction value.  Id. at 1334.

The Court concludes that 19 U.S.C. § 1401a(b)(1) does not require an

international sale or sale abroad, but rather requires a sale for exportation to the

United States based on a fact-specific analysis of the reality of the transaction.  As

noted previously, the undisputed evidence establishes that at the time of sale when

customers in the United States placed orders electronically with Plaintiff's sales

representatives, the subject merchandise was located in Canada and was shipped

from the Canadian warehouse to customers in the United States.  Thus, a sale for

exportation to the United States occurred based on the undisputed facts.

Plaintiff argues that the Court should consider the intentions of Plaintiff and

its customers in determining whether the sales were "for exportation to the United

States."  See Pl.'s Br. at 23–24; Oral Arg. at 7:39–8:57, 1:01:10–1:01:30, Mar. 22,

2022, ECF No. 70.  Plaintiff cites the existence of the shipping term "FOB Buffalo,

New York" printed on purchase orders as evidence of the intention of Plaintiff and

its customers to engage in domestic sales.  See Pl.'s Br. at 23–24.

The term "FOB" means "free on board" and denotes a "method of shipment

whereby goods are delivered at a designated location, usually a transportation

depot, at which legal title and thus the risk of loss passes from seller to buyer."

Litecubes, LLC v. N. Lights Prods., Inc., 523 F.3d 1353, 1358 n.1 (Fed. Cir. 2008).

The U.S. Court of Appeals for the Federal Circuit has held that a sale does not

necessarily occur at the location where the title to the goods passes under FOB

shipping terms, and that the location of a sale can be established by record evidence notwithstanding an FOB shipping term.  See, e.g., SEB S.A. v. Montgomery Ward & Co., Inc., 594 F.3d 1360, 1375 (Fed. Cir. 2010) (recognizing in a patent infringement case that an FOB shipping term is not dispositive when considering whether a sale took place inside or outside the United States, while noting that examination of the record evidence is critical to determining where the sale took place); MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1377 (Fed. Cir. 2005) (in a patent infringement case, finding that a sale occurred in Japan when all the essential activities of a sale occurred outside the United States and noting that despite an FOB delivery term, "the criterion for determining the location of a 'sale' . . . is not necessarily where legal title passes"); N. Am. Philips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576, 1579 (Fed. Cir. 1994) (noting that appellee failed to explain why the criterion for where a sale occurred should be the place where legal title passes rather than the "more familiar places of contracting and performance"); see also E.C. McAfee Co., 842 F.2d at 319 (concluding that a lack of knowledge that goods were destined for the United States by one party to a transaction was irrelevant when determining whether transaction value was appropriate).  Accordingly, this Court does not consider the existence of the delivery term "FOB Buffalo, New York" to be

dispositive evidence that sales of the subject merchandise were domestic and not for export to the United States.

The Court concludes that Plaintiff's emphasis on the term "FOB Buffalo, New York" is misplaced. The record does *not* establish that Plaintiff's customers in the United States intended to make a domestic purchase because there is no evidence on the record that Plaintiff's customers were aware of the location of the products when placing their orders. Similarly, Plaintiff contends that the shipping terms were "explicitly selected" but the record is silent on whether Plaintiff's customers negotiated the FOB Buffalo, New York terms of delivery. Pl.'s Br. at 23.

The Court rejects Plaintiff's argument that inclusion of the term "FOB Buffalo, New York" is dispositive evidence that Plaintiff and its customers intended the sales to be domestic and not for export to the United States. Because the undisputed facts establish that the subject merchandise was destined for the United States at the time of sale when the customers based in the United States first submitted their sales orders electronically to Plaintiff's Order Processing Department in Canada, the Court holds that the sales of the subject merchandise are "for exportation to the United States" pursuant to 19 U.S.C. § 1401a(b).

## II.   Deemed Liquidated By Operation of Law

Plaintiff contends that Customs' extensions of the liquidation deadline after June 14, 2015 were unlawful and that entries subject to those extensions should be deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504.  Pl.'s Br. at 34–38.  Defendant opposes Plaintiff's liquidation contentions.  Def.'s Cross-Mot. at 3; Def.'s Br. at 39–44.  The Court concludes that Customs' extensions of the relevant deadlines were in accordance with the law and that the subject entries should not be deemed liquidated by operation of law.

Merchandise entered for consumption not liquidated within one year of entry are "deemed liquidated" by operation of law at the duty rate asserted by the importer at the time of entry.  19 U.S.C. § 1504(a)(1).  Customs may extend the deadline for liquidation for one year at the request of the importer of record or if additional information is needed for a proper assessment or classification of the merchandise.  Id. § 1504(b); 19 C.F.R. § 159.12(a)(1).

The Parties disagree as to what standard the Court should apply in reviewing Customs' extensions of liquidation.  Defendant posits that the Court should apply an abuse of discretion standard.  Def.'s Br. at 40.  Plaintiff contends that a plain reading of 19 U.S.C. § 1504(b) does not confer discretion to Customs but establishes an objective rule.  Pl.'s Reply Br. at 29.  Under Plaintiff's interpretation

of the statute, Customs has no discretion to extend the deadline for liquidation in order to obtain additional information necessary for its appraisement. Id. at 29–30.

Plaintiff's argument runs contrary to the precedent of this Court holding that Customs' decisions regarding liquidation extensions are reviewed for arbitrariness and abuse of discretion, and whether Customs acted in accordance with the law. See Int'l Fid. Ins. Co. v. United States, 41 CIT __, __, 227 F. Supp. 3d 1353, 1362 (2017) ("This Court reviews the validity of Customs' liquidation extensions to determine whether they are proper under the statute, and are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (internal quotation omitted)); Int'l Cargo & Sur. Ins. Co. v. United States, 15 CIT 541, 542, 779 F. Supp. 174, 176 (1991); Detroit Zoological Soc. v. United States, 10 CIT 133, 137–38, 630 F. Supp. 1350, 1356 (1986). The only authority offered by Plaintiff in support of its position is North Dakota v. United States, 480 F. Supp. 3d 917 (D.N.D. 2020), in which the U.S. District Court for the District of North Dakota considered whether the Army Corps of Engineers was able to assert the discretionary function exception as a defense to claims brought under the Federal Tort Claims Act ("FTCA"). The FTCA provides a limited waiver of the Government's sovereign immunity for claims seeking monetary damages for injuries resulting from a negligent or wrongful act or omission by a Government employee. 28 U.S.C. § 1346(b). A statutory exception to this waiver is recognized

for claims based on a Government employee's exercise of or failure to exercise a discretionary function or duty.  Id. § 2680(a).  In determining whether the discretionary function exception was applicable, the district court noted that "if the statutes and regulations impose a mandatory obligation upon the government[,] there is no discretion to act contrary to or ignore such an obligation."  North Dakota, 480 F. Supp. 3d at 923.

The only relevant commonality between the FTCA claims considered by the U.S. District Court for the District of North Dakota and the issues currently before this Court is the presence of a Government action.  The Court is not persuaded that this minor similarity warrants deviating from well-established precedent.  There is no statutory ambiguity in Customs' discretion to determine how to best collect import duties or extend liquidation deadlines.  See St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 768 (Fed. Cir. 1993).  Accordingly, the Court reviews Customs' extensions of liquidation deadlines under the standard of whether Customs abused its discretion and acted in accordance with the law.  Int'l Fid. Ins. Co., 41 CIT at __, 227 F. Supp. 3d at 1362–63; Ford Motor Co. v. United States, 157 F.3d 849, 855 (Fed. Cir. 1998).  Plaintiff carries the burden of proving by a preponderance of the evidence that Customs abused its discretion in granting the extensions.  28 U.S.C. § 2639(a)(1); St. Paul Fire & Marine Ins. Co., 6 F.3d at 768–69.

Plaintiff contends that Customs had no reasonable basis for extending liquidation after June 14, 2015 because Plaintiff provided all requested information on or before June 14, 2014, and Customs' final appraisement calculation was based on Plaintiff's submissions from before June 14, 2014.  Pl.'s Br. at 34–36. Defendant argues that the extensions were justified because Customs required additional internal information in order to determine the appropriate method of appraisement and to liquidate the subject entries.  Def.'s Br. at 41–44.

"Information" under section 1504(b) includes "whatever is reasonably necessary for proper appraisement or classification of the merchandise involved." Detroit Zoological Soc., 10 CIT at 138, 630 F. Supp. at 1356.  In acquiring necessary information, Customs is not limited to information provided by the importer and may seek additional information internally.  Ford Motor Co., 157 F.3d at 856.  As this Court has previously noted, "[section] 1504(b)(1) should be construed sufficiently broadly for Customs to perform its obligations in a competent manner."  Int'l Cargo & Sur. Ins. Co., 15 CIT at 546, 779 F. Supp. at 179.

The Court observes that James Conrad, an auditor at the Port of Buffalo, New York, described Customs' audit process in his declaration.  Conrad Decl.  The auditor's fieldwork began on February 24, 2014 and continued to October 14, 2014.  Id. ¶¶ 8a, b, & f at 2–3; Def.'s SMF ¶ 89 at 14; Pl.'s Resp. at 16–17.

Documents were prepared by auditors based on fieldwork and reviewed by

Customs personnel. Conrad Decl. ¶ 8f at 3. Following review of the documents, a

senior auditor prepared an Audit Document Review Sheet on December 1, 2014.

Id. ¶¶ 8f–g at 3. On March 10, 2015, an Audit Report Review Sheet was

completed to ensure that the report satisfied Customs' internal standards and

Generally Accepted Government Auditing Standards ("GAGAS"). Id. ¶ 8i at 3.

The report was then submitted to a Report Referencing Review to confirm its

accuracy, which was completed on April 1, 2015. Id. ¶ 8j at 3–4. A Field Quality

Assurance Program review was completed on April 8, 2015 to ensure compliance

with GAGAS. Id. ¶ 8k at 4. The Draft Audit Report was issued on July 1, 2015.

Draft Audit Report; Pl.'s SMF ¶ 36 at 8; Def.'s SMF ¶ 99 at 16; Def.'s Resp. at 10;

Pl.'s Resp. at 18. Plaintiff provided its reply to the Draft Audit Report on July 8,

2015. Pl.'s Resp. Draft Audit Report; Pl.'s SMF ¶ 37 at 8; Def.'s SMF ¶ 100 at 16;

Def.'s Resp. at 10; Pl.'s Resp. at 18. On August 20, 2015, Plaintiff requested

internal advice from Customs' Office of Regulations and Rulings pursuant to 19

C.F.R. § 177.11 with respect to the proper basis of appraisement for the subject

merchandise. Def.'s Request for Internal Advice; Def.'s SMF ¶¶ 103–04 at 16;

Pl.'s Resp. at 19. The Final Audit Report was issued on February 24, 2016. Final

Audit Report; Pl.'s SMF ¶ 39 at 8; Def.'s SMF ¶ 101 at 16; Def.'s Resp. at 10–11;

Pl.'s Resp. at 19. Customs Headquarters Ruling H275056 was issued on July 1,

2016.  HQ H275056; Pl.'s SMF ¶ 40 at 9; Def.'s Resp. at 11.  The subject entries

were liquidated between April and October 2016.  Def.'s SMF ¶ 116 at 18; Pl.'s

Resp. at 22.

    Plaintiff characterizes Customs' review as a "lassitude" or "prolonged

internal deliberation."  Pl.'s Br. at 38.  While extensions solely for the purpose of

excusing or facilitating prolonged periods of inaction or actions unrelated to

appraisement might be an abuse of discretion, see Ford Motor Co., 157 F.3d at

855–57, the record reflects that Customs was actively engaged throughout the audit

process in collecting and reviewing the information needed to determine the proper

method of appraisement.  The fact that Customs' final determination and

calculations appear to be based mainly on information obtained early in the audit

process does not support a conclusion that Customs abused its discretion or acted

contrary to law by granting extensions to collect information, to confirm the

accuracy of that information, or to verify the appropriateness of the application.

Because Customs had a reasonable basis for extending liquidation in order to

complete the audit process, ensure its accuracy, and comply with established

standards, the Court concludes that Customs acted in accordance with the law and

did not abuse its discretion.  The Court holds that the subject entries should not

have been deemed liquidated by operation of law pursuant to 19 U.S.C.

§ 1504(a)(1).

## CONCLUSION

The Court holds that there are no genuine issues of material fact in dispute regarding whether Plaintiff's import transactions were sales for exportation to the United States and whether certain entries became deemed liquidated by operation of law.  Partial summary judgment is therefore appropriate as a matter of law. Upon consideration of Plaintiff's Motion for Partial Summary Judgment, Defendant's Cross-Motion for Partial Summary Judgment, and all other papers and proceedings in this action, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 56, is denied; and it is further

**ORDERED** that Defendant's Cross-Motion for Partial Summary Judgment, ECF No. 61, is granted as it pertains to Plaintiff's transactions qualifying as sales "for exportation to the United States" under 19 U.S.C. § 1401a(b) and to the subject entries not having been deemed liquidated by operation of law; and it is further

**ORDERED** that the remaining issues relating to the proper methods of valuation are reserved for Phase Two and that the Parties shall submit a joint status report and scheduling order by June 21, 2022 regarding Phase Two of this action.

            /s/ Jennifer Choe-Groves
            Jennifer Choe-Groves, Judge

Dated:    May 20, 2022
        New York, New York