**Appeal No. 2024-1142**

# United States Court of Appeals
# For The Federal Circuit

━━ ◀◆▶ ━━

MIDWEST-CBK, LLC,

*Plaintiff-Appellant*,

—v.—

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States Court of International Trade
in Consol. Court No. 17-00154, Judge Jennifer Choe-Groves

## BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-in-Charge

MONICA P. TRIANA
Senior Trial Counsel

BRANDON A. KENNEDY
Trial Attorney
International Trade Field Office
U.S. Department of Justice
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (212) 264-9240

*Attorneys for Defendant-Appellee*

*Of Counsel:*

EMMA TINER
Office of Assistant Chief Counsel
U.S. Customs and Border Protection

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.............................................................. 1

STATEMENT OF THE CASE ................................................................ 1

I.  Nature Of The Case ..................................................................... 1

II. Factual Background ...................................................................... 3

    A. History Of The Company ............................................................. 3

    B. Midwest's Operations In Canada After The Acquisition By Ganz.............. 4

    C. Specifics Of Midwest Import Operations Beginning In 2013...................... 6

        i.   Midwest Suppliers ................................................................ 7

        ii.  Sales Orders ...................................................................... 7

        iii. Delivery Of The Merchandise ................................................. 9

        iv. Payment By U.S. Customers ................................................... 12

    D. The Administrative Proceedings Involving Midwest................................ 12

    E. The Liquidation And Reliquidation Of The Entries.................................. 18

III. Proceedings Before The Court Of International Trade ................................... 19

    A. Court Of International Trade Slip Opinion 22-51 .................................... 20

    B. Court Of International Trade Order Denying Motion To Certify Questions For Interlocutory Appeal ............................................................. 22

    C. Court Of International Trade Slip Opinion 23-154 .................................. 25

SUMMARY OF ARGUMENT ............................................................... 25

ARGUMENT ................................................................................... 27

I.  STANDARD OF REVIEW .............................................................. 27

II. THE TRIAL COURT'S INTERPRETATION AND APPLICATION OF THE
    VALUE STATUTE SHOULD BE AFFIRMED BECAUSE THE SALES
    FROM MIDWEST TO ITS U.S. CUSTOMERS QUALIFY AS SALES "FOR
    EXPORTATION TO THE UNITED STATES"............................................ 28

    A. The Trial Court Properly Interpreted And Applied The Value Statute ....... 29

    B. Midwest's Interpretation Of 19 U.S.C. § 1401a Is Not Supported By
       The Law ....................................................................... 33

       1. An International Sale Is Not Required To Apply The Transaction Value
          Method Of Appraisement……………………………………………...….33

       2. The Method of Shipment Is Not Dispositive Evidence Of The Statutory
          Standard……………………………………………………………………...36

       3. The Court Should Not Apply *Orbisphere*……………………..……………39

III.THE TRIAL COURT'S HOLDING THAT THE SUBJECT ENTRIES DID
    NOT LIQUIDATE BY OPERATION OF LAW SHOULD BE AFFIRMED
    BECAUSE CBP PROPERLY EXTENDED THE TIMEFRAME FOR
    LIQUIDATION ................................................................... 44

    A. The Trial Court Properly Interpreted And Applied 19 U.S.C. § 1504(b) ... 44

    B. Midwest's Interpretation Of 19 U.S.C. § 1504(b) Is Not Supported By The
       Law ........................................................................... 49

    C. The Undisputed Facts Show That Customs Did Not Abuse Its Discretion In
       Extending Liquidation ........................................................ 51

CONCLUSION ....................................................................... 54

# TABLE OF AUTHORITIES

## **Cases**

*Brosterhous, Coleman & Co v. United States*,
   737 F. Supp. 1197, 1199 (Ct. Int'l Trade 1990) .................................................. 35

*Detroit Zoological Soc'y,. v. United States*,
   630 F. Supp. 1350, 1356 (Ct. Int'l Trade 1986). .......................................... 50, 51

*E.C. McAfee Co. v. United States*,
   842 F.2d 314 (Fed. Cir. 1988) ..................................................................... *passim*

*Ford Motor Co. v. U.S.*,
   157 F.3d 849, 855 (Fed. Cir. 1988) ................................................. 28, 45, 46, 51

*Generra Sportswear Co., v United States*,
   905 F.2d 377, 381 (Fed. Cir. 1990) ............................................................. 42, 43

*Int'l Cargo & Sur. Ins. Co. v. United States*,
   779 F. Supp. 174, 179 (Ct. Int'l Trade 1991) ............................................... 22, 51

*Int'l Customs Prods., Inc. v. United States*,
   748 F.3d 1182, 1186 (Fed. Cir. 2014) .............................................................. 27

*Int'l Fid. Ins. Co. v. United States*,
   227 F. Supp. 3d 1353, 1362 (2017) ................................................................... 45

*La Perla Fashions, Inc. v. United States*,
   9 F. Supp. 2d 698 (Ct. Int'l Trade 1998), *aff'd without opinion*,
   185 F.3d 885 (Fed. Cir. 1999) ............................................................... 34, 37, 38

*Litecubes, LLC v. N. Lights Prods., Inc.*,
   523 F.3d 1353, 1358 n.1 (Fed. Cir. 2008) ......................................................... 36

*Midwest-CBK, LLC v. United States*,
   578 F. Supp. 3d 1296 (Ct. Int'l Trade 2022) ....................................................... 3

*Midwest-CBK, LLC v. United States*,
   662 F. Supp. 3d 1377 (Ct. Int'l Trade 2023) ....................................................... 3

*Moss Mfg. Co. v. United States*,
   896 F.2d 535, 539 (Fed. Cir. 1990) ............................................................ 42, 43

*Nissho Iwai Am. Corp. v. United States*,
   982 F.2d 505 (Fed. Cir. 1992) ........................................................ 30, 31, 32, 35

*Orbisphere Corp. v. United States*,
   726 F. Supp 1344 (Ct. Int'l Trade 1999) .................................................... *passim*

*St. Paul Fire & Marine Ins. Co. v. United States*,
   6 F.3d 763, 768 (Fed. Cir. 1993) ...................................................... 27, 45, 46, 50

*United States v. Massce & Company*,
   21 CCPA 54 (1993) ........................................................................ 21, 23, 40, 41

*VWP of Am., Inc. v. United States*,
   175 F.3d 1327 (Fed. Cir. 1999) ................................................................ *passim*

## Statutes

19 U.S.C. §1401a ....................................................................................... *passim*

19 U.S.C § 1500 .......................................................................................... 13, 47

19 U.S.C. § 1504 ......................................................................................... *passim*

Trade Agreements Act of 1979,
   Pub. L. No. 96-39, 201(a), 93 State 144, 194-201 (1979)................................ 42

S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979) ...................................... 42

## Regulations

19 C.F.R. § 159.12 ...................................................................................... 44, 45

19 C.F.R. § 177.11 ........................................................................................... 16

## Other Authorities

HQ H275056 (July 1, 2016)............................................................................... 17

Case: 24-1142    Document: 16    Page: 6    Filed: 06/10/2024

"FOB Free on Board," Incoterms 2010 Edition, International Chamber of
   Commerce ................................................................................................... 36

## **STATEMENT OF RELATED CASES**

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The Government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## STATEMENT OF THE ISSUES

This consolidated case covers 562 entries filed with the Port of Buffalo, New York in 2013 and 2015.

The first issue is whether the sales between Midwest-CBK, LLC (Midwest), and its customers located in the United States qualify as sales "for exportation to the United States," as that standard is used under 19 U.S.C. §1401a, when a U.S. customer enters into a contract for the purchase of foreign-manufactured merchandise, that merchandise is located in Canada at the time of the sale, and is exported out of Canada and into the United States based on that sale.

The second issue is whether the entries did not liquidate by operation of law, pursuant to 19 U.S.C. § 1504, when Customs extended the timeframe for liquidation so that it could collect and review the necessary information for the proper appraisement of the merchandise and to ensure compliance with law.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

This consolidated action concerns the appropriate valuation of giftware, housewares, and decorative items imported by Midwest.  The merchandise was manufactured in China, transported to Canada for storage, sold to customers in the United States, and then exported from Canada to the United States in fulfillment of those sales.  Merchandise imported into the United States is appraised for customs

purposes in accordance with Section 402 of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. § 1401a).  By statute, the primary method of appraisement is transaction value, which is defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus certain statutorily enumerated additions.  19 U.S.C. § 1401a(b)(1).  When transaction value cannot be applied, then the appraised value is determined based on the other valuation methods in the order specified in 19 U.S.C. § 1401a(a).

CBP appraised the merchandise on the basis of transaction value between Midwest and its customers located in the United States.  Midwest challenges this method of appraisement arguing that Midwest's sales do not qualify as sales "for exportation to the United States."  Midwest argues that, by operation of 19 U.S.C. § 1401a(a), the method of deductive value should be used to appraise its merchandise.  Second, Midwest claims that CBP improperly extended liquidation of the 562 entries, and, as a result, the entries deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by operation of 19 U.S.C. § 1504.

The trial court bifurcated the case into two phases for organization and expediency.  The trial court limited Phase One to deciding "whether Plaintiff's import transactions reflect a sale 'for exportation to the United States'" – a

threshold issue in determining whether transaction value is the proper method of valuation – "and (2) whether the subject entries became deemed liquidated by operation of law." APPX0034. The trial court limited Phase Two to "all remaining issues, including the determination of the proper method of valuing the subject merchandise and whether Customs' calculation of the transaction value during liquidation was correct." APPX0034-35.

Plaintiff-Appellant, Midwest, appeals the trial court's judgment holding (1) that the transactions in questions constitute sales for exportation to the United States; and (2) that the entries did not become liquidated by operation of law. The trial court's decision as to these issues (*i.e.*, Phase One) is published at *Midwest-CBK, LLC v. United States*, 578 F. Supp. 3d 1296 (Ct. Int'l Trade 2022). The final judgment is published at 662 F. Supp. 3d 1377 (Ct. Int'l Trade 2023).

## II.    Factual Background

### A.    History Of The Company

Midwest of Cannon Falls, Inc., plaintiff-appellant's predecessor company, was a gift store founded in 1953 that sold seasonal items such as nutcrackers, music boxes and other holiday decorations/ornaments. APPX0394; APPX0420. Both the corporate headquarters and the warehouse/distribution facility for Midwest of Cannon Falls were located in Cannon Falls, Minnesota. APPX0394. The company purchased its merchandise from Chinese suppliers, and imported the

3

merchandise directly into the United States from its suppliers, where it was

warehoused until sale. *Id.* It executed its sales through a United States sales force,

and it shipped its merchandise from Cannon Falls to its U.S. customers using the

shipping terms, "FOB Cannon Falls, Minnesota." *Id.* At entry, the company

appraised its merchandise based on the transaction value of the sale from the

foreign supplier to Midwest. *Id.*

In 2009, Midwest's assets and business operations changed hands a number

of times. APPX0395. Ultimately, on December 5, 2012, the Ganz family,

investors based in Canada, acquired the assets of Midwest through Giftware

Holdings, LLC, a Delaware limited liability company owned by Ganz Partnership

(Ganz). *Id.*; APPX0418, APPX0421; APPX0502-APPX0561. Midwest-CBK,

LLC, the importer of record, *see e.g.,* APPX0689, was then formed by Ganz to

acquire those assets. APPX0418. The Ganz family owns, among other things,

businesses in the United States and Canada through several Canadian trusts,

APPX0563; APPX0565; APPX0421; APPX0418; APPX0429. Ganz is based out

of One Pearce Road in Woodbridge, Ontario. APPX0429.

### B. Midwest's Operations In Canada After The Acquisition By Ganz

After the acquisition by the Ganz family, Midwest changed the structure of

its business and the location of its facilities. APPX0396; APPX0094-97. Its

corporate office remained in Cannon Falls, Minnesota, which housed the following

departments: product development; supply chain, procurement, purchasing and compliance; financial analysis, planning & accounting; and sales managers. *Id.*; APPX0424; APPX0425-427. Midwest, however, shifted its warehouse, distribution and order processing operation to Canada, where the Ganz family and its companies were based. APPX0094-97.

By January 2013, Midwest transitioned warehousing operations to a leased facility at 610 Hanlan Road, Woodbridge, Ontario, APPX0109-129; APPX0423, owned by Ganz Realty Limited (based in Canada). *Id.*; APPX0563. It housed distribution and warehousing as well as invoicing and order control departments, APPX0424; APPX0428; APPX0569-582. They were responsible for, among other things, picking, packing, invoicing and delivery of merchandise. APPX0428; APPX0450-451. Midwest leased additional storage space at 260 Hanlan Road, from Ganz Realty. APPX0429.

Midwest also leased a two-story office building from Ganz Realty located at 555 Hanlan Road, in Woodbridge. APPX0428. Approximately 22 Midwest employees worked in that building from the following departments: order processing, inventory control, customer service, key accounts, information technology and customer accounts. APPX0592-593; APPX0569-582; APPX0427-429. These departments were responsible for, among other things, setting up customer accounts, assisting with technology issues, managing key customer

5

accounts, fielding customer inquiries, applications for credit and delinquent

accounts, and assisting with order fulfillment at the warehouse. *Id.*; APPX0594.

Midwest kept records in both Minnesota and Canada. Midwest maintained a

data center and mainframe (AS400) system at One Pearce Road, in Woodbridge,

Ontario, which stored "the order management, inventory, customer account and

source accounting records," APPX0633-635; APPX0430-431; APPX0402-403.

The servers were maintained by a Ganz employee. APPX0431. Use of the space

at One Pearce Road (where Ganz offices are located) was governed by a contract

with Ganz Studios, a software development company also owned by Ganz. *Id.*;

APPX0637-639; APPX0563. Finally, beginning in 2013, Midwest maintained an

additional showroom in the Ganz facility at One Pearce Road, APPX0649;

APPX0436, for which it did not pay any additional sums. APPX0436.

### C. Specifics Of Midwest Import Operations Beginning In 2013

After the acquisition by the Ganz family in 2013, Midwest changed its

import operations. APPX00396. As explained below, after production in China,

Midwest transported the merchandise to Canada for storage. *Id.*; APPX0438,

APPX0440; APPX0655. While in storage, Midwest executed the sale of the

merchandise to customers in the United States, and then exported the merchandise

from Canada to the United States in fulfillment of those sales. APPX0654-658.

On these facts, Midwest could no longer appraise the merchandise based on the

transaction value of the sale between Midwest and its Chinese suppliers. As explained by Midwest, it, therefore, "intentionally structured" the transactions between Midwest and its U.S. customers in an effort to "ensure that there was no sale of the goods 'for exportation to the United States' and that no basis would exist for appraisement under 'transaction value.'" APPX0655.

### i.    **Midwest Suppliers**

When Midwest's warehouse and distribution operations relocated to Canada, it began importing merchandise directly from its Chinese supplier into Canada, where it was brought to Midwest's Canadian facilities. APPX0396; APPX0438, APPX0440; APPX0655. Midwest paid all taxes, freight, fees, and Canadian import duties on those shipments. APPX0396; APPX0440. This inventory was available for purchase by any Midwest customer, not just those in the United States. APPX0364; APPX1013; APPX0439-440.

### ii.    **Sales Orders**

Sales were made primarily through a U.S. based sales force. APPX0440; APPX0397; APPX0038. Sales personnel visited customers with an electronic device that had point of sale software loaded, either Emun or WhereOWhere, which allowed the customer to view Midwest's catalog(s) and make purchases. APPX0399; APPX0440-441; APPX0661. If the parameters in the software systems were met, which establish the necessary information to place an order

(account information, *etc.*), the order would be accepted into the electronic system for processing, and made available to personnel in both Cannon Falls and Canada through the global distribution system.  APPX0445-447; APPX0405.

Prior to transmission to the distribution system, however, orders are batched together and routed through a third-party server located in Alabama.  APPX0445; APPX0661.  The Midwest employees in the order processing department (located in Canada), which was responsible for managing orders, were the first individuals to access the purchase order information after download into the AS400 mainframe.  APPX0586-587; APPX0590-591.

Purchase orders reflecting the details of the order were provided to the U.S. customer (either in hard copy or via email).  *See e.g.,* APPX0666-667; APPX0442. They included the date, the name and address of the U.S. purchaser, the merchandise ordered, its quantity, the price to be paid and a purchase order number.  *Id.*  The purchase orders also included terms of the sale, including the phrase "All *prices* FOB Buffalo, New York as defined by the New York State Uniform Commercial Code."  APPX0667 (emphasis added).  The complete terms and conditions, as noted on the purchase order, could be obtained by contacting the customer services department by phone or email.  *Id.*; APPX0442-443.  The terms and conditions included contact information for customer service, order

processing, customer accounts, and customer finance, all of which are located in

Canada.  APPX0184; APPX0443.

After order processing, employees in the fulfillment department (in Canada)

access the purchase order from the distribution system and generate a pick ticket.

APPX0661-662; APPX0669; APPX0448-449.  The pick ticket includes the same

information as the purchase order and doubles as a packing slip for shipment to the

U.S. customer.  *Id*.  Midwest personnel consult the inventory system to determine

availability.  If available, the item would be removed from the electronic inventory

records.  APPX0662; APPX671-675; APPX0449.  The pick ticket is then sent to

the warehouse so the merchandise can be picked, packed and labeled for delivery

to the U.S. customer.  APPX0450.  The pick ticket/packing slip is attached to the

box for delivery.  *Id.*

### iii.  Delivery Of The Merchandise

After Midwest executes the sales to the U.S. customers, the merchandise is

delivered from Canada to its U.S. customers in two phases.  First, pre-labeled

boxes are sent by truck from the warehouse to a United Parcel Service (UPS) or

FedEx facility in Buffalo, New York; second, the pre-labeled boxes are shipped

from Buffalo to the U.S. customers.

While at the warehouse in Canada, the merchandise that is picked and

packed for individual U.S. customers is weighed by Midwest personnel using UPS

software (located in the Canadian warehouse) to determine the freight charge from Buffalo to the U.S. customer.  APPX0662; APPX0450.  A UPS bar code and address label (with the U.S. customer's address) is then printed and placed on each individual box.  *Id.*  Also on each box is a pouch with the packing slip (listing the items ordered and the price to be paid by the U.S. customer).  *Id.*  Individually labeled boxes are then loaded onto third-party trucks, APPX0450-451; APPX0662, these trucks are contracted and paid for by Midwest.  APPX0719; APPX0721, APPX0662.  As the boxes are loaded onto the truck, picking/packing slips are either electronically scanned, or a hard copy is detached to be sent back to the office for invoicing.  APPX0451.  Each truckload leaving Midwest's warehouse is identified by batch number.  *Id.*

A batch record identifying the merchandise on each truck is then created.  APPX0452; APPX0662; APPX0677-687.  The batch record includes a list of the items, Midwest's calculated entered value, and the tariff code for each.  *Id.*  The batch record is provided to the Customs broker to prepare the necessary papers to make entry in the United States.  APPX0452.  Midwest's calculated entered value for each piece of merchandise is different from (and often less than) the price of the merchandise that is paid by the U.S. customer.  *Id.*; APPX0367-368; APPX1018.

Midwest, as the exporter and importer of record, makes entry of the merchandise into the United States, APPX0662, APPX0689-715; APPX0401; APPX0626-631, where it is brought directly to a U.S. carrier, most often a UPS facility (located at either 60 Industrial Parkway in Cheektowaga, New York or 1907 James E. Casey Drive in Buffalo, New York). *See* APPX0406; APPX0455-456; APPX0626-631; APPX0719; APPX0721; APPX0723-729. At UPS, pursuant to an agreement with Midwest, the previously labeled boxes are deconsolidated from the truckload batch, the shipping labels are scanned into the UPS system, and the merchandise is shipped to Midwest's U.S. customers in fulfillment of the orders. APPX0406; APPX0433; APPX0662; APPX0723-729; APPX0039-40. No Midwest personnel work at the UPS facility or at any location in Buffalo. APPX0433.

Midwest prints invoices to its U.S. customers, in Canada, at approximately the time that the merchandise is picked. APPX453-454; *see e.g.*, APPX0717. Ganz has a postage machine for the U.S. postal service in its mailroom in Canada. APPX0454. The invoices are printed and stuffed in envelopes and U.S. postage is applied in the Ganz mailroom in Canada. *Id.* The invoices are then couriered from the Midwest/Ganz facility in Canada to the United States, and placed in the mail in Buffalo. *Id.*; APPX0040.

iv.    **Payment By U.S. Customers**

Payments to Midwest were directed to P.O. Box 529 in Buffalo, New York. APPX0717.  Midwest contracted with a bank's lockbox services, for pick up and deposit of these payments.  APPX0433; APPX0434.  These sales were then recorded on Midwest's General Ledger journal.  APPX0457.

**D. The Administrative Proceedings Involving Midwest**

This consolidated case covers 562 entries filed with the Port of Buffalo, New York in 2013 and 2015.  APPX0370; APPX1020.  Prior to the acquisition by Ganz, the merchandise being imported by Midwest was appraised on the basis of the transaction value of the sales from the Chinese supplier to Midwest.  APPX0394; Blue Br. at 4.  On January 30, 2013, following the acquisition, Midwest notified CBP of a change in its operations.  APPX0094-105.  Specifically, Midwest notified CBP that it would enter its merchandise using the "deductive value" method of appraisement.  *Id.*; *see* 19 U.S.C. § 1401a.

In early 2013, after meeting with Midwest, CBP requested additional information about Midwest's operations and import procedures; Midwest provided certain requested information.  APPX0370; APPX1020; *see e.g.,* APPX0186-0189.

In March of 2013, Import Specialists at the Port of Buffalo requested that CBP's Office of Regulatory Audit (Regulatory Audit) conduct an audit of Midwest's valuation.  APPX0731.  Although the audit officially began in February

2014, preliminary work began in 2013 with respect to whether Midwest properly appraised its merchandise, which was shipped from Midwest's warehouse in Canada, through the Port of Buffalo, and ultimately to a U.S. customer. APPX0731-732. The scope of the audit was to determine the proper basis of appraisement with respect to the transactions that took place from January 2013 to December of 2013. APPX0732; APPX0223-244. If Regulatory Audit determined that the correct basis of appraisement under 19 U.S.C. § 1401a was transaction value, CBP, at the Port of Buffalo, would, as a second step, be required to determine how to properly calculate the transaction value of the merchandise at liquidation. APPX0734; *see also* 19 U.S.C § 1500(a) (stating that CBP "shall . . . fix the final appraisement of merchandise by ascertaining or estimating the value thereof . . . .").

The audit conducted by CBP's Buffalo Field Office of Regulatory Audit was known as a Quick Response Audit. APPX0731. A Quick Response Audit involves a number of steps, including a risk assessment of the relevant issue, a questionnaire tailored to that issue, a walkthrough of import practices or entries, interviews with company personnel and the issuance of a final audit report. APPX0731-732; APPX0042.

As part of the audit, CBP conducted an on-site review of Midwest facilities in Canada from February 24-25, 2014. APPX0732. CBP also made a number of

requests for information, to which Midwest responded. *See e.g.*, APPX0661-717.

In one request, CBP asked for all the documentation underlying twelve specific

line items on the entry papers. APPX0732-733; APPX0133-160. Midwest

provided the information for one transaction, but either partial or no information

with respect to the rest. APPX0733. CBP conducted fieldwork, which included

developing an understanding of how to match invoices to U.S. customers with a

specific line item on the entry paperwork. APPX0732. Each of the more than 560

entries could be comprised of more than 100 line items. *See* APPX0372;

APPX1023; APPX0732. Each line item for a single entry was then made up of a

particular classification (not a particular item), and each classification could

include multiple different items of merchandise that may have been sold to

different U.S. customers. APPX0732.

    CBP continued to make inquiries, and Midwest continued to provide

information in response to CBP's inquiries through June of 2014. APPX0372;

APPX1023.

    On July 12, 2014, Regulatory Audit performed a review of the sample

transaction provided by Midwest, which included import documentation, purchase

orders, invoices, bills of lading and accounting data. APPX0733. CBP completed

its fieldwork on October 14, 2014. *Id*. As part of the audit process, auditors

prepared "workpapers," which are detailed documents describing the fieldwork

conducted and the findings reached.  *Id*.; *see also* 1067-1146.  In addition, the

auditors prepared the audit report.  APPX0733.  The audit process further required

review of these workpapers by other auditors as well as the Assistant Field

Director.  *Id*.  Thereafter, a senior auditor reviewed the workpapers and prepared

an audit document review sheet.  *Id.*  This process ensured the accuracy and

completeness of the workpapers and the conclusions reached.  *Id*.  CBP completed

the audit document review sheet by December 1, 2014.  *Id.*

On March 10, 2015, the CBP Assistant Field Director completed an audit

report review sheet, the purpose of which was to ensure that the report was in

compliance with Generally Accepted Government Auditing Standards (GAGAS).

*Id*.  Further review of the report was then conducted by CBP's Report Referencing

Review (which confirms the accuracy of all information and conclusions in the

report) as well as CBP's Field Quality Assurance Program (which also ensures

compliance with GAGAS).  APPX0733-734.  Both reviews were completed in

April, 2015.  *Id*.  During the process of review, workpapers were returned for

changes and questions by auditors.  *Id*.  Regulatory Audit continued to work with

the Field Quality Assurance Program into June of 2015 to further ensure all

regulatory standards had been met.  APPX0734.

On July 1, 2015, CBP issued a draft findings sheet and audit report,

concluding that transaction value was the proper basis of appraisement.

APPX0191-192.  Shortly thereafter, on July 8, 2015, Midwest submitted a rebuttal. APPX0194-220.  CBP issued its final audit report on February 24, 2016, APPX0223-244, finding, consistent with the draft report, that the proper basis of appraisement was transaction value.  APPX0229.  The final report included a "rejoinder" by CBP.  APPX0231.

On August 20, 2015, after the draft report was issued but before the report was finalized (while the audit continued), Midwest made a request for internal advice to CBP's Office of Regulations & Rulings, pursuant to 19 C.F.R. § 177.11, with respect to the proper basis of appraisement for Midwest's merchandise. APPX0737-804.  A request for internal advice is handled by CBP's Headquarters office, and is separate from audits. 19 C.F.R. § 177.11.

When the draft audit report was issued in July of 2015, import specialists at the Port of Buffalo, tasked with assessing the transaction value for each imported item, began working on that assessment with Regulatory Audit.  APPX0734. Liquidation, however, could not occur absent a final report.  *Id.*  A standard calculation of transaction value (based on the actual sale to the customer) was not possible without the invoices that Midwest issued to its U.S. customers and information to match the invoice to the line item on the entry documents, which were not provided.  APPX0734-735.  Therefore, CBP calculated transaction value for each entry using Midwest's 2013 financial records.  *Id.*; APPX 274-277.

Specifically, CBP deducted certain amounts from Midwest's total U.S. sales, and subtracted the total entered value to determine the percentage that each entry was undervalued. *Id.* In doing so, CBP identified a formula to arrive at the transaction value, which consisted of a percentage uplift to be added to the entered value for all entries. *Id.* On March 28, 2016 and April 6, 2016, shortly after issuance of the final audit report, CBP issued notices of action, noting that hundreds of entries would be appraised using an uplift of 123.18 percent. APPX0257-267. On April 16, 2016, after receiving the notices of action, Midwest asked CBP to extend the liquidation of its entries so that it could submit data, not presently available, to appraise the merchandise in accordance with the Audit report — *i.e.*, according to transaction value. APPX0269-272. On May 13, 2016, Midwest submitted comments to the Notice of Action, noting "specific errors" in CBP's calculated uplift formula. APPX0279-306. These comments were considered by CBP. APPX0735.

On July 1, 2016, CBP issued HQ H275056 (July 1, 2016), in response to Midwest's request for internal advice finding, consistent with its audit results, that the proper basis of appraisement is transaction value. APPX0246-255.

### E. The Liquidation And Reliquidation Of The Entries

Subsequent to importation, CBP extended the liquidation of the entries two or three times, as needed, to allow CBP time to gather information and to complete the audit process.  APPX0806-998.  CBP liquidated 336 entries in April, May and June, 2016 and it liquidated the remaining 226 entries in August, September and October, 2016.  APPX0376; APPX1029.  CBP appraised the 336 entries liquidated in April, May and June of 2016 using transaction value and an uplift of 123.18 percent over the entered value.  *Id.*; APPX0735.  Based, in part, on the comments provided by Midwest, CBP later recalculated the valuation and amended the percentage uplift to be applied to 75.75 percent.  APPX0329-341; APPX0735.  The uplift was modified as a result of a change in the calculated entered value and total sales price for the entries in 2013.  The new uplift was applied to the remaining entries liquidated in August, September and October, 2016.  *Id.*, APPX0376; APPX1029.

Midwest timely protested the 336 entries liquidated at 123.18 percent.  APPX0376; APPX1029.  Midwest challenged CBP's appraisal of the subject merchandise using transaction value, as well as the use of the markup.  *Id.*  Midwest also claimed that the entries deemed liquidated at the rate and amount asserted at entry because CBP improperly extended the liquidations.  APPX0376-377; APPX1029.  With respect to the issue of valuation, CBP approved the protests

in part, indicating that the entries should be reliquidated at 75.75 percent.
APPX0377; APPX1029-1030. CBP, thereafter, reliquidated these entries at a
75.75 percent markup in January and February of 2017.[1] *Id.* Midwest timely filed
two protests challenging the 2017 reliquidations. CBP denied the protests in full.
APPX0377; APPX1030. As to the entries liquidated in August, September and
October 2016, Midwest protested the liquidations and CBP denied the protests in
full. *Id.*

## III.    Proceedings Before The Court Of International Trade

In its complaint, Midwest challenged Customs' selection of transaction
value as the proper basis of appraisement, by operation of 19 U.S.C. § 1401a(a),
arguing that Midwest's sales do not qualify as sales "for exportation to the United
States." Midwest claims that the deductive value or fall back method should be
used to appraise its merchandise. Midwest also alleges that the entries deemed
liquidated at the rate of duty, value, quantity, and amount of duties asserted at the
time of entry by operation of 19 U.S.C. § 1504. *See* APPX0034.

The court bifurcated the case into two phases for organization and
expediency. Phase One included "whether Plaintiff's import transactions reflect a
sale 'for exportation to the United States'" – a threshold issue in determining

---

[1] Due to various errors for Entry Nos. 799-0291383-3 and 112-2628978-9, the
liquidation at the 123.18 percent markup remains in full effect.

whether transaction value is the proper method of valuation – "and (2) whether the subject entries became deemed liquidated by operation of law." APPX0034. Phase Two encompassed "all remaining issues, including the determination of the proper method of valuing the subject merchandise and whether Customs' calculation of the transaction value during liquidation was correct." *Id.*

### A. Court Of International Trade Slip Opinion 22-51

The trial court granted the Government's partial motion for summary judgment (and denied Midwest's partial motion for summary judgment) as to both counts. Specifically, in its decision as to Phase One, the court held (1) that "the sales of the subject merchandise are 'for exportation to the United States' pursuant to 19 U.S.C. § 1401a(b);" APPX0056, and (2) "that the subject entries should not have been deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504(a)(1)." APPX0062.

First, the trial count analyzed whether transaction value, the default method of appraisement, was the proper method of valuation, under the applicable statute, 19 U.S.C. § 1401a(a)(1), and relevant precedent. APPX0047-56; *see e.g.*, *VWP of Am., Inc. v. United States*, 175 F.3d 1327 (Fed. Cir. 1999); *E.C. McAfee Co. v. United States*, 842 F.2d 314 (Fed. Cir. 1988). The trial court analyzed whether the import transaction satisfied the two elements for appraising the merchandise using transaction value – *i.e.*, "(1) that the merchandise is sold and (2) that the sale is for

exportation to the United States." APPX0047. The trial court held that the

merchandise, which was based in Canada prior to importation, was "clearly

destined for the United States at the time of the sale" and, therefore, Midwest's

sales were "for exportation to the United States under 19 U.S.C. 1401a(b)(1)."

APPX0049.

Midwest argued that a sale "for exportation to the United States" must be an

international sale, or must have occurred abroad, and that the sales in question do

not satisfy that requirement. APPX0049-50. Midwest stated that sales were

negotiated in the United States, and that it retained title to the goods until they

entered the United States in Buffalo, based on its chosen FOB shipping terms. *Id.*

The court found Midwest's argument (requiring an international sale) was contrary

to existing law. APPX0053. The statute, the court noted, only requires "a sale for

exportation to the United States based on a fact-specific analysis of the reality of

the transaction." APPX0054. The existence of the shipping term FOB. was not

dispositive of this analysis. APPX0055-56.

The court further found unpersuasive Midwest's reliance on *Orbisphere*

*Corp. v. United States*, 726 F. Supp 1344 (Ct. Int'l Trade 1989), a decision that

relied on the Court of Customs and Patent Appeals decision in *United States v.*

*Massce & Company*, 21 CCPA 54 (1993). APPX0052. The decision in *Massce*

was decided under a predecessor value statute, which did not consider "transaction

21

value" and "deductive value," but rather considered "export value" and "United States value." APPX0050-52. The language in the current statute was a departure from the criteria in the predecessor statute. APPX0052-53.

Second, the trial court addressed Midwest's argument that the entries were deemed liquidated by operation of law because the extensions of liquidation were unlawful. APPX0057-62. The court concluded that CBP's extension of the liquidation deadlines were in accordance with law, and that the entries did not liquidate by operation of law. APPX0057. The court agreed with the Government that the proper standard of review is an abuse of discretion standard. APPX0057-59. Moreover, the court noted, 19 U.S.C. § 1504(b)(1) "should be construed sufficiently broadly for Customs to perform its obligations in a competent manner." APPX0060 (quoting *Int'l Cargo & Sur. Ins. Co. v. United States*, 779 F. Supp. 174, 179 (Ct. Int'l Trade 1991)). The court found that "Customs had a reasonable basis for extending liquidation in order to complete the audit process, ensure its accuracy, and comply with established standards" and therefore, did not abuse its discretion in extending liquidation. APPX0062.

### B. Court Of International Trade Order Denying Motion To Certify Questions For Interlocutory Appeal

Midwest requested the trial court to certify two questions for interlocutory appeal and the trial court denied that request. *See* APPX0065-77.

First, Midwest requested the court to certify the question of "whether a post-importation sale, consummated on '[Free on Board ('F.O.B.')] Buffalo, New York' terms, as defined by New York Uniform Commercial Code ('UCC'), may serve as the basis of a 'sale for exportation to the United States' for purposes of the transaction value statute, 19 U.S.C. § 1401a(b)?"  APPX0065.  The court held that none of the factors relevant for certifying a question for interlocutory appeal were satisfied for this issue.  APPX0067-73.  As to the first factor for the test, whether the question before the court is a pure question of law, the court held that the issue involved a "fact specific inquiry and a case-by-case analysis."  APPX0068.  The inquiry is "not solely dependent on where title passes," but on "the reality of the transaction in its entirety."  *Id.*

As to the second factor for the test, whether there was a "substantial ground for difference of opinion," APPX0068 (quoting 28 U.S.C. § 1292(d)), the trial court again held that Midwest failed to establish this element.  APPX0068-72.  Midwest argued that the trial court departed from holding of the *Orbisphere* decision.  APPX0068.  The court held that *Orbisphere*, which relied on *Massce*, "failed to appreciate that the Trade Agreements Act of 1979 . . . amended the valuation statute to eliminate references to foreign markets and the requirement that sales be international or occur abroad."  APPX0069.  None of the cases relied upon by Midwest (which cite *Orbisphere*) support its argument.  APPX0069-71.

23

Moreover, the trial court held that there was not a difference of opinion as to the interpretation of the shipping terms or whether shipping terms determine the place of sale. APPX0071-72. And, even if a difference of opinion existed, it would not be dispositive of the issue. *Id.* Finally, the court was not persuaded that an interlocutory appeal would be more efficient in litigating this case. APPX0072-73.

Second, Midwest requested the trial court to certify the question of "[w]hether, after [Customs] has received all factual information needed to render its appraisement determination, the agency has any discretion to extend liquidation of entries pursuant to 19 U.S.C. § 1504(b)?" APPX0073. As to the first factor of the test, whether this was a pure question of law, the court held it was not, but instead a factual inquiry as to "whether Customs had all of the information necessary to reach an appraisement determination and whether Customs abused its discretion in granting the extensions under the statute." APPX0074. Further, the trial court held that there was not a substantial ground for a difference of opinion. APPX0074-76. Section 1504(b)(1) permits CBP to extend liquidation when additional information is required, which is not limited to factual information provided by one of the parties. APPX0076. Finally, for the same reason articulated above, deciding this issue at this stage does not advance the termination of the litigation. *Id.*

## C. Court Of International Trade Slip Opinion 23-154

The issue that remained in Phase Two of the litigation involved "questions of valuation of the subject merchandise." APPX0017. The Government requested information from Midwest with respect to the traditional calculation of transaction valuation. *Id.* Midwest declined to provide this information, and instead conceded the unresolved issues of Phase Two so that it could proceed to appeal the portion of the judgment from Phase One. APPX0017-18. Midwest stipulated that, even if reversed, it would present no further evidence as to the calculation of transaction value. APPX0018. Based on this representation, the trial court entered final judgment against Midwest. APPX0019.

## <u>SUMMARY OF ARGUMENT</u>

In valuing imported merchandise for tariff purposes, the law defines transaction value as "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions. 19 U.S.C. § 1401a(b)(1). The trial court correctly held that the sales between Midwest and its U.S. customers meet the statutory requirement of being sold "for exportation into the United States." APPX0056.

In conducting this analysis, the trial court appropriately applied the holding of *E.C. McAfee Co.*, 842 F.2d 314. The trial court held that "whether merchandise is sold 'for exportation to the United States' [is] based on a fact-specific inquiry

that requires case-by-case analysis[,]" in which the court considers "the reality of the transaction" in question.  APPX0048 (citing *E.C. McAfee*, 842 F.3d at 319).  A sale is "for exportation to the United States" when the merchandise was "clearly destined for the United States at the time of the sale."  *Id.*; *see also* APPX0072.

The trial court properly held that the facts of this case satisfied this statutory requirement.  The merchandise was located in Canada at the time when the order was placed by the U.S. customer.  Midwest then labeled the package for delivery to the U.S. customer who contracted to pay – and did pay – an agreed price for that merchandise.  Midwest then exported the merchandise from Canada to the U.S. customer in the United States.  *See* APPX0048-49.

Midwest's fails to identify any error in this analysis, instead repeating the same unsuccessful arguments made before the trial court.  Indeed, the trial court properly held that an "international sale" is not required for that sale to be "for exportation to the United States," and further found Midwest's reliance on *Orbisphere*, 726 F. Supp. 1344, to be unpersuasive.  APPX0049-53.

The trial court properly held that CBP did not abuse its discretion in extending the liquidation for the 562 entries, and, therefore, the entries did not become liquidated by operation of law.  APPX0057-62.  The law allows CBP to extend the timeframe for liquidation up to a period of four years when additional information is needed for the proper appraisement of the merchandise or to ensure

compliance with the law. *See* 19 U.S.C. 1504(b). The undisputed record shows that CBP did not abuse its discretion in extending liquidation. To the contrary, up until the time of liquidation, CBP was collecting and reviewing information from the importer, conducting a Quick Response Audit to determine the proper basis of appraisement, and thereafter determining a methodology for calculating transaction value when the necessary information was not provided. Therefore, CBP extended the timeframe for liquidation in accordance with law. *Id.*

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews the trial court's interpretation of the value statute *de novo*. *VWP*, 175 F.3d at 1334; *Int'l Customs Prods., Inc. v. United States*, 748 F.3d 1182, 1186 (Fed. Cir. 2014) ("This court reviews the CIT's statutory interpretation de novo . . . .").

This Court reviews the factual findings of the trial court under the clear error standard. *VWP*, 175 F.3d at 1334.

This Court reviews a decision by CBP to extend the timeframe for the liquidation of the entries under the abuse of discretion standard of review. *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 768 (Fed. Cir. 1993) (emphasis added) ("Customs may, for statutory purposes . . . employ up to four years to effect liquidation so long as the extensions it grants *are not abusive of its*

*discretionary authority.*"); *Ford Motor Co. v. U.S.*, 157 F.3d 849, 855 (Fed. Cir.

1988) ("The Court of International Trade can only rule an extension improper if

Customs abused its discretion.").

## II.  THE TRIAL COURT'S INTERPRETATION AND APPLICATION OF THE VALUE STATUTE SHOULD BE AFFIRMED BECAUSE THE SALES FROM MIDWEST TO ITS U.S. CUSTOMERS QUALIFY AS SALES "FOR EXPORTATION TO THE UNITED STATES"

Imported merchandise must be appraised for purposes of ascertaining the

final amount of duty.  The value statute, codified at, codified at 19 U.S.C. §

1401a,[2] sets forth a number of methods for appraising merchandise.

---

[2] 19 U.S.C. § 1401a(a) provides:

(a) Generally
> (1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:
>> (A) The transaction value provided for under subsection (b).
>> (B) The transaction value of identical merchandise provided for under subsection (c), if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2).
>> (C) The transaction value of similar merchandise provided for under subsection (c), if the value referred to in subparagraph (B) cannot be determined.
>> (D) The deductive value provided for under subsection (d), if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternative valuation under paragraph (2).
>> (E) The computed value provided for under subsection (e), if the value referred to in subparagraph (D) cannot be determined.

*Continued on next page.*

"The primary method of valuation is the 'transaction value' of the merchandise provided for under 19 U.S.C. § 1401a(b)(1)." *VWP*, 175 F.3d at 1330. It is only when this "primary method" either "cannot be determined or cannot be used" that Customs will look to the "secondary valuations methods in the order listed in [19 U.S.C.] § 1401a(a)(1) . . . ." *Id*. Section 1401a(b)(1) provides that the "transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions. 19 U.S.C. § 1401a(b)(1). The "price actually paid or payable" is "the total payment . . . made, *or to be made*, for imported merchandise by the buyer to, or for the benefit of, the seller." 19 U.S.C. § 1401a(b)(4)(A) (emphasis added).

Pursuant to the plain language of the statute, there are only *two* requirements for application of transaction value: (1) the item must be "sold" and (2) that sale must be "for exportation to the United States." *VWP,* 175 F.3d at 1338-39.

## A. The Trial Court Properly Interpreted And Applied The Value Statute

The trial court's interpretation of 19 U.S.C. § 1401a(a) and 1401a(b)(1) is supported by the plain language of the statute. And, Midwest can show no error in the trial court's application of the statutory language to the facts of this case.

---

(F) The value provided for under subsection (f), if the value referred to in subparagraph (E) cannot be determined.

Accordingly, this Court should affirm the trial court's holding that the transactions between Midwest and its U.S. customers qualify as (1) sales and (2) that those sales were "for exportation to the United States," which triggers the use of the transaction value method of appraisement. *See* 19 U.S.C. § 1401(b)(1).

As to the first element, the parties agreed, and the trial court correctly held, that the merchandise was sold from Midwest to its U.S. customers. APPX0047; Blue Br. at 28-29. As this Court held, in *VWP*, "for merchandise to be 'sold' for purposes of 19 U.S.C. § 1401a(b)(1), there must be a transfer of title from one party to another for consideration." *VWP*, 175 F.3d at 1339. The sale from Midwest to its U.S. customers satisfied that standard.

As to the second requirement, that the sale be "for exportation to the United States," the trial court appropriately applied the legal framework established by *E.C. McAfee*, 842 F.2d at 319. APPX0048. "[W]hether merchandise is sold 'for exportation to the United States' [is] based on a fact-specific inquiry that requires case-by-case analysis;" indeed, the court must consider "the reality of the transaction" in question in making its determination. *Id.* (citing *E.C. McAfee*, 842 F.2d at 319). A sale is for exportation to the United States when the merchandise was "clearly destined for the United States at the time of the sale." *Id.*

Subsequent decisions by this Court reflect examples of the proper application of the law. In *Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505

(Fed. Cir. 1992), for example, this Court applied the legal framework of *E.C. McAfee* in considering a three-tiered transaction involving a Japanese manufacturer, Japanese distributor, and a U.S. customer. *Id.* at 506. The question presented in *Nissho Iwai* was whether the sale from the Japanese manufacturer to the Japanese middleman was a valid sale "for exportation to the United States" under the statutory definition of transaction value. *Id.* at 506-08 (quoting 19 U.S.C. § 1401a(b)(1)). Applying *E.C. McAfee*, this Court in *Nissho Iwai* considered whether merchandise was "clearly destined for export to the United States" at the time of the sale. *Id.* at 509. That Court held that the sale satisfied the statutory requirements because the merchandise (subway vehicles ordered by the MTA) was "manufactured for a specific United States purchaser," and was "*unquestionably intended* 'for exportation to the United States' [with] . . . no possible alternative destination." *Id.* (emphasis added). Here, the trial court applied the same legal standard, and reached a similar result.[3]

---

[3] Although many of the Federal Circuit cases analyzing this issue, *E.C. McAfee*, *VWP* and *Nissho Iwai*, considered *which* sale, in a three-tiered transaction (manufacturer, middleman, customer), should form the basis of transaction value, the same threshold analysis applies initially to each individual transaction. The choice between two sales, both of which constitute sales "for exportation to the United States" need not be considered on these facts. Indeed, the first sale in the three-tiered transaction here (from the Chinese supplier to Midwest) cannot meet the statutory test for transaction value – a fact to which the parties agree. Blue Br. at 5. Indeed, the merchandise in that sale was "clearly destined" for "export to Canada," when it was warehoused until a sale was made by Midwest; it was not yet sold "for exportation to the United States." *Id.*

The trial court committed no error, let alone clear error, in applying the law to the facts. Specifically, the trial court found that when Midwest's sales representatives accepted sales orders in the United States, its merchandise (manufactured in China) was stored in facilities in Canada. APPX0048. These sales orders, the court noted, were transmitted electronically, and first accessed by Midwest's order processing department in Canada. *Id.* Employees in Canada confirmed availability of the merchandise, which was then collected, packaged and prepared for shipment to U.S. customers. *Id.* The court further found that the merchandise was transported from Canada to a warehouse in Buffalo, and ultimately to domestic carriers for delivery to Midwest's U.S. customers. APPX0049. Based on these facts, the court concluded "that the reality of the transaction establishes that the subject merchandise was based in Canada at the time of sale, [and] was clearly destined for the United States at the time of sale." *Id.* Indeed, from the time the order was placed until the merchandise entered into the United States, it was "clearly destined for export to the United States," to the specific U.S. customer who paid an agreed price for that merchandise. *Nissho Iwai*, 982 F.2d at 509; *see supra* at 6-12.

Therefore, the court properly concluded that "plaintiff's sales of the subject merchandise were for exportation to the United States under 19 U.S.C. 1401a(b)(1)." APPX0049

**B. Midwest's Interpretation Of 19 U.S.C. § 1401a Is Not Supported By The Law**

Midwest interprets the statutory requirement – sale "for exportation to the United States" 19 U.S.C. § 1401a(b)(1) – as requiring an "international sale of goods." Blue Br. at 29-30. Specifically, Midwest argues that the sale of the merchandise was made between U.S. entities, and that Midwest chose specific shipping terms so that it maintained the risk of loss until the merchandise arrived in the United States. *Id.* at 27-30. Midwest further argues that the delivery terms "FOB Buffalo, New York" show that the sales were domestic and not international. *Id*. at 30-36. Midwest relies heavily on the trial court's holding in *Orbisphere* for its analysis. *Id.* at 36-41. This interpretation of the statute is not supported by the law.

**1. An International Sale Is Not Required To Apply The Transaction Value Method Of Appraisement**

Midwest's interpretation of the value statute – that an international sale is required to find that a sale is "for exportation to the United States" and, thus, to apply the transaction value method of appraisement – is "contrary to existing law." APPX0053.

In *VWP*, 175 F.3d 1327, this Court considered a three-tiered transaction that involved a Canadian manufacturer that sold goods to its U.S. subsidiary, which then resold those goods to U.S. customers. Although the *VWP* Court held that the

33

sales between the Canadian manufacturer and the U.S. subsidiary were sales for

exportation to the United States (that may serve as the basis of transaction value),

the *VWP* Court further held that "sales between the United States distributor and its

domestic buyers could provide an alternative basis for transaction value."

APPX0053 ((citing *VWP*, 175 F.3d at 1334) (holding that if the sale from the

Canadian company to the U.S. company were not a sale for exportation to the U.S.

"the transaction value must be based upon sales by VWPA [a U.S. company] to its

U.S. customers.")).  As reflected by this holding, the valuation statute does not

require an international sale to apply the transaction value methodology.

Midwest fails to show that the trial court's holding is contrary to law, nor

can it.  Indeed, the holding of *VWP*, and the conclusion here, is further supported

by *La Perla Fashions, Inc. v. United States*, 9 F. Supp. 2d 698 (Ct. Int'l Trade

1998), *aff'd without opinion*, 185 F.3d 885 (Fed. Cir. 1999).  That case involved

another three-tiered transaction – an Italian manufacturer, a New York distributor

and a U.S. customer.  9 F. Supp. 2d at 699-700.  The court found that the price for

the sale between the Italian manufacturer to the New York distributor could not be

the basis for transaction value, and subsequently held that the transaction value

"*can only be* based on" the price of the transaction from the New York distributor

to its U.S. customer.  *Id.* at 704 (emphasis added).  The second transaction

occurred between two U.S. entities, and does not reflect an international sale.  This

is another example showing that an international sale is not required to apply the transaction value method of appraisement.

We agree with Midwest's argument that this Court should not adopt the standard articulated by the trial court in *Brosterhous, Coleman & Co. v. United States*, 737 F. Supp. 1197, 1199 (Ct. Int'l Trade 1990), and overruled by this Court in *Nissho Iwai*, 982 F.2d at 511. Blue Br. at 41-42. In that case, the trial court considered the sale that "most directly caused the exportation" in determining how transaction value should be calculated when choosing between two valid sales (often in a three-tiered transaction between manufacturer, distributer, customer), both of which satisfied the requirements of transaction value. *Brosterhous*, 737 F. Supp. at 1199. The facts of *Brosterhous* are not present here – the record lacks two valid sales that satisfy the statutory requirements – and more significantly, this Court displaced the *Brosterhous* test in *Nissho Iwai*, 982 F.2d at 511. In considering whether any transaction is "for exportation to the United States," the law as articulated by *E.C. McAfee* and *Nissho Iwai* is the governing legal standard. The facts at the time of sale are considered to determine whether the merchandise was "clearly destined for the United States." *E.C. McAfee*, 842 F.2d at 319; *Nissho Iwai*, 982 F.2d at 509; APPX0048; *see also* APPX0072. The facts of this case satisfy that test.

35

## 2. The Method of Shipment Is Not Dispositive Evidence Of The Statutory Standard

Midwest argues that the use of the shipping terms "FOB Buffalo, New York" shows that the sales in question were domestic sales that do not satisfy the statutory requirements that goods be sold "for exportation to the United States." Blue Br. at 30-36.  The trial court properly held to the contrary.  APPX0055-56 ("[T]his court does not consider the existence of the delivery term 'FOB Buffalo, New York' to be dispositive evidence that sales of the subject merchandise were domestic and not for exportation to the United States."); APPX0072 (noting that disagreement as to place of sale is "not dispositive of whether the sales were 'for exportation to the United States.'")  And, Midwest fails to show error in the trial court's determination.

Midwest, instead, discusses, at length, the meaning of the shipping term FOB. – free on board, Blue Br. at 30-36 – which the trial court noted (and the Government agrees) denotes a "method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of losses passes from seller to buyer."  APPX0054 (citing *Litecubes, LLC v. N. Lights Prods., Inc.*, 523 F.3d 1353, 1358 n.1 (Fed. Cir. 2008)); *see also* "FOB Free on Board," Incoterms 2010 Edition, International Chamber of Commerce.

However, as the trial court properly held, these shipping terms are not dispositive of the question.  If they were, an importer could effectively circumvent

the parameters of 19 U.S.C. § 1401a by selecting a particular method of shipment, which is not how Congress intended the valuation statute to operate. " *See* APPX0655 (admitting that Midwest "intentionally structure[d]" the transaction in an effort "to ensure that there was no sale of the goods 'for exportation to the United States' and that no basis would exist for appraisement under 'transaction value.'")

Instead, the facts and analysis of *VWP* and *La Perla* support the trial court's conclusion. As discussed above, in *VWP,* the Canadian manufacturer sold fabrics to the U.S. distributor, who sold these fabrics to U.S. customers. For the time relevant to the Court's analysis, the shipping terms involved in the sale of the foreign goods from the U.S. distributor to the U.S. customer were "FOB Jackman, Maine, or other *U.S. port of entry*." *VWP*, 175 F.3d at 1331 (emphasis added). Despite this fact, the Court held that this sale could be an alternative basis for transaction value – *i.e.* that it satisfied the statutory requirements for transaction value – even though the seller maintained the risk of loss until the merchandise arrived in the United States. *Id.* at 1334. The method or terms of shipment did not factor into the Court's analysis. *Id.*

The trial court, and this Court, made a similar determination in *La Perla*, which involved an Italian manufacturer, a New York distributor and a U.S. customer. In that case, the "terms of sale between La Perla [New York] and its

U.S. customers were delivered *at customer's premises, duty-paid*."  9 F. Supp. 2d

at 700 (emphasis added).  Plaintiff in *La Perla* made an argument similar to the

one being made here, that the sale to the U.S. customer was simply a domestic sale

that could not form the basis of transaction value.  *Id.*  The trial court disagreed,

holding that when the court cannot use the price from the Italian manufacturer to

the U.S. distributor, the transaction value can only be based on the price of the

transaction from *La Perla* (New York) to its U.S. customer.  *Id.* at 704.  The

holding of the trial court was affirmed by this Court.  *See* 185 F.3d 885.  Again, the

delivery terms did not factor into the Court's analysis.

Moreover, Midwest's characterization of the shipment of the merchandise

from Canada to Buffalo as a "consignment" is not supported by the plain meaning

of that term.  *See e.g.,* Blue Br. at 27 ("The bill of lading and other documents

accompanying the goods from Canada to the United States confirm that the

shipment is a mere consignment, from one Midwest (storage) location to another

(delivery) location . . . ."); *id.* at 31 ("[T]he *pro forma* invoice shows that the

merchandise is exported from the Woodbridge warehouse on consignment to

Midwest at an address in Buffalo . . . ." ).  A "consignment," however, involves the

transfer of merchandise to another party ***without a sale,*** so that the other party can

effectuate a sale on behalf of the original transferor or hold the merchandise for the

transferor.[4] Here, the transportation of the goods from Canada to the United States is not a consignment but part of the shipment of the goods from Midwest, in Canada, to the U.S. customers (to which it is labeled for delivery) in fulfillment of a sale already executed.

Therefore, despite Midwest's attempt to "intentionally structure[]" its transaction to avoid the use of the transaction value method of appraisement, APPX0655, the method of shipment cannot change the "reality of the transaction," *E.C. McAfee*, 842 F.2d at 319 – that the sales in question are "for exportation to the United States." *See* 19 U.S.C. § 1401a(b)(1).

### 3. The Court Should Not Apply *Orbisphere*

Midwest relies on the trial court's decision in *Orbisphere*, 726 F. Supp. 1344 to argue that there is no sale "for exportation to the United States." Blue Br. at 36-41. Specifically, Midwest claims that the trial court in *Orbisphere* established the principle that "where goods move to the United States on consignment, or in a transfer between two of the sellers' facilities, there is no sale of goods 'for

---

[4] A "consignment" is "the act of consigning goods to one who will sell them for the owner or transport them for the owner." APPX1000; *see* Black's Law Dictionary, 11th Ed., APPX1007 (defining "consign" as "**1.** To transfer to another's custody or charge. **2.** To give (goods) to a carrier for delivery to a designated recipient. **3.** To give (merchandise or the like) to another to sell, usu. with the understanding that the seller will pay the owner for the goods from the proceeds.") Black's Law Dictionary defined a "commercial consignment" as one "made by a merchant who delivers goods to another for the purpose of sale, lease, or other disposal when both parties deal in goods of that kind in the ordinary course of business. APPX1006.

exportation to the United States' and no transaction value can be determined . . . ." *Id.* at 36. Here, the trial court considered and rejected these arguments, holding that the sales at issue were "for exportation to the United States," and that the analysis in *Orbisphere* should not be applied. APPX0050-53; APPX0068-71. Midwest fails to identify any error in the trial court's analysis.

The trial court in *Orbisphere* relied heavily on *United States v. Massce & Company*, 21 CCPA 54 (1933), a decision issued by the Court of Customs and Patent Appeals that analyzed a predecessor version of the value statute. *Orbisphere*, 726 F. Supp at 1348-57. Because of its reliance on *Massce* (and its interpretation of a predecessor value statute), the court in *Orbisphere* held, incorrectly, that the use of transaction value "depends substantially upon where the sales of the merchandise are deemed to have occurred." *Id*. at 1348.

Specifically, the court in *Orbisphere* defined "export value" (under the predecessor statute) as:

> the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise *is freely offered for sale to all purchasers* **in the principal markets of the country from which exported**, in the usual wholesale quantities and in the ordinary course of trade, **for exportation to the United States** . . . .

*Id.* at 1349 (quoting Section 402(d), Tariff Act of 1930) (emphasis added).

Moreover, the court in *Orbisphere* defined "United States value" (again, under the

predecessor statute) as:

> the price at which such or similar imported merchandise
> *is freely offered for sale*, packed ready for delivery **in the**
> **principal market of the United States** to all purchasers,
> at the time of exportation of the imported merchandise, in
> the usual wholesale quantities and in the ordinary course
> of trade, with allowance made for duty, cost of
> transportation and insurance . . .

*Id.* at 1349-50 (quoting Section 402(a)(3), Tariff Act of 1930) (emphasis added).

Quoting *Massce,* the court in *Orbisphere* noted that "where offers of sale,

agreements to sell, and sales are all made in the United States, and none in a

foreign country, there cannot be an *export value* of the exported merchandise . . . ."

*Orbisphere*, 726 F. Supp. at 1350 (emphasis added) (quoting *Massce*, 21 CCPA at

60).

The trial court correctly rejected the application of *Orbisphere* to the facts of

this case. APPX0052. As the trial court observed, the predecessor value statute

did not consider "transaction value" and "deductive value," at issue in the current

statute, but rather considered "export value" and "United States value," two very

different terms. APPX0052-53; *see also* Section 402(d), Tariff Act of 1930. As

the plain language of the current version of the value statute makes clear, the

location of the transaction or sale is no longer relevant under the current statute.

Indeed, "export value" was "abandoned . . in favor of transaction value."

APPX0052 (*citing* Trade Agreements Act of 1979, Pub. L. No. 96-39, 201(a), 93

State 144, 194-201 (1979)).

To be sure, "the language of the current statute does not expressly require

that a sale be international or occur abroad," and, as the trial court appropriately

observed, the "1979 revision removed all references to foreign markets in which

merchandise might be traded." APPX0052. The Senate Committee on Finance, in

its report on the Trade Agreements Act of 1979, specifically acknowledged the

statutory change:

> The use of transaction value as the primary basis for
> customs valuation will allow the use of *the price which
> the buyer and seller agreed to* in their transaction as the
> basis for valuation, rather than having to resort to more
> difficult concepts of 'freely offered,' 'ordinary course of
> trade,' 'principal markets of the country of export" and
> 'usual wholesale quantities' contained in existing U.S.
> law.

APPX0052-53 (*citing* S. Rep. No. 96-249, 96th Cong. 1st Sess. at 119 (1979)).

This Court did as well. APPX0053 (citing *Generra Sportswear Co., v United

States*, 905 F.2d 377, 381 (Fed. Cir. 1990) and *VWP*, 175 F.3d at 1334-35 (noting

that the use of transaction value was a departure from the complex concept of

export value)).

Put simply, transaction value "is based on the price paid for the merchandise

to or for the benefit of the seller." *Moss Mfg. Co. v. United States*, 896 F.2d 535,

539 (Fed. Cir. 1990). And, as this Court in *Generra* noted, the "straightforward approach [of section 1401a(b)] is no doubt intended to enhance the efficiency of Customs' appraisal procedure; it would be frustrated were we to parse the statutory language in the manner, and require Customs to engage in the formidable fact-finding task, envisioned by [appellant]." *Generra*, 905 F.2d at 380 (internal citations and quotation marks omitted). Therefore, the trial court's refusal to apply *Orbisphere* to this case is correct.

\* \* \*

In short, a determination as to whether a sale is "for exportation to the United States" is "a fact-specific analysis of the reality of the transaction," APPX0054, and should consider whether the merchandise in that sale was "clearly destined for the United States at the time of [the] sale in question." APPX0048. Here, "the undisputed evidence [– none of which Midwest challenges – ] establishes that at the time of sale when customers in the United States placed orders electronically with [Midwest's] . . . sales representatives, the subject merchandise was located in Canada and was shipped from the Canadian Warehouse to customers in the United States." APPX0054. Therefore, as the trial court correctly held, the statutory requirements for using the method of transaction value to appraise the merchandise have been met.

**III.    THE TRIAL COURT'S HOLDING THAT THE SUBJECT ENTRIES DID NOT LIQUIDATE BY OPERATION OF LAW SHOULD BE AFFIRMED BECAUSE CBP PROPERLY EXTENDED THE TIMEFRAME FOR LIQUIDATION**

CBP extended the timeframe to liquidate the entries of this case either two or three times.  APPX0806-998.  The trial court properly held that CBP's decisions to extend the relevant liquidation deadlines "were in accordance with the law" and the subject entries were not "deemed liquidated by operation of law."  APPX0057. That decision should be affirmed.

**A. The Trial Court Properly Interpreted And Applied 19 U.S.C. § 1504(b)**

Pursuant to 19 U.S.C. § 1504(a), merchandise entered into the United States for consumption, which is "not liquidated within one year of entry, [is] 'deemed liquidated' by operation of law at the duty rate asserted by the importer at the time of entry."  APPX0057 (citing 19 U.S.C. § 1504(a)).  Customs, however, can extend the deadline for liquidation, for a period of one year, either at the request of the importer of record or if additional information is needed for the proper appraisement or classification of the imported merchandise or for ensuring compliance with applicable law, among other reasons.  APPX0057; 19 U.S.C. § 1504(b); 19 C.F.R. § 159.12(a)(1).  According to the applicable statute and regulation, up to three, one-year extensions can be obtained.  19 C.F.R. § 159.12(a), (d) & (e).  After four years, though, if Customs has not liquidated an

entry, it will liquidate by operation of law.  19 U.S.C. § 1504(b); 19 C.F.R. § 159.12(f).

This Court reviews a decision by CBP to extend the timeframe for the liquidation of the entries under the abuse of discretion standard of review.  *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 768 (Fed. Cir. 1993) ("Customs may for statutory purposes . . . employ up to four years to effect liquidation so long as the extensions it grants ***are not abusive of its discretionary authority***.") (emphasis added); *Ford*, 157 F.3d at 855 (emphasis added) ("The Court of International Trade can only rule an extension improper if Customs abused its discretion."); APPX0057-62.[5]  According to this Court, "[s]uch an abuse of discretionary authority may arise only when an extension is granted even following elimination of all possible grounds for such an extension" leaving only "a narrow limitation on Customs' discretion to extend the period of liquidation." *St. Paul Fire & Marine*, 6 F.3d at 768.

As this Court has held, in evaluating CBP's decision, the court "must accept the fact that Congress has directed the Court of International Trade to presume that

---

[5] Midwest challenged the standard of review for this claim before the trial court. APPX0058-59.  The trial court properly held that that CBP's decisions regarding liquidation extensions are reviewed for arbitrariness and abuse of discretion, and whether Customs acted in accordance with the law.  APPX0057-62 (citing *Int'l Fid. Ins. Co. v. United States*, 227 F. Supp. 3d 1353, 1362 (Ct. Int'l Trade 2017), among others).

Customs' decisions are correct and that it is [Midwest's] burden to prove otherwise." *St. Paul Fire & Marine*, 6 F.3d at 768 (citing 28 U.S.C. § 2639(a)(1)); *see also Ford*, 157 F.3d at 855. The trial court properly concluded, based on the relevant facts, that Midwest failed in this showing. APPX0062 (The facts do "not support a conclusion that Customs abused its discretion or acted contrary to law . . . .").

As the undisputed facts show, CBP did not act contrary to law or abuse its discretion in extending the timeframe for liquidation because it needed additional information to properly assess the merchandise and ensure Midwest's compliance with the law. As we explain below, during the time period in which the extensions were sought, CBP was collecting and reviewing information from the importer, conducting a Quick Response Audit to determine the proper basis of appraisement of the merchandise, and thereafter determining a methodology for calculating transaction value when the necessary information was not provided. *See supra* at 12-17. The critical facts are undisputed.

Here, CBP had to review and consider all information provided by Midwest, and ensure that (1) the proper basis of appraisement was being applied (here transaction value) – a task performed by the Office of Regulatory Audit; and (2) that the methodology for assessing transaction value (here using a percentage uplift from entered value), was proper – a task led by Import Specialists at the Port of

46

Buffalo.  *Id.*  During this process, CBP ensured that all steps were completed in compliance with both statute and regulation.  *Id.*

The audit report addressed only the basis of appraisement, in accordance with the scope of the Quick Response Audit, APPX0734-735; APPX0224-244, and does not reflect the entirety of the analysis being conducted or the work that was completed prior to liquidating the entries.  After completion of the audit process, CBP was required to effectuate the liquidation of all 562 entries.  APPX0734-735.  However, CBP personnel at the port responsible for setting the appraised value of the merchandise under 19 U.S.C § 1500 had no basis for liquidating the merchandise until the proper basis of appraisement was determined by the Office of Regulatory Audit.  APPX0734.

As set forth above, determining the proper basis of appraisement was difficult, and required document review, analysis, as well as approval and verification of the workpapers and audit report by a number of different groups within CBP.  *See supra* at 12-17; APPX0731-735.  A review of the sample transaction provided by Midwest was conducted by the auditors on July 12, 2014 and fieldwork was not concluded until October 14, 2014.  APPX0733.  Thereafter, as the trial court noted, both the workpapers and the audit report underwent substantial review by other members of Regulatory Audit, the Assistant Field

Director, Report Referencing Review and members of Field Quality Assurance Program.  APPX0732-734; APPX0061.

Specifically, the workpapers, which are detailed documents, *see* APPX1067-1146, were reviewed by the Assistant Field Director and a senior auditor, and, as the trial court further noted, an audit document review sheet was prepared to ensure their accuracy and completeness; this process was completed by December 1, 2014.  APPX0732-734; APPX0061.  Then, an audit report review sheet was prepared by the Assistant Field Director, a process completed by March 10, 2015, the purpose of which is to ensure accuracy of the report and its compliance with applicable accounting standards.  *Id.*  Subsequent review of the report was then conducted by Report Referencing Review and the Field Quality Assurance Program; both reviews were completed by April of 2015.  *Id.*  Work on the report, however, continued by Regulatory Audit, in conjunction with the Field Quality Assurance Program into June of 2015.  APPX0732-734.

Although the Import Specialists began the process of establishing a methodology to calculate transaction value (without invoices) in 2015, absent the final Audit Report, the Import Specialists did not have all of the requisite information to appraise the merchandise.  APPX0734.  Ultimately, the Port of Buffalo utilized information obtained by the auditors to calculate transaction value by using the uplift formula previously described.  APPX0734-735.  Liquidation,

48

then, required re-opening entries and re-appraising every line item for all 562

entries at issue in this litigation.  The final audit report was issued on February 24,

2016, APPX0224-244, and notices of action were issued shortly thereafter, on

March 28, 2016 and April 6, 2016.  APPX0257-267.  Between April and October

2016, CBP appraised and liquidated all entries at issue.  *See supra* at 18.  Notably,

on April 15, 2016, when it received the notice of action, and in acknowledgment

that the entries had not yet liquidated by operation of law, Midwest asked that CBP

extend the liquidation and "permit the submission of data necessary."  APPX0269-

277.  Liquidation was properly extended so as to effectuate the proper appraisal of

the merchandise.

Thus, as the trial court correctly concluded, "Customs had a reasonable basis

for extending liquidation in order to complete the audit process, ensure its

accuracy, and comply with established standards," and therefore, "Customs acted

in accordance with the law and did not abuse its discretion."  APPX0062.  The

court held that "the subject entries should not have been deemed liquidated by

operation of law pursuant to 19 U.S.C. § 1504(a)(1)."  *Id.*

## B. Midwest's Interpretation Of 19 USC § 1504(b) Is Not Supported By The Law

Midwest makes a number of arguments, none of which show an error in the

trial court's analysis or an abuse of discretion in CBP's decision-making.

First, Midwest argues that Customs had no basis to extend the liquidation of entries after June 14, 2014 because, in Midwest's view, Customs had in its possession "the information needed" for the appraisement of Midwest's entries. Blue Br. 18, 21, 24.  Moreover, Midwest argues, "[a]t that point the statutory condition for further extensions had disappeared," *id.* at 24, and CBP had no discretion under 19 U.S.C. § 1504(b) to extend liquidation.  *Id.*  As the trial court properly held, Midwest is wrong. APPX0062.

CBP's discretion does not terminate, as Midwest contends, simply because an importer provided what it believes to be sufficient information to liquidate. Rather, liquidation can be extended if CBP does not have "the information needed for the proper appraisement or classification" or to ensure compliance with the law. 19 U.S.C. § 1504(b).  In the words of the trial court, "[t]here is no statutory ambiguity in Customs' discretion to determine how to best collect import duties or extend liquidation deadlines."  APPX0059; *see also St. Paul Fire & Marine*, 6 F.3d at 768 (citing 19 U.S.C. § 3).

Importantly, as the trial court acknowledged, the statutory term "information" under 19 U.S.C. § 1504(b) includes, not just information received from an importer, but "whatever is reasonably necessary for proper appraisement or classification of the merchandise involved."  APPX0060 (quoting *Detroit Zoological Soc'y v. United States*, 630 F. Supp. 1350, 1356 (Ct. Int'l Trade 1986)).

Indeed, in acquiring the necessary information, "Customs is not limited to information provided by the importer and may seek additional information internally." APPX0060; *see also Ford*, 157 F.3d at 856 ("[T]he statute does not require that information justifying a delay must come *from the importer*. A need for internal information from other Customs personnel might also satisfy 1504(b)(1) (emphasis in original); *Zoological Soc'y*, 630 F. Supp. at 1356 ("An extension of liquidation is . . . justified . . . if additional time is needed to obtain the internal advice and to consider it before making the classification decision."). Section "1504(b)(1) should be construed sufficiently broadly for Customs to perform its obligations in a competent manner." APPX0060 (quoting *Int'l Cargo*, 779 F. Supp. at 179). That Midwest had last provided information in June of 2014 is not dispositive of whether CBP had all of the information necessary to liquidate at that time or whether it had the discretion to extend liquidation beyond that point.

## C. The Undisputed Facts Show That Customs Did Not Abuse Its Discretion In Extending Liquidation

Midwest argues that "[m]ere lassitude, or prolonged internal deliberations, do not provide a basis for extending the liquidation period." Blue Br. at 23. But those circumstances do not exist for this case. As the trial court correctly held, "[w]hile extensions solely for the purpose of excusing or facilitating prolonged periods of inaction or actions unrelated to appraisement might be an abuse of discretion, *see Ford*, 157 F.3d at 855–57, the record reflects that Customs was

actively engaged throughout the audit process in collecting and reviewing the information needed to determine the proper method of appraisement." APPX0062. The trial court's review of the record evidence is correct, and Midwest fails to show any error by the trial court or an abuse of discretion by CBP.

Next, Midwest argues that the extensions were an abuse of discretion because CBP's calculation of transaction value was based on information provided in April 2014 (financial statements). Blue Br. at 21, 23, 25. Not so. As the trial court properly observed, "[t]he fact that Customs' final determination and calculations appear to be based mainly on information obtained early in the audit process does not support a conclusion that Customs abused its discretion" when it granted extensions in order "to collect information, to confirm the accuracy of that information, or to verify the appropriateness of the application." APPX0062. Again, Midwest fails to show any error by the trial court or an abuse of discretion by CBP.

Finally, Midwest claims that CBP did not need a final audit report before re-liquidating and that, in any event, CBP disregarded the results of the final report because CBP did not consider the actual prices paid by Midwest's U.S. Customers (which is a traditional calculation of transaction value). Blue Br. at 21, 23. Midwest is wrong. The final audit report identified the proper basis of appraisement – transaction value. But more was needed by CBP to properly assess

the merchandise.  The import specialists could not conduct a standard calculation of transaction value (based on the actual sale to the customer) without the invoices that Midwest issued to its U.S. customers and the information necessary to match the invoice to the line item on each of the 562 entry documents.  Midwest did not provide this information to CBP.  APPX0734-735.  Therefore, CBP calculated transaction value for each entry using Midwest's 2013 financial records.  *Id.*; APPX0274-277.[6]

As the undisputed record shows, CBP was collecting and reviewing information from the importer, conducting a Quick Response Audit to determine the proper basis of appraisement, and thereafter determining a methodology for calculating transaction value.  Accordingly, the extensions of liquidation were necessary and proper by CBP to properly assess the merchandise, and Midwest fails to show any error by the trial court or an abuse of discretion by CBP.

---

[6] Specifically, CBP deducted certain amounts from Midwest's total U.S. sales for the relevant year, and subtracted the total entered value to determine the percentage that each entry was undervalued.  APPX0734-735.  In doing so, CBP identified a formula to arrive at the transaction value, which consisted of a percentage uplift to be added to the entered value for all entries.  *Id.*; APPX0274-277.  This portion of CBP's calculation is not before the Court on appeal.  In order to obtain a final judgment from the trial court to appeal the holdings with respect to Phase One of these proceedings, Midwest conceded the issues involving Phase Two, which includes this portion of the calculation.

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the judgment of the trial court.

Respectfully submitted,

*Of Counsel:*

EMMA TINER
*Attorney*
*Office of Assistant Chief Counsel*
*U.S. Customs and Border Protection*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

PATRICIA MCCARTHY
*Director*

JUSTIN R. MILLER
*Attorney-In-Charge*

MONICA P. TRIANA
*Senior Trial Counsel*

BRANDON KENNEDY
*Trial Attorney*
*International Trade Field Office*
*U.S. Department of Justice*
*26 Federal Plaza, Room 346*
*New York, NY 10278*
*(212) 264-9232*

Dated:  June 10, 2024
         New York, New York

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*/s/ Monica Triana*

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FEDERAL CIRCUIT RULE 32(b)(3)**

I, Monica Triana, a senior trial counsel in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch, International

Trade Field Office, who is responsible for the foregoing brief, relying upon the

word count feature of Microsoft Word, the word processing program used to

prepare the brief, certify that this brief complies with the type-volume limitation

under Fed. R. App. P. 32(a)(7)(B), and contains 12,307 words.

*/s/ Monica Triana*
MONICA TRIANA