# United States Court of Appeals
# for the Federal Circuit

**MIDWEST-CBK, LLC.**

Plaintiff-Appellant,

*v.*

**UNITED STATES.**

Defendant-Appellee.

Appeal from the United States Court of International Trade,
Consol. Court No. 17-cv-00154, Judge Jennifer Choe-Groves

## REPLY BRIEF OF PLAINTIFF-APPELLANT MIDWEST-CBK, LLC

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

John M. Peterson
 *Counsel of Record*
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Ste. 2602
New York, NY 11229
(212) 635-2730
jpeterson@npwny.com

July 19, 2024

*Attorneys for Plaintiff-Appellant*

**TABLE OF CONTENTS**

PAGE

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

ARGUMENT.........................................................................................1

I.      The Protested Entries Were Deemed Liquidated By Operation of Law Pursuant to 19 U.S.C. § 1504(b) ...................................................1

II.     There is No "Transaction Value" of the Imported Merchandise Under 19 U.S.C § 1401a(b). .......................................................................14

CONCLUSION .................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Am. Capital Corp. v. FDIC*, 472 F.3d 859 (Fed. Cir. 2006)....................................18

*Ashland Chemical Co. v. United States*, 7 C.I.T. 362 (1984)..................................7

*Brosterhous, Coleman & Co. v. United States*, 737 F. Supp. 1197 (Ct. Int'l Tr. 1990) ....................................................................................................19

*Chemsol Inc. v. United States*, 755 F.3d 1345 (Fed. Cir. 2014)........................8, 11

*Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp. Emer. Ct. App. 1982).........................................................................................15

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010) .......................................................................................17

*E.C. McAfee Co. v. United States*, 842 F.23 314 (Fed. Cir. 1988) ........................22

*Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir. 1988) ........ 11, 12, 13, 14

*Freightliner Corp. v. Caldera*, 225 F.3d 1361 (Fed. Cir. 2000)............................18

*George Hyman Constr. Co. v. United States*, 832 F.2d 574 (Fed. Cir. 1987).........18

*Hercules Inc. v. United States*, 516 U.S. 417 (1996) ...........................................16

*J.L. Wood v. United States*, 62 C.C.P.A. 25 (1974) .............................................14

*Kiewit Infrastructure West Co. v. United States*, 972 F.3d 1322 (Fed. Cir. 2020)..............................................................................................................18

*Nissho-Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992).19, 22

*Orbisphere Inc. v. United States*, 726 F. Supp. 1344 (Ct. Int'l Tr. 1989)...20, 21, 22

*R.J. Saunders v. United States*, 42 C.C.P.A 55 (1955)..........................................22

*Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) ......................16

*St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993)....3, 7

*Swan & Finch Co. v. United States,* 190 U.S. 143 (1903) .....................................14

*United States v. 1903 Obscene Magazines*, 907 F.2d 1338 (2d Cir. 1990) ............15

*United States v. Chavez*, 228 U.S. 525 (1913).....................................................15

*United States v. Ehsan*, 163 F.3d 855 (3d Cir 1998).............................................15

*United States v. Getz Bros & Co.*, 55 C.C.P.A. 11 (1967) ....................................22

*United States v. Hill*, 34 F.2d 133 (2d Cir. 1929) ................................................15

*United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933)............................20, 21, 22

*United States v. National Sugar Ref. Co.*, 39 C.C.P.A. 96 (1951).........................15

*United States v. S.S. Kresge Co. et al*, 26 C.C.P.A. 349 (1939)............................22

*VWP of America Inc. v. United States*, 175 F.3d 1327 (Fed. Cir. 1999) ...............14

## Statutes

19 U.S.C. § 1401a ....................................................................................passim

19 U.S.C. § 1504.......................................................................................passim

19 U.S.C. § 3 ................................................................................................ 1

28 U.S.C. § 2639............................................................................................ 8

**Regulations**

19 C.F.R. § 177.9 ................................................... 6

**Other Authorities**

*Customs Headquarters Ruling 275056 of July 1, 2016* ....................................6, 11

*Customs Headquarters Ruling 548273 of April 17, 2003* ......................................16

Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 209, 92 Stat. 888 ................................................... 2

*Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/export (last accessed July 17, 2024) ............................14

S. Rep. 95-778 (May 2, 1978). ................................................... 2

Plaintiff-Appellant, Midwest-CBK, LLC, ("Midwest"), in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure, and the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, hereby submits its reply brief in this appeal.

Defendant-Appellee asserts in their brief that the Trade Court properly found that all aspects of Customs actions regarding the protest at issue were lawful. Plaintiff-Appellant submits, as discussed in discussed herein and in its opening brief, that the Trade Court erred in its findings and that the subject entries were deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504(a).

Should this Court find that the entries were not deemed liquidated, the goods are properly appraised via deductive value, 19 U.S.C. § 1401a(d), as entered, rather than at the arbitrary values used by Customs in liquidation. Further, the Trade Court erred in holding that Midwest's landed, duty paid, domestic sales to its customers—made per the following terms of sale "F.O.B. Buffalo, New York, in accordance with the New York Uniform Commercial Code"—could be used as the basis for calculating a "transaction value" pursuant to 19 U.S.C. § 1401a(b).

## ARGUMENT

### I. The Protested Entries Were Deemed Liquidated By Operation of Law Pursuant to 19 U.S.C. § 1504(b)

The Customs laws of the United States, at 19 U.S.C. § 3, provide that "[t]he Secretary [of the Treasury] shall direct the superintendence of the collection of the

duties on imports as he shall judge best." While broad discretion is conferred by this provision, Customs' discretion is not unlimited.

In 1978, the Congress enacted Section 209 of the Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 209, 92 Stat. 888, which, for the first time, imposed time limits on the Secretary's actions requiring that import entries be liquidated within one year, or else they are "deemed liquidated" at the rate and amount of duties asserted in the entry papers. 19 U.S.C. § 1504(a)(1). The Senate Finance Committee explained that the time limitation was intended to "increase certainty in the customs process for importers, surety companies and other third parties with a liability relating to a customs transaction." S. Rep. 95-778, at 31-32 (May 2, 1978).

The one year limitation on liquidation, however, is not absolute. Congress granted the Secretary conditional authority to extend the liquidation period, but only if certain conditions exist. Thus, 19 U.S.C. § 1504(b), provides:

**(b) Extension**

The Secretary of the Treasury may extend the period in which to liquidate an entry if—

> (1) the information needed for the proper appraisement or classification of the imported or withdrawn merchandise, or for determining the correct drawback amount, or for ensuring compliance with applicable law, is not available to the Customs Service; or

(2) the importer of record or drawback claimant, as the case may be, requests such extension and shows good cause therefor.

The Secretary shall give notice of an extension under this subsection to the importer of record or drawback claimant, as the case may be, and the surety of such importer of record or drawback claimant. Notice shall be in such form and manner (which may include electronic transmittal) as the Secretary shall by regulation prescribe. Any entry the liquidation of which is extended under this subsection shall be treated as having been liquidated at the rate of duty, value, quantity, and amount of duty asserted by the importer of record, or the drawback amount asserted by the drawback claimant, at the expiration of 4 years from the applicable date specified in subsection (a).

This Court has previously observed that Customs' discretion in extending the liquidation of entries is not unbounded, and that abuse of discretion "may arise only when an extension is granted even following elimination of all possible grounds for such an extension. There is, in sum, a narrow limitation on Customs' discretion to extend the period of liquidation." *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 768 (Fed. Cir. 1993) (emphasis added).

One of the two statutory conditions permitting extension of the liquidation period have never existed here. Neither Midwest, its consignees, or agents, requested that the liquidation period be extended.[1] The sole question here is whether, when CBP issued its final extensions of liquidation for plaintiff's entries, the agency

---

[1] While Midwest did request that CBP extend the liquidation of certain entries in 2016, once it became apparent that CBP had selected a wholly arbitrary basis of appraisements, this request was disregarded, and the entries were already in the liquidation process.

lacked "information **needed** for the proper appraisement … of the merchandise." 19 U.S.C. § 1504(b)(1) (Emphasis added).

Midwest submits there were no sales of the merchandise "for exportation to the United States," and thus, the "transaction value" of the imported merchandise, as defined in 19 U.S.C. § 1401a(b), could not be determined. Nor were there any sales of "identical or similar merchandise" to the United States, precluding the appraisement of the goods according to the transaction value of such merchandise, per § 1401a(c). Midwest therefore entered the goods via "deductive value," in accordance with § 1401a(d), and so advised CBP.

In response, CBP initiated a "Quick Response Audit" to determine the proper basis for appraisement of Midwest's entries. During the course of that audit, Customs auditors made numerous requests of Midwest to provide factual information, which Midwest did. The record shows that the auditors took a field visit to Midwest's premises in 2013 and had prepared their analysis of Midwest data **by the end of 2013**. Appx. 1068-1146 ("Prepared by: J. Conrad 12/23/13: Reviewed by J. Baker 12/17/13").[2] The auditors' conclusion was stated at Appx. 1081.[3] Midwest's last submission of information to the auditors occurred in May 22, 2014. Appx.1008-

---

[2] Messrs. Conrad and Baker are Customs auditors.

[3] For reasons unknown, Customs auditors did not transmit the audit work papers to the Import Specialists who would liquidate Midwest's entries for more than a year and half, transmitting them on July 20, 2015. Appx.1067-1068.

1047.[4] At that point, CBP had all the "information" it claims was required to appraise the merchandise in liquidation.

Significantly, Midwest's 2013 financial report, which CBP would use to appraise the merchandise in liquidation, had been provided to the auditors on May 7, 2014. Appx. 340. Yet <u>Customs did nothing for more than a year after the last data was submitted</u>; it did not issue a draft Audit Report for comment until fifteen months after the information had been submitted. Appx. 191-192. During that period, CBP extended, once again, the liquidation of all of Midwest's entries. The draft audit report was issued for comment in July 2015 and therein recommended that Midwest's entries be liquidated on the basis of "transaction value," according to the prices at which Midwest sold the goods, "FOB Buffalo, New York, as provided in the New York Uniform Commercial Code."

During the audit, the Customs auditors asked for, and were provided with, copies of customer invoices for two (2) sample shipments. Appx. 133-136. The Import Specialists who performed the liquidations never requested copies of any customer invoices.

Before this Court, defendant's counsel asserts that Customs last extensions were justified because "determining the proper basis of appraisement was difficult,

---

[4] Counsel's notes reflect a brief telephone call with the auditor on June 14, 2014.

and required document review, analysis as well as approval and verification of the work papers and audit report by a number of different groups within CBP." Government Brief ("Gov't Br."). at 47. However, such internal deliberations hardly constitute "information," and it can hardly said that such work was "needed for the proper … appraisement of the merchandise," 19 U.S.C. § 1504(b)(1), since the values recommended by the auditors were not used in liquidation.[5]

Rather, all of Midwest's entries were liquidated according to a non-statutory "uplift formula" arbitrarily determined by certain CBP Import Specialists at the Port of Buffalo, New York, using Midwest financial data which had been provided to CBP on May 7, 2014—two years before.

In a letter to plaintiff's counsel dated April 25, 2016, Customs Import Specialist Mark Wisniewski, indicated that CBP had appraised plaintiff's merchandise using an arbitrary uplift applied to information dating back to the 2013 financial statement, explaining that the appraisements were:

---

[5] Customs Headquarters issued *Customs Headquarters Ruling H275056 of July 1, 2016*, also recommending that Midwest-CBK's entries be appraised on the basis of "transaction value," as determined from Midwest's FOB Buffalo, New York prices to its customers. Although a Headquarters Ruling "represents the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel," 19 C.F.R. § 177.9(a), the CBP personnel in Buffalo liquidating Midwest's entries completely disregarded that direction as well as the recommendations contained in the audit report (whose issuance supposedly justified the further extension of liquidation of Midwest's entries).

… done from financials [sic] statement (*i.e.,* Income Statement and General Ledger which Midwest-CBK freely provided. From figures provided by Midwest-CBK and using GAAP,[6] an uplift (markup) was determined for entries for calendar year 2013. The uplift was determined to be 123.18% [of entered values].[7]

Appx.274-277. Thus, the liquidation of plaintiff's entries was not at all based on the conclusions of the Audit Report, but rather on an arbitrary "uplift" calculation which Customs based on financial data dating back to 2013.[8]

This Court, in *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763 (Fed. Cir. 1993), noted that, in contesting the appropriateness of a CBP determina-

---

[6] "GAAP" normally stands for "Generally Accepted Accounting Principles," but plaintiff has no idea what accounting principle, if any, was applied in the development of the "uplift" which CBP applied to the entered values of the merchandise at bar. The Trade Court, in *Ashland Chemical Co. v. United States*, 7 C.I.T. 362 (1984), long ago cautioned against the use of arbitrary uplifts in appraising imported merchandise:

> The unsupported addition of twenty percent to the invoice price of the merchandise in question by the Customs Service, because of Hooker New York's failure to supply it with requested information is unreasonable … and it thus clearly erroneous.

In this case, the government does not contend that Midwest failed to provide it with any requested information. Nor has it provided any cogent explanation of how its "uplift" was calculated.

[7] By Customs Form 19 Notice of Action dated August 16, 2016, CBP acknowledged errors in its uplift computation and reduced the uplift percentage to 75.75%. Appx. 315-326.

[8] The uplifts based on the 2013 financial data were used to appraise entries for 2013, 2014, 2015, and 2016.

tion to extend liquidation of an entry, a plaintiff must deal with the statutory presumption of correction that attaches to CBP's liquidation decision. 28 U.S.C. § 2639(a). It is presumed that CBP has made all factual findings necessary to its liquidation decision, and that all CBP determinations merge in liquidation. Indeed, as this Court held in *Chemsol Inc. v. United States*, 755 F.3d 1345, 1350 (Fed. Cir. 2014):

> … liquidation is the "final challengeable event" and "[f]indings related to liquidation," **such as the need for extensions**, "merge with the liquidation." *See Volkswagen of Am., Inc. v. United States*, 532 F.3d 1365, 1370 (Fed. Cir. 2008); *see also* United States v. *Utex Int'l Inc.* [*v. United States*], 857 F.2d 1408, 1410 (Fed. Cir. 1988) ("'All findings involved in a [Customs] decision merge in the liquidation.")

The government asks this Court to hold that the final extensions of liquidation of Midwest's entries are presumed correct, because Customs somehow lacked the audit report "information" necessary to appraise the goods correctly, when in fact **none of the audit information or findings were used in liquidation of the entries**. Plaintiff is at a loss—as should the Court be—to understand how the "need for extensions" based on completion of an audit report is entitled to the statutory presumption of correctness, when the entries were liquidated based on an entirely different basis.

Turning then to the information which *was* used to calculate the liquidated values, the record establishes that CBP had Midwest's 2013 financial information by May 7, 2014, nearly two years before the liquidations occurred. Appx. 340.

Again, there was no basis for CBP's final extensions of liquidation of any of the entries at bar.

The Government's brief spins an elaborate *post-hoc* rationalization of counsel for CBP's final extensions of liquidation of Midwest's entries. Counsel asserts that "the proper basis of appraisement was difficult, and required document review, analysis, as well as approval and verification of workpapers and audit report by a number of different groups within CBP." Gov't Br. at 47. Counsel contends that "a review of the sample transaction provided by Midwest was conducted by the auditors and July 12, 2014 and fieldwork was not concluded until October 14, 2014." It further contends that "absent the Final Audit Report, the Import Specialists did not have all of the requisite information to appraise the merchandise," Gov't Br. at 48, and that, thereafter, "both the workpapers and the audit report underwent substantial review by other members of Regulatory Audit, the Assistant Field Director, Report Referencing Review and members of the Field Quality Assurance Program," *id*. at 47-48. Counsel further avers that "the [audit] workpapers, which are detailed documents … were reviewed by the Assistant Field Director and a senior auditor," and "an audit document review sheet was prepared to ensure their accuracy and completeness." *Id*. at 48. "Then, an audit report review worksheet was prepared by the Assistant Field Director," "the purpose of which is to ensure accuracy of the report and its compliance with applicable accounting standards." *Id* at 48. As noted above, the

audit workpapers had already been reviewed by the Assistant Field Director and a senior auditor **in December 2013.** Appx 1068-1146.

Government counsel's proffered explanation is unavailing because it is untrue and the reasons given, even if true, are immaterial and cannot satisfy the statutory requirements for lawfully extending liquidation. The auditors, while recommending that Midwest's goods be appraised on the basis of the company's "FOB Buffalo, New York" prices to domestic customers, never solicited or reviewed a single entry document containing those prices, and the auditors only requested two (2) sample invoices. Moreover, the auditors' work never contributed a thing to the liquidation of plaintiff's entries.[9] Rather, as the Government admits, the Import Specialists at Buffalo "began the process of establishing a methodology to calculate transaction value[10] (without invoices) in 2015." Gov't Br. at p. 48.

If data being reviewed by Customs is not used to liquidate an entry, the review cannot possibly justify an extension of liquidation. In *Ford Motor Co. v. United*

---

[9] While Customs might have intended to use the results of the audit report to appraise future entries of Midwest's goods, the record is clear that the report did not figure into the appraisement of any of the goods at bar whose liquidation dates were extended.

[10] The Government never offers any explanation for how a value calculated on plaintiff's financial statements, plus an "uplift" alleged to be taken from those financial statements, constitutes a lawful "transaction value." Indeed, the government's final liquidations never considered *any* prices for the sale of the imported goods, specifically the "price actually paid or payable," which is a fundamental element of calculating a transaction value. 19 U.S.C. § 1401a(b).

10

*States*, 157 F.3d 849 (Fed. Cir. 1988), Customs commenced an audit into certain classification matters and claims for duty allowances under subheading 807.00, TSUS. CBP repeatedly extended the date for liquidating Ford's entries pursuant to 19 U.S.C. § 1504(b)(1), ultimately liquidating them with a 25% *ad valorem* duty assessment. Ford challenged the validity of the extensions. Customs asserted that the need for further information, plus an ongoing civil investigation of Ford's imports, justified the extensions. This Court noted that:

> On the other hand, Ford contends that, despite some evidence of need for additional information, Customs did not request any information from Ford after mid-1986. Therefore, Ford argues that Customs' overall time in seeking additional information was unreasonable. Moreover, Ford challenges whether much of the information that Customs might have "needed" was for "appraisement" or "classification," the only type of information that the statute makes relevant to Customs' extension decision. …

*Ford Motor Co.*, 157 F.3d at 855.

Similarly, here, while CBP's auditors claimed that Midwest's merchandise was subject to appraisement of the basis of the "FOB Buffalo, New York" prices charged to Midwest's customers—a view adopted in *Customs Headquarters Ruling 275056 of July 1, 2016,* Appx 246-255—Customs liquidated Midwest's entries without reference to either the audit report or the Customs HQ ruling. Under such circumstances, it cannot be assumed that the audit results were "needed for appraisement," *Chemsol, supra,* 755 F.3d at 1350, as **the data *used for* appraisement** is "the

only type of information that the statute makes relevant to Customs' extension decision." *Ford Motor, supra*, 157 F.3d at 855. Here, the audit data was not *used for appraisement*.

CBP had Midwest's 2013 financial statement—the only information the agency consulted in liquidating plaintiff's entries—no later than May 7, 2014. Appx. 340. Therefore, subsequent extensions of liquidation of Midwest's entries were invalid.

In *Ford Motor,* this Court determined that pretextual excuses for extending liquidation of entries are invalid. Noting that the evidence in that case raised at least a triable issue of fact concerning whether CBP had a legally justifiable basis for extending liquidation of Ford's entries, the Court said:

> Construing the evidence in a light most favorable to Ford, as required on summary judgment, this court acknowledges that Ford has presented sufficient evidence to raise a triable issue of fact about the reasonableness of Customs' delay. The record shows that McNally met with Ford personnel in January 1986, February 1986, and June 1986 before drafting his report, and then again in February 1987. Customs did not meet with Ford after February 1987. A reasonable fact finder could determine that, as of McNally's July 1986 report, Customs had completed most of its work on appraisement and classification issues. Indeed, the July 1986 report made a conclusion—albeit preliminarily—on those issues. Moreover, the total amount at which the entries were eventually liquidated is substantially the same as the amount McNally calculated in his July 1986 report.[11]

---

[11] This conclusion stands in stark contrast to the situation in the instant case, where the appraised values used in liquidation bear no apparent resemblance to the

McNally's deposition testimony does not help Customs show that it acted reasonably. When asked whether he expected additional information on classification and valuation of the entries after his July 1986 report, McNally answered affirmatively. When asked simply what that information was, however, he could not remember. Nor could he recall any specific instances when he requested information from Ford after his 1986 report. Instead, McNally concluded that he must have needed more information because he had waited to liquidate. **This reasoning, of course, is quite circular: Customs delayed because it needed more information yet argues it must have needed more information because it delayed.** Thus, a reasonable fact finder could determine that an additional three years was an unreasonable amount of time to finalize that work and therefore an abuse of Customs' discretion.

On summary judgment, Customs cannot prevail by showing only a need for additional information, because the record shows that Customs identified those needs three years earlier and apparently failed to act. For example, notes from a February 1989 Customs meeting show that McNally still needed to "rectify discrepancies in figures" in the entries. This task relates to "appraisement" and "classification," but McNally had known he needed to perform this task three years earlier. Customs offers no explanation for taking three years to perform this task.

157 F.3d at 855-856 (Fed. Cir 1988) (emphasis added). This case is even clearer:

undisputed evidence shows that, while CBP based its extensions of liquidation on

an asserted need to complete a Customs audit, the fruits of the audit were not used

to appraise the merchandise in liquidation. Rather, Customs based the liquidated

values on data from a financial statement it had received two years before liquida-

tions occurred. There was no lawful basis for the extensions under 19 U.S.C.

---

"FOB Buffalo, New York" prices which the audit report identified as the appropriate basis of appraisement.

§ 1504(b)(1). As this Court noted in *Ford Motor, supra,* a reasonable finder of fact could conclude that Customs took an "unreasonable amount of time to finalize [its] work", and thus committed an abuse of discretion. It follows that plaintiff's entries were deemed liquidated "as entered" on their entry anniversary dates.

## II. There is No "Transaction Value" of the Imported Merchandise Under 19 U.S.C § 1401a(b).

The "transaction value" statute, 19 U.S.C. § 1401a(b), determines dutiable value on the basis of the "price actually paid or payable" in the sale of merchandise "for export to the United States." This not only requires that there be a bona fide "sale" of merchandise, *J.L. Wood v. United States*, 62 C.C.P.A. 25, 33 (1974); *VWP of America Inc. v. United States*, 175 F.3d 1327, 1339 (Fed. Cir. 1999), but that the sale be "for export to the United States." There must be a meeting of the minds on the part of the seller and the buyer, that, as a consequence of the sale, the goods will be sent out of a foreign country to the United States. The term "export" has been defined as "to carry or send (something, such as a commodity) to some other place (such as another country)." *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/export (last accessed July 17, 2024). Over a century ago the Supreme Court declared that "the word 'export' as used in the Constitution and laws of the United States, generally means the transportation of goods from this to a foreign country." *Swan & Finch Co. v. United States,* 190 U.S. 143, 145 (1903). More specifically, the meaning "of exportation is a severance of

goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or other." *Id.* (internal quotation marks omitted). Courts have applied this definition not only in the customs and duties arena, *see e.g.*, *United States v. Hill*, 34 F.2d 133, 135 (2d Cir. 1929); *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717, 719 (Temp. Emer. Ct. App. 1982); *United States v. National Sugar Ref. Co.*, 39 C.C.P.A. 96, 98-101 (1951); *United States v. 1903 Obscene Magazines*, 907 F.2d 1338, 1342 (2d Cir. 1990), but also in other contexts, for example, in the interpretation of a congressional weapons embargo. *See e.g.*, *United States v. Chavez*, 228 U.S. 525, 530 (1913); *United States v. Ehsan*, 163 F.3d 855, 858 (3d Cir 1998).

Accordingly, the definition of "transaction value" requires not merely "exportation," but that there be a "sale for exportation"—that is, the goods must move from one country to another as the result of a contract of sale and a meeting of minds of the contracting parties. The fact of exportation, alone, is insufficient. In negotiating a contract of sale, the parties will necessarily negotiate terms incidental to an international sale—for example, which party will bear responsibility for international freight charges, for the payment of Customs duties, and for Customs clearance. That was not done here.

Not all foreign goods will enter the United States pursuant to a "sale for exportation." In that case, the Tariff Act provides alternate bases on which to appraise

goods for duty assessment purposes, such as deductive value, 19 U.S.C. § 1401a(d), or computed value, 19 U.S.C. § 1401a(e). Once goods have cleared Customs and been entered for consumption—as is the case here—the subsequent resale of such imported goods in a domestic transaction does not create the basis for calculating a "transaction value."

Throughout its history, Plaintiff Midwest-CBK has sold goods to its customers in purely domestic transactions, making delivery at an "F.O.B." point, typically located near the company's inventory site. Midwest and its customers do not negotiate responsibility for international transportation costs, Customs clearance or payment of Customs duties. Indeed, that the goods may be of foreign origin is not a consideration in such sales.

A "sale" of foreign-made goods after the goods have entered the commerce of the United States does not form the basis for calculating a "transaction value." Customs has long recognized this fact. *See e.g.*, *Customs Headquarters Ruling 548273 of April 17, 2003*. Stated another way, the requirement of exportation must be found in the *sale*, which is the product or evidence of a meeting of minds, "either embodied in an express contract or inferred as a fact from the conduct of the parties showing in light of the surrounding circumstances, their tacit understanding." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1370 (Fed. Cir. 2003) (quoting *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996)).

Here, the parties have expressly contracted for Midwest to sell the merchandise to its customers, but only *after* the importation process is completed and the goods have arrived in the United States for delivery "F.O.B. Buffalo, New York" in accordance with the terms of the New York UCC. Such a sale, by Customs' own admission, cannot be a sale "for export to the United States."

Midwest's Terms and Conditions, featured in its catalogue and website offerings, expressly indicates that "Freight charge is in addition to our Buffalo, NY F.O.B. cost. Oversized items might incur additional freight charges." Appx. 184. The invoice to the customer specifically states the terms of sale and delivery: "FOB Buffalo, New York, as defined in the New York Uniform Commercial Code." Appx38-Appx39. These are the terms of sale governing the transaction and they evidence a "meeting of the minds" between Midwest and its domestic customers.

Of course, the meaning of these terms is well-established in the laws pertaining to the sale of goods. The Uniform Commercial Code is explicit in requiring a seller of goods on "FOB" terms to make the goods available to the buyer at the named place and to bear the risks attendant to, and costs of, putting them into the buyer's possession. Delivery to the carrier constitutes delivery to the buyer. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1255 n.2 (11th Cir. 2010),("the use of the term "F.O.B. Savannah" in this case means that Diamond Crystal had the obligation  [**8] to tender the product at its plant in Savannah and

bore the risk of loss for the product until it was tendered.") The facts regarding Midwest's sale of goods to its customers in this case are clear and undisputed.

However, what Customs seeks to do in this case is to rewrite Midwest's contracts of sales to its customers, discarding the UCC terms and inferring an international sales agreement where none exists. The agency has no power to do this, nor to ask this Court to do so.

In other contexts, this Court has declined "to rewrite the contract … and insert words the parties never agreed to." *Kiewit Infrastructure West Co. v. United States*, 972 F.3d 1322, 1330 (Fed. Cir. 2020); *see also, George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987); *Am. Capital Corp. v. FDIC*, 472 F.3d 859, 865 (Fed. Cir. 2006) (explaining that a court "cannot rewrite a contract or insert words to which a party has never agreed"); *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1367 (Fed. Cir. 2000) (rejecting a proffered interpretation of a contract term "because it add[ed] an unnecessary interpretative gloss to the contract language"). Here, Midwest's sales to its customers are purely domestic sales, governed by the New York UCC. Midwest charges its customers New York State sales taxes, or solicits sales tax waivers from them. Midwest's prices are "delivered duty paid" prices, and reflect expenses borne by Midwest, such as international transportation charges and Customs duties, which are not included in any basis of dutiable value set out in 19 C.F.R. § 1401a.

Nor has CBP articulated any basis for deeming Midwest's FOB Buffalo, New York, sales to its customers as being "sales for export to the United States." The "logic" appears to be that "customers agreed to purchase goods in Buffalo, New York, goods were shipped from Canada to the United States to fulfill those sales orders, therefore the sales to the customers must have been the sales which prompted importation of the goods." However, this is nothing more than a re-hash of the rule which CBP formerly applied in identifying "sales for exportation" to the United States, as expressed in in *Brosterhous, Coleman & Co. v. United States*, 737 F. Supp. 1197, 1199 (Ct. Int'l Tr. 1990), a decision this Court explicitly overruled in *Nissho-Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992).

Return, for a moment, to the example cited in plaintiff's Principal Brief, of a Mercedes-Benz car dealership in downtown Buffalo, New York. Customer A visits the dealership and negotiates the purchase of a German-made automobile, to be delivered in a week's time at the dealership's location. Unbeknownst to Customer A, the automobile was previously imported from Germany and is sitting in the dealer's lot in Buffalo. Customer B negotiates the purchase of a similar German-origin vehicle on the same terms, for delivery in a week's time at the dealership location. Unbeknownst to Customer B, his vehicle is, at the time the agreement is concluded, sitting in the lot of another Mercedes dealer in Ontario, and has to be shipped to the United States. By Customs' logic, Customer A's purchase contract is a domestic

one, while Customer B's involves a sale of merchandise "for export to the United States." The law does not countenance this. Rather, it requires that there be a sale of merchandise "for exportation to the United States." The law requires that Customs examine the circumstances of a sales contract, as agreed to by the parties, and to give effect to the parties' expressed intent. In this case, Midwest and its customers have explicitly defined the terms of their sale agreements, leaving no interpretive "gaps" for a court or agency to fill.

The Trade Court for decades looked to the decision in *Orbisphere Inc. v. United States*, 726 F. Supp. 1344 (Ct. Int'l Tr. 1989), to determine whether a sale of merchandise is for export to the United States or not—a decision the lower court declined to apply in this case because it was rested upon precedents decided under an earlier version of the Customs valuation statute, and a case decided thereunder, *United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933). In deciding this appeal, this Court should affirm the logic of these decisions.

*Orbisphere* stands for the principle that where goods move to the United States on consignment, or in a transfer between two of the seller's facilities, there is no sale of goods "for exportation to the United States," and no transaction value can be determined for the goods pursuant to 19 U.S.C. § 1401a. In *Orbisphere*, sales agreements were consummated at the importer's offices in New Jersey. The importer then placed the order for custom-made goods with its manufacturing affiliate in

Switzerland. The terms of delivery, there as here, indicated that "title and risk of loss passes [sic] from seller to the buyer on delivery of the merchandise to the carrier at the F.O.B. point indicated in the invoice."

Resting upon this Court's decision in, *United States v. Massce & Co., et. al.,* 21 C.C.P.A. 54 (1933), the *Orbisphere* court noted that purchase orders had been placed in the United States before the goods were exported from their foreign country of origin, raising the question of where the sales of the product were deemed to have occurred. The Trade Court there held that the sales from *Orbisphere* to its customers were domestic sales, not international sales which could have formed the basis for a transaction value, concluding that "title and risk of loss of the goods passed to the purchasers" in New Jersey, and that the sales were thus domestic, rather than international sales.

While the current valuation statute is different than the one at issue in *Massce,* both dictated that dutiable value be calculated, if possible, on the basis of the price in a sale of goods for export to the United States. As in *Orbisphere*, Midwest accepted orders at its domestic office in Minnesota. As in *Orbisphere,* employees at Midwest's Canadian fulfillment center had no contact with the purchasers.

In *Massce*, the issue was whether there were "sales for export" which would permit the goods to be appraised on the basis of "export value." The facts were similar to those here: United States customers placed orders for custom embroideries

with an office in the United States, received delivery of the embroideries in the United States, and paid for the goods in the United States. The United States customers had no contact with the Swiss factory that made the embroideries. This Court's predecessor noted:

> Where offers of sale, agreements to sell and sales are all made in the United States and none in a foreign country, there cannot be an export value of the exported merchandise involved in such transactions.

*Massce,* 21 C.C.P.A. at 61. The same result should obtain here.

That *Massce* involved an earlier version of the Customs valuation statute is not a sufficient basis for the Trade Court to disregard it, nor to disregard decisions like *Orbisphere* which rest on it. In deciding issues such as what constitutes a "sale for export to the United States" for Customs valuation purposes, this Court has repeatedly looked to, and embraced precedents established under earlier versions of the Customs valuation statute. *See e.g*, *Nissho-Iwai American Corp. v United States,* 982 F.2d 505 (Fed Cir. 1992); *E.C. McAfee Co. v. United States,* 842 F.23 314 (Fed. Cir. 1988); *United States v. Getz Bros & Co.,* 55 C.C.P.A. 11 (1967); *R.J. Saunders v. United States,* 42 C.C.P.A 55, 59 (1955); *United States v. S.S. Kresge Co. et al,* 26 C.C.P.A. 349 (1939).

## CONCLUSION

For the reasons presented herein, and in our principal brief, Plaintiff-Appellant respectfully request that this Court vacate the opinion and judgment of the Trade Court, and remand this matter for proceedings consistent with this Court's opinion.

Respectfully submitted.

 /s/ John M. Peterson
John M. Peterson
  *Counsel of Record*
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

*Attorneys for Plaintiff-Appellant*

July 19, 2024

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify that the foregoing Reply Brief of Midwest-CBK, LLC complies with

the relevant type-volume limitation of the Federal Rules of Appellate Procedure and

Federal Circuit Rules. It was prepared using a proportionally-spaced typeface and

includes 5,728 words.


　　/s/ Richard F. O'Neill　　
Richard F. O'Neill

July 19, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of July 2024, I electronically filed the foregoing

Reply Brief of Midwest-CBK, LLC, with the Clerk of the Court for the United States

Court of Appeals for the Federal Circuit through the Court's CM/ECF system. Par-

ticipants in this case who are registered CM/ECF users will be served by the appel-

late CM/ECF system.

                         /s/ Richard F. O'Neill
                          Richard F. O'Neill

July 19, 2024